UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

CAPITOL RECORDS INC.,
A Delaware corporation, et al.,

                Plaintiffs,

v.                                                                Civil File No. 06-1497 (MJD/RLE)

JAMMIE THOMAS,

                Defendant.

---

**BRIEF OF COPYRIGHT LAW PROFESSORS AS AMICI CURIAE IN SUPPORT OF DEFENDANT**

Amici are scholars at American law schools who teach and write about intellectual property law in general and copyright law in particular. We understand that the Court has recognized a possible error in a jury instruction given in this action, and that it has solicited responses from amici to the following question: "whether the Court committed a manifest error of law in instructing the jury that '[t]he act of making copyrighted sound recordings available for electronic distribution on a peer-to-peer network, without license from the copyright owners, violates the copyright owners' exclusive right of distribution, regardless of whether actual distribution has been shown." We respectfully submit that the correct answer to this question is "yes"—that the Court did commit a manifest error of law in so instructing the jury. Our reasons for reaching this conclusion follow.

# I. The Act of Making Copyrighted Sound Recordings Available for Electronic Distribution on a Peer-to-Peer Network, Without License from the Copyright Owners, Does Not by Itself Violate the Copyright Owners' Exclusive Right of Distribution.

As the United States Supreme Court has reminded us on numerous occasions, the first place to begin in construing a statute is with the relevant statutory language. *See, e.g.*, Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241, 255 (2004) (citing Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450 (2002)). In addition, the Court has stated as recently as this past April that "[t]he 'strong presumption' that the plain language of the statute expresses congressional intent is rebutted only in 'rare and exceptional circumstances.'" United States v. Clintwood Elkhorn Min. Co., 128 S. Ct. 1511, 1518 (2008) (quoting Ardestani v. INS, 502 U.S. 129, 135, 112 S.Ct. 515, 116 L.Ed.2d 496 (1991) (quoting Rubin v. United States, 449 U.S. 424, 430, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981)). In the present case, § 106 of the Copyright Act confers upon copyright owners the exclusive right "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106(3). As we explain below, the plain language of the statutory text, as confirmed by other courts and leading commentators, compels but one conclusion: that merely making a work available to the public, whether over the Internet or otherwise, by itself does *not* constitute a distribution. More precisely, because a defendant "distributes" in violation of § 106(3) only when she actually transfers to the public the possession or ownership of copies or phonorecords of a work, no distribution is effected merely by making a work available for distribution on a peer-to-peer network.

The relevant statutory language is clear, unambiguous, and dispositive. First, the ordinary meaning of the word "distribute," as defined in leading dictionaries, necessarily entails a transfer of ownership or possession from one person to another. *See, e.g.*, FUNK & WAGNALLS NEW 'STANDARD' DICTIONARY OF THE ENGLISH LANGUAGE 734 (1962) (defining "distribute" as "[t]o give out or divide among a number; share or parcel out; allot; dispense; apportion"); III OXFORD ENGLISH DICTIONARY 533 (1933) (defining "distribute" as "to deal out or bestow in portions or shares among a number of recipients; to allot or apportion as his share to each person of a number"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 660 (1993) (defining "distribute" as "to divide among several or many: deal out: apportion esp. to members of a group or over a period of time: ALLOT"). Second, § 106(3) imposes liability only on distributions that meet three additional criteria, namely that the distribution consist of (1) "copies or phonorecords of the copyrighted work" (2) "to the public" (3) "by sale or other transfer of ownership, or by rental, lease, or lending." The first element ("copies or phonorecords of the copyrighted work") requires that the defendant distribute some material object. *See* 17 U.S.C. § 101 (defining copies as "material objects, other than phonorecords, in which a work is fixed," and phonorecords as "material objects in which sounds . . . are fixed"). The second element ("to the public") requires that the distribution be made to members of the general public, i.e., that it constitute a "general publication." *See* 2 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT, § 8.11[A], at 8-148 (2006); *see also infra* pp. 10-14 (discussing the relationship of distributions to publications). Consistent with the dictionary definition of the term "distribute," the third element would appear to require some transfer of possession or ownership from the distributor to a third party.

Merely making copies or phonorecords of a work available to the public, by contrast, would not by itself effect a "sale or other transfer of ownership," or a "rental, lease, or lending," of those copies or phonorecords. Although the act of making copies or phonorecords available may *enable* the public to acquire possession or ownership of the copies or phonorecords, unless and until members of the public actually obtain such possession or ownership the necessary final step for transforming the "making available" into a distribution would be lacking.

The structure of the Copyright Act further counsels against equating "making available" with distribution, because such an equation would tend to render superfluous, or undermine settled interpretations of other, provisions of the Act. For example, the copyright owner's exclusive right to publicly display copies of her work, *see* 17 U.S.C. § 106(5), might become superfluous insofar as a public display necessarily "makes available" the displayed copy to the public for viewing. *See id.* § 101 (defining "display" as "to show a copy of" a work, "either directly or by means of a film, slide, television image, or any other device or process," and "publicly display" as meaning, *inter alia*, to display a work "at a place open to the public"). *See* Knight v. Comm'r, 128 S. Ct. 782, 789 (2008) (describing a proposed—and rejected—statutory interpretation as "render[ing] part of the statute entirely superfluous, something we are loath to do") (quoting Cooper Industries, Inc. v. Aviall Services, Inc., 543 U.S. 157, 166 (2004)). Such an interpretation also might undermine settled case law holding that merely inducing or encouraging another to infringe does not, by itself, constitute an act of infringement, unless and until the party so encouraged actually infringes. *See, e.g.*, Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 936-37 (2005) (stating that "one who

4

distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable *for the resulting acts of infringement by third parties*") (emphasis added); Subafilms, Inc. v. MGM Pathe Comms., Inc., 24 F.3d 1088, 1092 (9th Cir. 1994) (en banc) (stating that there can "be no liability for contributory infringement unless the authorized or otherwise encouraged activity itself could"—and did—"amount to infringement"). By contrast, if merely making a copy of a work available to the public constitutes a distribution, regardless of whether members of the public ever access those copies, copyright owners in some instances would be able to make an end run around these carefully delineated standards for assessing contributory (and other forms of indirect) copyright infringement.

Finally, the "plain meaning" interpretation of § 106(3) is consistent with the views of other respected courts and commentators. Several courts, including the United States Court of Appeals for the Eighth Circuit, have stated that § 106(3) requires an actual distribution. *See* National Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc., 991 F.2d 426, 434 (8th Cir. 1993) (stating that "[i]nfringement of [the distribution right] requires an actual dissemination of either copies of phonorecords") (quoting 2 NIMMER & NIMMER, *supra*, § 8.11[A]); Atlantic Recording Corp. v. Howell, No. CV06-2076-PHX-NWB, 2008 WL 1927353, at *8 (D. Ariz. Apr. 29, 2008) (holding that merely making a work available on a peer-to-peer network did not constitute a distribution); London-Sire Records, Inc. v. Doe 1, No. 04cv12434-NG, 2008 WL 887491, at *7-10 (D. Mass. Mar. 31, 2008) (same); Atlantic Recording Corp. v. Brennan, 534 F. Supp. 2d 278, 281-82 (D. Conn. 2008) (describing the "making available" theory as "problematic"); In re Napster, Inc. Copyright Litig., 377 F. Supp. 2d 796, 802-05 (N.D. Cal. 2005) (holding that Napster

5

did not distribute copyrighted works merely by listing those works in an index of files available for peer-to-peer downloading); Arista Records, Inc. v. Mp3Board, Inc., No. 00 CIV. 4660 (SHS), 2002 WL 1997918, at *4 (S.D.N.Y. Aug. 29, 2002); Paramount Pictures Corp. v. Labus, No. 89-C-797-C.1990 WL 120642, at *4 (W.D. Wis. Mar. 23, 1990); Obolensky v. G.P. Putnam's Sons, 628 F. Supp. 1552, 1555-56 (S.D.N.Y.), *aff'd mem.*, 795 F.2d 1005 (2d Cir. 1986). All three of the leading copyright treatises also agree with this interpretation, in no uncertain terms. See 2 PAUL GOLDSTEIN, GOLDSTEIN ON COPYRIGHT § 7.5.1, at 7:127 (3d ed. 2007) ("Section 106(3) is unequivocal in its requirement that, for the distribution right to be infringed, copies or phonorecords must be distributed"); 2 NIMMER & NIMMER, *supra*, § 8.11[A], at 8-149 ("Infringement of this right requires an actual dissemination of either copies or phonorecords"); 4 WILLIAM PATRY, PATRY ON COPYRIGHT, § 13:9, at 13-13 (2008) ("without actual distribution of copies . . . there is no violation of the distribution right").

## II. The Case Law Equating "Making Available" with Distribution Is, with All Due Respect, Incorrect, and in Any Event Is Not Binding upon This Court.

Amici are aware of decisions from some other courts interpreting § 106(3) in a more expansive fashion. In *Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 199 (4th Cir. 1997), for example, the court appears to have held that a library's merely making an infringing work available to the public for borrowing or browsing constituted an unauthorized distribution, stating:

> When a public library adds a work to its collection, lists the work in its index or catalog system, and makes the work available to the borrowing or browsing public, it has completed all the steps necessary for distribution to the public. At that point, members of the public can visit the library and use the work.

6

*Id.* at 203. More recently, a few other courts have applied the principle articulated in *Hotaling* to conclude that merely making a work available for others to download over a peer-to-peer network may constitute a distribution. *See* A & M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1014 (9th Cir. 2001); Elektra Enter. Group, Inc. v. Barker, Case No. 05-C-7340 (KMK), 2008 WL 857527, at *4-8 (S.D.N.Y. Mar. 31, 2008) (rejecting *Hotaling*, but concluding that some offers to distribute can violate § 106(3)); Motown Record Co., LP v. DePietro, No. 04-CV-2246, 2007 WL 576284, at *3 n. 38 (E.D. Pa. Feb.16, 2007); Arista Records LLC v. Greubel, 453 F. Supp. 2d 961, 967-72 (N.D. Tex. 2006); Warner Bros. Records, Inc. v. Payne, No. W-06-CA051, 2006 WL 2844415, at *3-4 (W.D. Tex. July 17, 2006); Interscope Records v. Duty, No. 05CV3744-PHX-FJM, 2006 WL 988086, at *2 (D. Ariz. 2006). *But see* Perfect 10 v. Google, Inc., 508 F.3d 1146, 1162-63 (9th Cir. 2007) (interpreting the "making available" principle expressed in *Hotaling* and *Napster* not to apply where the defendant merely provided a link to sites hosting infringing content). In support of this interpretation, some either have expressed concern that a contrary interpretation would leave copyright owners with no effective recourse against infringement; or they have understood the legislative history of the 1976 Copyright Act as equating "distribution" with "publication," the latter of which concepts clearly *can* be effected by a mere offer to distribute. With all due respect to the courts that have decided these cases, however, we believe that their analysis is flawed.

First, the concern that the "plain meaning" interpretation will leave copyright owners with no recourse against infringement is generally untrue. In the *Hotaling* case, for example, the defendant allegedly made infringing copies of the plaintiffs' work, but the plaintiffs did not file suit until the statute of limitations period had run with respect to

7

those acts of copying. *See Hotaling*, 118 F.3d at 201-02. On the specific facts of *Hotaling*, therefore, the only way the plaintiffs could proceed with their action for infringement was for some infringing act to have been committed within three years of the filing of the complaint; the only candidate act that could have occurred within that time period was the act of making an infringing copy available to patrons of the defendant's Salt Lake City library. *See id.* at 202-05. As Judge Hall noted in his dissent, however, the Copyright Act confers the exclusive right to "distribute copies . . . of the copyrighted work to the public *by sale or other transfer or ownership, or by rental, lease, or lending*," and to construe the statutory language to mean that a library "lend[s] a work each time a patron consults it" is in serious tension with the express language of the statute. *See id.* at 205 (Hall, J., dissenting) (emphasis in original); *see also* 4 PATRY, *supra*, § 13:9, at at 13-14 to -15 (describing *Hotaling* as "[a] case beyond the outer limits," "a deeply flawed opinion").

More generally, any concern that the "plain meaning" interpretation of § 106(3) will leave copyright owners without any redress for the infringement of their works is misplaced. *See* 4 PATRY, *supra*, § 13:11.50, at at 13-26 (noting that "[c]opyright owners' desire to stop such activity is understandable but there are ways to do so within the statute"). First, a person who makes an unauthorized copy or phonorecord of a copyrighted work, for purposes of uploading it onto a peer-to-peer network, violates the reproduction right, *see* 17 U.S.C. § 106(1), absent an applicable defense such as fair use, *see id.* § 107. Depending on the specifics of the case, that person also may be liable for indirect infringement, to the extent his or her conduct causes others to engage in unauthorized reproduction, adaptation, public distribution, public performance, or public

8

display of another's copyrighted work. *See Grokster*, 545 U.S. at 930-31 & n.9, 936-37 (setting forth standards for contributory infringement, vicarious infringement, and intentional inducement of infringement).[1] Second, the end user who accesses or downloads the unauthorized copy or phonorecord may be liable for direct infringement, depending on the specific facts at issue and on the applicability (or not) of any possible defense, such as fair use. Third, a person who markets products or services that can enable others to infringe or to circumvent technological measures that control or restrict access to copyrighted works may, in an appropriate case, be liable for indirect

---

[1] We express no opinion on whether the person who makes the work available on a peer-to-peer network can be liable for an unauthorized distribution upon proof that another person has downloaded or accessed the work. It may be that, in such a case, an electronic transmission does not effect a distribution of *copies or phonorecords*, which the statute defines as material objects. *Compare* 17 U.S.C. § 101 (defining both copies and phonorecords as "material objects," and also stating that "[t]o 'transmit' a performance or display is to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent"); 2 NIMMER & NIMMER, *supra*, § 8.11[A], at 8-150 (stating that transmissions may constitute performances but not distributions), *with* 17 U.S.C. §§ 112(e)(8), 115(a)(1), 115(d) (referring, for purposes of certain exceptions relating to ephemeral recordings and to nondramatic musical works, to distributions by means of a "digital phonorecord delivery"); *London-Sire Records*, __ F. Supp. 2d at __, 2008 WL 887491, at *11-16 (concluding that electronic transmissions can effect distributions). Opinions also may vary as to whether it may be appropriate, in a civil action, to employ an evidentiary presumption that others have accessed or downloaded a work that has been made available over a peer-to-peer network, or whether instead the copyright owner must provide affirmative evidence of such access or downloading in every instance. Finally, without passing judgment on whether the WIPO Copyright Treaty or the WIPO Performances and Phonograms Treaty should be read as obligating the United States to render unlawful the type of "making available" at issue in the present action, *see* WIPO Copyright Treaty arts. 6(1), 8; WIPO Performances and Phonograms Treaty arts. 12, 14, we note that these treaties, like other intellectual property treaties to which the United States is a party, *see, e.g.*, ITC Limited v. Punchgini, Inc., 482 F.3d 135, 161-62 & n.22 (2d Cir.), *cert. denied*, 128 S. Ct. 288 (2007); Carter v. Helmsley-Spear, Inc., 71 F.3d 77, 83 (2d Cir. 1995), are not self-executing within the United States. *See Elektra Enter. Group*, __ F. Supp. 2d at __, 2008 WL at *6 n.7 (discussing this issue). Some of the other amici curiae who are filing briefs in the instant case may express an opinion on these matters, but for present purposes we have chosen to confine our analysis specifically to the narrow question the court has presented.

infringement, *see id.*, or for violation of the Digital Millennium Copyright Act, *see* 17 U.S.C. §§ 1201(a)(2), (b). Given these various options, there is no "gap" that the court needs to fill by reading the statute to say what it does not say. If ever the plain meaning of a statute should control, this is such a case.

Second, some of the other decisions equating "making available" with distribution have noted certain portions of the legislative history of the 1976 Copyright Act—or case law citing to that legislative history--that might be read as conflating the term "distribution" with "publication." *See Elektra Enter. Group*, ___ F. Supp. 2d at ___, 2008 WL 857527, at * 5 (noting that "the House and Senate Committees that evaluated the [1976] Copyright Act described this bundle of five rights as 'the exclusive rights of reproduction, adaptation, *publication*, performance, and display'") (citing H.R. No. 94-1476, at 61 (1976), and S. Rep. No. 94-473, at 57 (1976)) (emphasis added by court); *Warner Bros.*, 2006 WL at * 3 (citing *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 552 (1985), for the proposition that § 106(3) confers upon copyright owners a right of first publication). These courts then reason that, because an *offer* to distribute can constitute a publication, *see* 17 U.S.C. § 101, an unauthorized offer to distribute necessarily violates § 106(3). *See Elektra Enter. Group*, __ F. Supp. 2d at __, 2008 WL 857527, at *5-8; *Warner*, 2006 WL 2844415, at *3. The flaw in this reasoning is the assumption that, because all distributions within the meaning of § 106(3) are publications, all publications within the meaning of § 101 are distributions.[2] Because the

---

[2] We do not ascribe the equation of the two terms to either Congress or the Supreme Court, however. *See London-Sire*, ___ F. Supp. 2d at ___, 2008 WL 887491, at *9 (stating that the Supreme Court's reference to the "statutory right of first publication" in *Harper & Row*, 471 U.S. at 552, "is a far cry from squarely holding that publication and

10

statutory definition of "publication" is broader than the term "distribution" as used in § 106(3), however, the argument fails; some "publications" are *not* "distributions" for purposes of § 106(3).

To see why, it is important to note that, under § 101 of the Copyright Act, a "publication" can be effected in either of two ways. First, a publication may occur by means of the "distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease or lending." 17 U.S.C. § 101. *This* portion of the definition of publication contains language identical to that found § 106(3). Second, however, a publication may occur by "offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display." *Id.* § 101.[3] According to the House Report accompanying the 1976 Copyright Act, this provision "makes clear that, when copies or phonorecords are offered to a group of wholesalers, broadcasters, motion picture theaters, etc., publication takes place if the purpose is 'further distribution, public performance, or public display.'" H.R. REP. NO. 94-1476, at 138 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 5659, 5754. More generally, courts have long construed offers to distribute copies to the public as equivalent to the publication of the work. *See* 1 NIMMER & NIMMER, *supra*, § 4.04 (stating that publication occurs when "by consent of the copyright owner the original or tangible copies of a work are sold, leased, loaned, given away, or otherwise made available to the general public, or when an authorized offer is

---

distribution are congruent"); *see also Atlantic Recording Corp.*, __ F. Supp. 2d at __, 2008 WL 1927353, at *7 (similar).

[3] The statute also makes clear that "[a] public performance or display of a work does not of itself constitute publication." *Id.*

made to dispose of the work in any such manner even if a sale or other such disposition does not in fact occur"); Brown v. Tabb, 714 F.2d 1088, 1091 (11th Cir. 1983) (citing this provision of the Nimmer treatise with approval).

Nevertheless, and despite some overlap, publication and distribution remain distinct concepts. "Publication" of a work at one time terminated the author's common law copyright, and imposed upon the author a duty to affix copyright notice to every published copy or risk having the work thrust into the public domain. *See, e.g.*, Martha Graham School & Dance Found., Inc. v. Martha Graham Center of Contemporary Dance, Inc., 380 F.3d 624, 632-33 & n.14 (2d Cir. 2004); Nat'l Comics Publ'ns., Inc. v. Fawcett Publ'ns., Inc., 191 F.2d 594, 598 (2d Cir. 1951). Although publication without copyright notice no longer has this effect, *see* 17 U.S.C. §§ 401(a), 402(a), 405(a) (collectively rendering copyright notice optional for works published on or after the date of the Berne Convention Implementation Act of 1988), publication can still trigger numerous consequences, including a duty to deposit copies with the Copyright Office, see 17 U.S.C. § 407(a); a duty timely to effect copyright registration in order to preserve one's right to recover statutory damages and attorneys' fees, in the event of an infringement, *see id.* § 412; and the calculation of the date of copyright termination for works made for hire, anonymous, and pseudonymous works, *see id.* § 302(c) (stating that copyright in these works subsists for 95 years from publication or 120 years from creation, whichever period is shorter. But while a publication that is effected by "distribut[ing] copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease or lending" is, tautologically, also a distribution, a publication that is effected by merely *offering* to distribute copies or phonorecords to the

public is just that--an *offer* to distribute, not an actual distribution. Thus, while an offer to distribute can constitute a publication under some circumstances, an offer to distribute is not synonymous with an *actual* distribution for purposes of § 106(3). *See* 2 NIMMER & NIMMER, *supra*, § 8.11[A], at 8-148 n.2; 4 PATRY, *supra*, § 13:9, at 13-12 to -13); William Patry, *The Recent Making Available Cases*, *available at* http://www.williampatry.blogspot.com (Apr. 3, 3008).[4]

Finally, even if the courts were correct in inferring an intent on the part of the Congress that enacted the 1976 Copyright Act to equate all publications with distributions for purposes of § 106(3), such an intent cannot override the plain meaning of the statutory text, absent ambiguity or patent absurdity. *See, e.g.*, Exxon Mobil Corp. v. Allapattah Servs. Inc., 545 U.S. 546, 567-68 (2005) (criticizing the use of legislative history to interpret an unambiguous statute). In the present context, the relevant statutory language is neither ambiguous nor absurd: distribution requires actual distribution, and

---

[4] The fact that Congress has not chosen to add "offer to distribute" language to § 106(3) also stands in stark contrast to Congress's treatment of "offers to sell" in the related field of patent law. *See, e.g.,* eBay v. MercExchange, LLC, 547 U.S. 388, 392-93 (2006) (citing copyright case law as persuasive precedent in a patent case); Eldred v. Ashcroft, 537 U.S. 186, 201-02 (2003) (citing patent practice as persuasive precedent in a copyright case); Sony Corp. v. Universal City Studios, Inc., 464 U.S. 417, 442 (1984) (similar). When the United States became a member of the TRIPs Agreement, Congress amended the Patent Act to include, among the patent owner's rights, the right to prevent unauthorized "offers to sell" the patented invention. See 35 U.S.C. § 271(a). Prior to that time, however, courts strictly interpreted the statutory language, which expressly forbade sales but not offers to sell, as requiring proof of an actual sale. See Rotec Indus. v. Mitsubishi Corp., 215 F.3d 1246, 1251 (Fed. Cir. 2000). The fact that Congress has not chosen to make a similar change to § 106(3) of the Copyright Act suggests that, unless and until such a change is made, courts should construe the act to mean what it says: that only an actual distribution is actionable. *See National Car Rental*, 991 F.2d at 434.

not just an offer to distribute or a "making available" of copies or phonorecords of the work.

## **Conclusion**

For the reasons stated above, we urge this Court to conclude that the act of making copyrighted sound recordings available for electronic distribution on a peer-to-peer network, without license from the copyright owners, does not violate the copyright owner's exclusive right of distribution.

Respectfully submitted,

Date: 6/13/2008                By: ___s/Prentiss Cox_____
                                   Prentiss Cox
                                   Associate Professor of Clinical Law
                                   University of Minnesota Law School
                                   Attorney for Amici Curiae Law Professors

                                   Attorney Registration No. 218844
                                   190 Mondale Hall
                                   229 19th Avenue South
                                   Minneapolis, MN 55455
                                   Phone: (612) 625-6810
                                   Fax: (612) 624-5771