UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

CAPITOL RECORDS INC.,
A Delaware corporation, et al.,

                Plaintiffs,

v.                                 Civil File No. 06-1497 (MJD/RLE)

JAMMIE THOMAS,

                Defendant.

---

**BRIEF AMICI CURIAE OF ELECTRONIC FRONTER FOUNDATION, PUBLIC KNOWLEDGE, UNITED STATES INTERNET INDUSTRY ASSOCIATION, AND COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION IN SUPPORT OF DEFENDANT JAMMIE THOMAS**

**INTRODUCTION AND SUMMARY OF ARGUMENT**

The Electronic Frontier Foundation ("EFF"), Public Knowledge, the United States Internet Industry Association ("USIIA"), and the Computer & Communications Industry Association ("CCIA") file this brief as *amici curiae* in support of Defendant Jammie Thomas to address an issue whose importance reaches well beyond this case: the proper scope of the exclusive right of distribution as defined in section 106(3) of the Copyright Act, 17 U.S.C. § 106(3).

Ms. Thomas, like more than 20,000 other individuals, was sued by Plaintiffs for copyright infringement based on her use of peer-to-peer ("P2P") file sharing software.[1] The jury was instructed that:

> The act of making copyrighted sound recordings available for electronic distribution on a peer-to-peer network, without license from the copyright owners, violates the copyright owners' exclusive right of distribution, regardless of whether actual distribution has been shown.

This instruction was erroneous as a matter of law. The plain language of the Copyright

---

[1] For an overview of the history of the recording industry's national litigation campaign against P2P file sharing, *see* EFF, *RIAA v. The People: Four Years Later* (Aug. 2007), *available at* http://w2.eff.org/IP/P2P/riaa_at_four.pdf.

1

Act and applicable precedents mandate that an infringement of the distribution right requires the unauthorized, actual dissemination of copies of a copyrighted work—a completed act of transfer. To permit a finding of distribution liability based on anything less would be to transform section 106(3) into an unbounded form of civil attempt liability, even where no copies had ever been distributed and thus no harm had ever been inflicted on the copyright owner.

More than just Ms. Thomas' liability is at stake. Acceptance of the "making available" theory could disrupt copyright law in a variety of other contexts. As will be discussed further below, several Plaintiffs sued a national radio broadcaster, XM Radio, based on a variant of the "making available" theory that they advance here. *See Atlantic Recording Corp. v. XM Satellite Radio*, No. 1:06-cv-03733-DAB (S.D.N.Y. filed May 16, 2006).[2] Copyright owners have also pressed this theory against Google, contending that the Internet search engine runs afoul of an expansive "making available" conception of the distribution right. *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007). And the Recording Industry Association of America has sent thousands of DMCA notices to colleges and universities based solely on evidence that students have made songs available for possible download by others. *See* Ted Bridis, *AP: Music Companies Targeting Colleges*, S.F. CHRONICLE (Feb. 21, 2007). As a result of these notices, students can suffer a range of consequences, including fines and permanent loss of access to their school networks. *Id.*

Getting this issue right is also crucial in light of the extraordinary penalties that can follow from a finding of infringement. Copyright infringement is a simple cause of action, containing just two elements: proof of ownership and proof of use in violation of one or more exclusive statutory rights. Because there is no need to allege or prove actual

---

[2] Complaint available at http://eff.org/IP/digitalradio/XM_complaint.pdf. XM subsequently settled with the plaintiffs in that suit, but the fact the case was filed well illustrates *amici's* concerns.

damage, proof of those two elements is a gateway to statutory damages that may be well out of proportion to any particular actual harm—as in this case, where Ms. Thomas was found liable for over $222,000. Given the serious consequences that flow from copyright's strict liability regime, the Court should resist Plaintiffs imprecations to expand that regime absent an unequivocal expression of Congressional intent.

## STATEMENT OF INTEREST

*Amici* are public interest and industry groups with strong interests in ensuring that the Copyright Act is interpreted properly. *Amici* submit this brief to address the proper, limited scope of the distribution right defined in 17 U.S.C. § 106. *Amici* express no view regarding the merits of any other claims Plaintiffs may have, nor on any fair use or other defenses that Ms. Thomas may have with respect to those claims.

EFF is a member-supported, nonprofit public interest organization devoted to maintaining the traditional balance that copyright law strikes between the interests of copyright owners and the interests of the public. Founded in 1990, EFF represents more than 13,000 dues-paying members including consumers, hobbyists, computer programmers, entrepreneurs, students, teachers, and researchers united in their reliance on a balanced copyright system that ensures adequate protection for copyright owners while ensuring broad access to information in the digital age. Because a ruling on this motion may have implications for consumers and new technology innovators, EFF has a strong interest in ensuring that the statutorily limited § 106(3) right is correctly applied in this and other cases.[3]

Public Knowledge is a non-profit, public interest organization advocating for

---

[3] EFF has appeared as *amicus curiae* in several other district court cases that have addressed the scope of the distribution right. *Elektra Enter. Group v. Barker*, No. 05-CV-7340 KMK (S.D.N.Y., brief filed Feb. 23, 2006); *Fonovisa v. Alvarez*, No 1:06-CV-011 (N.D. Tex., brief filed June 1, 2006); *Elektra v. Dennis*, No. 07-CV-39 DPJ JCS (S.D. Miss., brief filed Apr. 6, 2007); *Atlantic v. Howell*, No. CV 06-02076 PHX NVW (D. Ariz., brief filed Jan. 11, 2008); *London-Sire v. Doe*, No. 1:04-CV-12434-NG (D. Mass, brief filed Feb. 7, 2008). As in this case, those cases involve individuals accused by record labels of downloading and uploading music over the Internet.

consumers' digital rights and a vibrant information commons.  These goals can only be met when the rights of all parties—creators, users, and intermediaries—are balanced appropriately. An inappropriately expansive reading of the distribution right will have far-reaching effects on the rights of users of digital works as well as the ability of innovators to find new, legal uses for those works.

USIIA is a trade association with more than 100 members who provide the facilities and services that constitute the Internet as we know it today.  USIIA members include Internet Service Providers ("ISPs"), who provide proprietary content, email capability, and web browsing functionalities to their subscribers. USIIA President David P. McClure, a prominent Internet industry spokesperson, has testified before Congress on numerous occasions regarding the intersection of Internet policy and intellectual property.  USIIA has participated in numerous federal and state court cases raising issues of ISP duties and subscriber policies in the context of interpretations of the DMCA.

CCIA is an international, nonprofit association of technology companies dedicated to open markets, open systems, and open networks.  CCIA members participate in the Internet, information, and communications technology industries, ranging from the largest in the business to small entrepreneurial firms.  CCIA members employ nearly one million people and generate annual revenues exceeding $200 billion.  A complete list of CCIA's members is available online at http://www.ccianet.org/members.html.  CCIA members rely heavily on their intellectual property and depend upon robust intellectual property protection to encourage innovation and produce profits.  At the same time, the ability to create and innovate free from disputes over intellectual property is essential to innovation in CCIA members' industries.  CCIA members thus depend upon the copyright system to strike the right balance between underprotection and overprotection, and thereby fulfill its constitutional purpose of promoting progress.

# ARGUMENT

## I. The Plain Language of Section 106(3) Requires Actual Dissemination of Phonorecords or Copies.

Statutory interpretation begins with the plain language of the statute, and that familiar canon is particularly crucial in copyright law. The Copyright Act represents a painstaking set of legislative compromises aimed at balancing the interests of both owners and users of copyrighted works. *See Sony Corp. v. Universal City Studios*, 464 U.S. 417, 429 (1984). As the Supreme Court has explained, "[a] copyright, like other intellectual property, comprises a series of carefully defined and carefully delimited interests to which the law affords correspondingly exact protections." *Dowling v. United States*, 473 U.S. 207, 216 (1985).

Although the exclusive rights granted to a copyright owner are often described using the shorthand terms "reproduction, public performance, public display, distribution, and adaptation," the statute defines their scope with more specificity. *See* 17 U.S.C. § 106. Each exclusive right is further defined by a set of statutory exceptions, many of which apply differently depending on which exclusive right is implicated.[4] And because each exclusive right can be separately assigned or licensed, many rights holders control only a subset of the exclusive rights, which in turn means that many contractual licensing arrangements between private parties depend on a careful parsing of the exclusive rights. Precisely because so much in the copyright system turns on a clear understanding of which exclusive rights are implicated by any particular activity, it is critical that courts attend closely to the statutory scheme, rather than freely embroidering on it based on the perceived equities of any particular case. *See Sony Corp.*, 464 U.S. at 431 ("the protection given to copyrights is wholly statutory").

---

[4] *See, e.g.,* 17 U.S.C. §§ 109 (first sale limitation on distribution right); 110 (exceptions to public performance right); 111 (statutory license for public performance by cable television); 114 (statutory license for public performance by webcasters); 118 (statutory license for public performance by nonprofit broadcasters).

### A. The Copyright Act (and Controlling Precedent Interpreting It) Make Clear That § 106(3) Requires Actual Dissemination of Copies to the Public.

The plain meaning of the relevant section of the Copyright Act fatally undermines Plaintiffs' effort to conflate "making available" with "actual distribution." Section 106(3) bestows on the owner of a copyright the exclusive right "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106(3). This language cannot be read to include "making available."

"If the intent of Congress can be clearly discerned from the statute's language, the judicial inquiry must end." *United States v. Whiting*, 165 F.3d 631, 633 (8th Cir. 1999). That is precisely the case here. The distribution right encompasses only the distribution of *certain things* ("copies or phonorecords"), to *certain people* ("the public"), in *certain ways* ("by sale or other transfer of ownership, or by rental, lease, or lending"). In sharp contrast to choices Congress has made elsewhere, the language of § 106(3) does not include any prohibitory language pertaining to *offers* to distribute, *attempts* to distribute, or the "making available" of copyrighted works. When Congress means to prohibit *offers to act*, as well as the *acts* themselves, it has done so expressly. *See, e.g.,* 17 U.S.C. § 901(a)(4) (where semiconductor mask works are concerned, "to distribute means to sell, lease, bail, or otherwise transfer, or **to offer to** sell, lease, bail or otherwise transfer"); 35 U.S.C. § 271(a) (exclusive right of a patent owner reaches anyone who "without authority makes, uses, **offers to sell**, or sells any patented invention . . . .").

Given this unambiguous language, it is no wonder that the Eighth Circuit Court of Appeals has foreclosed Plaintiffs' effort to rewrite § 106(3). In *National Car Rental Sys., Inc. v. Computer Assoc. Int'l*, 991 F.2d 426, 434 (8th Cir. 1993), the Eighth Circuit considered whether a contract claim based on use of a software program beyond the terms of a license agreement was preempted by the Copyright Act. National Car Rental argued that a restriction on using the software on a third party's behalf amounted to a restriction on distribution, and, therefore, a contract claim based on that restriction would

be preempted by copyright law. The court rejected that argument, holding that a copyright holder's distribution right was violated only through an *actual distribution* of a copy of a work, and not by permitting the use of a program by third parties. *Id.* at 430, 434. Because the provisions at issue did not forbid the dissemination of copies, and because the allegations in the complaint did not concern the dissemination of actual copies, the distribution right was not implied and the claim was not preempted. *Id.*

The Eighth Circuit's position is supported by the decisions of numerous other courts. In *Perfect 10 v. Amazon.com,* for example, the Ninth Circuit held that "distribution requires an 'actual dissemination' of a copy." 508 F.3d at 1162. In coming to this conclusion, the Ninth Circuit joined a number of lower courts that have addressed this issue in the digital context. *See In re Napster, Inc. Copyright Litig.*, 377 F. Supp. 2d 796, 802 (N.D. Cal. 2005) (collecting authorities); *Arista Records, Inc. v. Mp3Board.com, Inc.*, No. 00-Civ.-4660-SHS, 2002 WL 1997918 at *4 (S.D.N.Y. Aug. 29, 2002).

In the past few months alone, two district courts have expressly rejected the "making available" theory in file-sharing cases. In *Atlantic v. Howell*, __ F. Supp. 2d __, 2008 WL 1927353 (D. Ariz. Apr. 29, 2008), plaintiff recording companies moved for summary judgment against a pro se defendant, based on a making available theory. The court concluded that the "great weight of authority" establishes that section 106(3) "is not violated unless the defendant has actually distributed an unauthorized copy of the work to a member of the public." *Id.* at *6. Evidence that a defendant made a copy of a work available to the public, on its own, "only shows that the defendant attempted to distribute the copy, and there is no basis for attempt liability in the statute . . . ." *Id.* Similarly, in *London-Sire v. Doe*, 542 F. Supp. 2d 153 (D. Mass. 2008), the court held that "merely exposing music files to the internet is not copyright infringement." *Id*. at 176.

The leading copyright law commentators agree that "an actual transfer must take place; a mere offer for sale will not infringe the right." Paul Goldstein, 2 GOLDSTEIN ON

7

COPYRIGHT § 7.5.1 (3d ed. 2007); *accord* Melville B. Nimmer & David Nimmer, 2 NIMMER ON COPYRIGHT § 8.11[A] (2007); William F. Patry, 4 PATRY ON COPYRIGHT § 13:9 (2007) ("[W]ithout actual distribution of copies . . . , there is no violation of the distribution right.").

"The 'strong presumption' that the plain language of the statute expresses congressional intent is rebutted only in 'rare and exceptional circumstances.'" *United States v. Clintwood Elkhorn Min. Co.*, 128 S. Ct. 1511, 1518 (2008) (citations omitted). No such circumstances apply here. Simply put, Plaintiffs' view of the distribution right would effectively create a new (and exceedingly vague) cause of action for attempted copyright infringement, based on the mere possibility of distribution alone and thus entirely disconnected from any actual harm. No such animal exists in copyright law, nor should it.

**B.     Even If the Language of the Statute Were Ambiguous, It Will Not Support Plaintiffs' "Making Available" Conception of § 106(3).**

Plaintiffs doubtless will contend, as they have in other file-sharing cases, that the "authorization" clause contained in section 106 expands direct infringement liability to reach those who merely offer or make available copyrighted works. Not so. Congress intended the "authorization" clause to provide a statutory foundation for secondary liability, not to expand the scope of direct infringement liability. *See* H.R. Rep. 94-1476, at 61 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5674 ("Use of the phrase 'to authorize' is intended to avoid any question as to the liability of contributory infringers."); *Venegas-Hernandez v. ACEMLA,* 424 F.3d 50, 57 (1st Cir. 2005). In the words of the First Circuit,

> Mere authorization of an infringing act is an insufficient basis for copyright infringement. Infringement depends upon whether an infringing act, such as copying or performing, has occurred. Therefore, to prove infringement, a claimant must show "an infringing act after the authorization."

*Latin Amer. Music Co. v. Archdiocese of San Juan,* 499 F.3d 32, 46 (1st Cir. 2007) (citing *Venegas-Hernandez,* 424 F.3d at 57-59) (internal citations omitted); *accord*

*Resnick v. Copyright Clearance Center, Inc.,* 422 F. Supp. 2d 252, 259 (D. Mass. 2006) ("[W]rongful authorization alone cannot constitute infringement under the statute.") (internal quotes omitted). In other words, without a direct infringement of § 106(3)—an actual "distribut[ion] of copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease or lending"—there can be no claim for "authorization" of distribution. *See* 4 PATRY ON COPYRIGHT § 13:9; *see also London-Sire Records,* 542 F. Supp. 2d at 166; *Elektra Entertainment v. Barker,* __F. Supp. 2d__, 2008 WL 857527 at *5 (S.D.N.Y Mar. 31, 2008).

Courts have also rejected attempts to bootstrap the "offer" language in the Copyright Act's definition of "publication," 17 U.S.C. § 101, into "making available" liability for distribution. While a few courts have erroneously concluded that publication and distribution are synonymous under the Copyright Act, and, therefore, just as an offer of sale may violate the publication right, so too may an offer to distribute violate the distribution right, *see, e.g., Elektra Entertainment,* 2008 WL 857527 at *5, the majority of reasoned decisions on the matter have firmly rejected that notion. As the court in *London-Sire Records* observed, "even a cursory examination of the statute suggests that the terms are not synonymous." 542 F. Supp. 2d at 168. "By the plain meaning of the statute," all distributions are publications, but not all publications are distributions:

> For example, suppose an author has a copy of her (as yet unpublished) novel. If she sells that copy to a member of the public, it constitutes both distribution and publication. If she merely offers to sell it, that is neither a distribution nor a publication. And if the author offers to sell the manuscript to a publishing house for purposes of further distribution, but does not actually do so, that is a publication not a distribution. Plainly publication and distribution are not identical. And Congress' decision to use the latter term when defining a copyright holder's right in 17 U.S.C. 106(3) much be given consequence.

*Id.* at 169; *see also Atlantic v. Howell,* 2008 WL 1927353 at *7-8.

Indeed, the inclusion of "offering to distribute" in the definition of "publication" actually underscores the fact that Congress knew how to reach mere offers when it wished to do so. In this respect, the two terms are not synonymous, as noted by a leading

copyright commentator:

> This statement [that "publication" and "distribution" are synonymous] is not found in any of the legislative reports, and in at least one important respect is incorrect; while the mere offering to sell copies of a novel to bookstores for subsequent sale to customers constitutes publication *due to the statutory definition of publication*, without actual distribution of copies of the novel, there is no violation of the distribution right.

4 PATRY ON COPYRIGHT § 13:9 (emphasis in original).

Even decisions favorable to Plaintiffs' position offer only weak support for it, at best. While the *Elektra* court suggested that an offer to distribute might violate the distribution right, the court hesitated to "equat[e] this avenue of liability with the contourless 'make available' right proposed by [plaintiff record companies]," noting that support for it in the case law was "quite limited." 2008 WL 857527 at *6.

In other cases, record labels have also pointed to a letter written by the U.S. Copyright Office to Congress to support their statutory argument, to little avail. First, opinion letters from the Copyright Office to Congress on matters of statutory interpretation are non-binding and "entitled to respect only insofar as they are persuasive." *Broadcast Music, Inc. v. Roger Miller Music, Inc.*, 396 F.3d 762, 778 (6th Cir. 2005); *see also Bartok v. Boosey & Hawkes, Inc.,* 523 F.2d 941, 946-47 (2d Cir. 1975) ("the Copyright Office has no authority to give opinions or define legal terms, and its interpretation on an issue never before decided should not be given controlling weight"). Second, nothing in the letter expresses any view on whether actual dissemination must be proven in order to establish direct infringement of the distribution right. If anything, the Register of Copyrights expresses the opposite view:

> Making a work available in this context [i.e., uploading to a peer-to-peer network] constitutes an infringement of the exclusive distribution right, as well as the reproduction right (*where the work is uploaded* without the authorization of the copyright holder.)

*Broadcast Music, Inc.,* 396 F.3d at 778 (citing Letter from Marybeth Peters, The Register of Copyrights of the United States of America, to Representative Howard L. Berman, United States House of Representatives (Sept. 11, 2003)). Contrary to what Plaintiffs

might suggest, the Register does not endorse the notion that the distribution right is infringed where a file is merely offered via a P2P network, but never actually uploaded or transmitted to another user.

C. **Plaintiffs Can Muster No Persuasive Case Authority For Their Expansive Theory**

Given the dearth of statutory support for their interpretation of section 106(3), in other cases involving individuals accused of file-sharing, record labels have tried, unpersuasively, to cite case law in support of their "making available" view of the distribution right. For example, record labels have made much of one line of *obiter dicta* in the Ninth Circuit's earlier ruling in *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1014 (9th Cir. 2001) ("Napster users who upload file names to the search index for others to copy violate plaintiffs' distribution rights."). The record labels contend that this statement establishes a "deemed distribution" theory that spares a copyright owner from having to prove that any actual distributions of copyrighted materials ever took place.

This view misreads *A&M Records v. Napster,* and has been expressly rejected by at least two district courts in the file-sharing context. *See London-Sire v. Does,* 542 F. Supp. 2d at 167 n.18 (Ninth Circuit's reasoning was "not persuasive" support for making available theory); *Atlantic v. Howell,* 2008 WL 1927353 at *5. In that appeal, the defendant did not dispute evidence that millions of Napster users were actively trading copyrighted materials. *See Napster,* 239 F.3d at 1013; *see also London-Sire,* 542 F. Supp. 2d at 167 at n.18 ("as the district court noted [in *Napster*] 'it is pretty much acknowledged' that infringement had occurred"). Moreover, because the appeal turned on application of secondary liability principles, there was no need for the court to inquire into the circumstances of any particular Napster user—it was enough that millions were actively swapping files, thus providing direct infringements for which Napster could be held secondarily liable. *Id.* In this context, it was unnecessary for the court to opine on whether a Napster user who merely offered, but never actually disseminated, any

11

copyrighted material was infringing the distribution right. In other words, in *Napster*, the court and parties alike assumed the existence of an avalanche of actual disseminations, making it unnecessary to express any view on whether *merely* "making available," without more, could infringe the § 106(3) distribution right. In subsequent rulings that have squarely faced that issue, as explained above, appellate and district courts have repeatedly rejected the broad "making available" theory pressed by Plaintiffs. *See Perfect 10 v. Amazon.com*, 508 F.3d at 1162; *In re Napster*, 377 F. Supp. 2d at 802-04.[5]

Plaintiffs may finally hope to fall back on the Fourth Circuit ruling in *Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 199 (4th Cir. 1997). In that case, a copyright owner sued a number of libraries that had made infringing copies of a microfiche work. Because the plaintiff's reproduction claims were time-barred, she was left with only a distribution claim, and because the libraries had no records of loans to patrons, she was unable to prove any actual loans to the public. The Fourth Circuit nevertheless found that the plaintiff could proceed with her distribution claim, reasoning that "a library distributes a published work, . . . when it places an unauthorized copy of the work in its collection, includes the copy in its catalog or index system, and makes the copy available to the public." *Id.* at 201. This outcome, perhaps motivated by sympathy for the plaintiff, *see id.* at 205 (Hall, J., dissenting), simply cannot be squared with the statutory language of § 106(3) or with the Eighth and Ninth Circuit authorities discussed above. *See generally Atlantic v. Howell,* 2008 WL 1927353 at *5 (collecting cases;

---

[5] Plaintiffs may also seek to rely, as they have in other lawsuits, on two cases that have only indirectly touched on the question. *United States v. Shaffer,* 472 F.3d 1219 (10th Cir. 2007), involved a criminal statute unrelated to copyright prohibiting the distribution of child pornography. The court there was not called on to construe "distribution" as defined and delimited in 17 U.S.C. § 106(3). As for *Sony Pictures Home Entertainment, Inc. v. Lott,* 471 F. Supp. 2d 716 (N.D. Tex. 2007), the *pro se* defendant appears not to have raised any arguments relating to the proper scope of the distribution right, relying instead on a "mistaken identity" defense. *See id.* at 721.

noting the "majority of district courts have rejected the recording companies' 'making available' theory because *Hotaling* is inconsistent with the Copyright Act"). The opinion has also drawn the criticism of commentators. *See* 4 PATRY ON COPYRIGHT § 13:9.[6]

## II. Expansion of the Distribution Right Would Have Disruptive Consequences in Other Contexts

Plaintiffs' expansive re-imagining of the § 106(3) distribution right would have disruptive consequences far beyond this case, jeopardizing the legitimate interests of consumers and technology innovators. For example, many broadcasters rely on compulsory or negotiated licenses that entitle them to publicly perform copyrighted works over the air. *See* 17 U.S.C. § 114(d). Plaintiffs' "making available" conception of the distribution right would call into question whether these broadcasters could now be forced to seek additional distribution licenses. This concern is not merely hypothetical—several Plaintiffs here sued XM Satellite Radio, alleging that although XM enjoys a statutory public performance license to transmit their works, it infringed plaintiffs' copyrights by "distributing Plaintiffs' copyrighted sound recordings to the public by making available and automatically disseminating to [its] subscribers copies of sound recordings contained in its satellite radio transmissions." Complaint ¶ 42, *Atlantic Recording Corp. v. XM Satellite Radio,* No. 1:06-cv-03733-DAB (S.D.N.Y. filed May 16, 2006) (complaint available at <http://eff.org/IP/digitalradio/XM_complaint.pdf>).

---

[6] In other cases, record labels have tried to find support the in the WIPO Copyright Treaty and the WIPO Performances and Phonograms Treaty. The WIPO treaties are not self-executing and lack any binding legal authority separate from their implementation through the Copyright Act. *See Medellin v. Texas*, 2008 WL 762533 at *9 (U.S. Mar. 25, 2008); 17 U.S.C. § 104(c) & (d); *see also Elektra*, 2008 WL 857527 at *6 n.7. Moreover, these treaties address minimum protections for *foreign* copyright holders; Plaintiffs have not shown that any of the works at issue here is a foreign work. *See* Jane C. Ginsburg, *International Copyright: From a Bundle of National Copyright Laws to a Supranational Code?*, 47 J. COPYRIGHT SOC'Y U.S.A. 265, 270 (2000). Finally, the WIPO treaties do not require a radical expansion of the distribution right; other U.S. copyright law doctrines (including the exclusive rights of reproduction and public performance, along with secondary liability doctrines), taken together, satisfy the WIPO treaty requirements.

Although the plaintiffs in that suit have since settled with XM, a conception of distribution that encompasses mere "making available" still threatens to blur the distinction between public performance and distribution, potentially exposing broadcasters and webcasters to massive infringement liability. *See Agee v. Paramount Comm., Inc.,* 59 F.3d 317, 325 (2d Cir. 1995) (in rejecting a distribution claim against a broadcaster, holding that "[i]t is clear that merely transmitting a sound recording to the public does not constitute a 'distribution . . . .'").

Similarly, some copyright owners have attempted to use expansive interpretations of distribution to transform secondary liability claims into direct infringement claims (in order to take advantage of the strict liability nature of direct infringement claims). In *Perfect 10 v. Amazon.com*, for example, the plaintiff argued that Google's operation of a search engine infringed their distribution rights by making it possible for users to find infringing photographs posted to the Internet by third parties, even in the absence of any evidence that users actually copied the photos. *See* 508 F.3d at 1162. Direct infringement claims of this kind could also be imagined against other businesses that make tools that help users find copyrighted works on the Internet, an arena that has, until now, been the realm of secondary liability. *See A&M v. Napster,* 239 F.3d at 1019-24.

A final consequence of Plaintiffs' making available theory is to subvert basic civil procedure. At root, Plaintiffs' theory appears to be nothing more or less than a thinly veiled attempt to avoid the burden of proving their case. Certainly, it may be difficult to show actual distribution using the virtually automated strategies employed by their investigator, MediaSentry. But as one leading copyright commentator notes,

> thousands of cases outside of copyright are dismissed every year because plaintiffs cannot come up with needed documents, testimony, or other evidence to make out what may well be a meritorious case. That is how the system works, though, for better or worse, and there is no reason at all for copyright owners to be placed outside of it.

The Patry Copyright Blog, http://williampatry.blogspot.com/2008/04/atlantic-recording-corp-v-howell.html/ (April 30, 2008).

### III. In Order to Prevail on Retrial, Plaintiffs Must Present Evidence That Defendants Actually Disseminated the Works in Question to Third Parties

As discussed above, the controlling authorities establish that an infringement of the distribution right requires that a copyright owner demonstrate *an actual dissemination* of the copyrighted work at issue. Should a new trial be granted, the jury should be cautioned that evidence derived from the activities of Plaintiffs' own investigators cannot suffice to establish a completed transfer. It is axiomatic that a copyright owner cannot infringe her own copyright. *See Olan Mills, Inc. v. Linn Photo Co.*, 23 F.3d 1345, 1348 (8th Cir. 1994). By the same token, an authorized agent acting on behalf of a copyright owner also cannot infringe any rights held by that owner. *Higgins v. Detroit Educ. Television Found.*, 4 F. Supp. 2d 701, 705 (E.D. Mich. 1998). Accordingly, where the only evidence of infringing distribution consists of distributions to authorized agents of the copyright owner, that evidence cannot, by itself, establish that other, *unauthorized* distributions have taken place. Thus, in *Resnick v. Copyright Clearance Center*, 422 F. Supp. 2d 252 (D. Mass. 2006), the court held that evidence that an investigator had obtained copies of plaintiffs' copyrighted work from the defendant at plaintiffs' direction was insufficient to establish direct infringement. *Id.* at 258. "Where the person making the copies has been 'authorized by the copyright owner to use the copyrighted work,' he has not infringed. . . . Thus, [the investigator's] work does not constitute direct infringement by a third party." *Id.* (citing *Sony Corp. v. Universal City Studios, Inc.,* 464 U.S. 417, 433 (1984)).

If section 106(3) requires that a copyright owner establish that actual unauthorized disseminations took place, Plaintiffs should not be able to bootstrap their way to that conclusion simply by relying on evidence created by their own investigator. Such bootstrapping would be especially offensive in the peer-to-peer context. Unless and until someone downloads the music, plaintiffs cannot claim to have been financially damaged. If Plaintiff's investigators can manufacture evidence of direct infringement, millions of Americans could be exposed to infringement liability without the plaintiff having

incurred any damage. While statutory damages provisions in the Copyright Act eliminate the necessity of actually demonstrating harm, those very provisions, combined with copyright's strict liability for direct infringement, underscore the importance of maintaining Plaintiffs' evidentiary burden.

Of course, evidence gathered by an investigator may be relevant, in appropriate cases, to prove whether actual infringing distributions may have occurred. For example, agents of a copyright owner may testify to observed infringements involving third parties. *See, e.g., Polygram Int'l Publishing v. Nevada/TIG, Inc.*, 855 F. Supp. 1314, 1319 (D. Mass 1994) (investigators observed unauthorized public performances by trade show exhibitors). In some cases, courts have been willing to accept evidence from investigators who successfully solicit defendants to "actively assist" unauthorized copying. *See, e.g., RCA/Ariola Int'l, Inc. v. Thomas & Grayston Co.,* 845 F.2d 773, 777 (8th Cir. 1988) (retailers liable for direct infringement of where employees actively assisted in copying the protected material by inspecting the material, selecting a blank tape of the proper length to copy the protected work, and actually operating the copy machine). Similarly, in appropriate cases, an investigator's purchase of infringing material may provide circumstantial evidence that supports the inference that similar sales have occurred to third parties. *See, e.g., RCA Records v. All-Fast Systems, Inc.*, 594 F. Supp. 335, 338 (S.D.N.Y. 1984) (experience of investigators created sufficient inference of similar activities with third parties to support preliminary injunction).

Although *amici* do not have access to the full trial record, it appears that the hearsay evidence presented at the first trial does not fit any of these descriptions. Plaintiffs' investigator, MediaSentry, did not observe Ms. Thomas disseminating any materials to third parties. Nor did Plaintiffs contend that MediaSentry sought Ms. Thomas' assistance in making unauthorized reproductions. Nor did Plaintiffs establish that MediaSentry's downloads constitute circumstantial evidence that the Thomas computer disseminated copies of the 24 songs in question to any other KaZaA user. At

any instant, KaZaA users are likely to have thousands of sources for these particular songs to choose from and no reason to choose Ms. Thomas' computer over any other. And while KaZaA users may engage in a prodigious amount of infringing activity, that tells us nothing about the crucial issue in this case: whether *this* Defendant transmitted any of *these* 24 songs during the relevant time period. Testimony from an investigator that he or she downloaded a song simply cannot bridge the chasm between "making available" and "actual dissemination" to anyone other than Plaintiffs' authorized agents.

Plaintiffs may complain that they cannot overcome this evidentiary hurdle. But Plaintiffs include some of the largest companies in the recording industry, with nearly limitless resources when compared to Ms. Thomas. It is Plaintiffs who have threatened litigation against over 30,000 people, many whom are unprepared for the unfamiliar (to a layperson) demands of discovery. It is Plaintiffs who have chosen to target noncommercial activities that occur in the privacy of the home, thereby injecting themselves "behind closed doors" where factual investigation can be difficult. Having put themselves in this position, Plaintiffs should not complain that proving their distribution claims poses evidentiary challenges.

Moreover, in this case, as in most file-sharing cases, Plaintiffs are not left without recourse. The record labels may still pursue reproduction claims; indeed, surely those claims are more appropriate given that the battle over peer-to-peer is, at heart, a battle over unauthorized *copying*. The labels may prove up those claims through traditional discovery methods (e.g., examining and comparing defendants' computers and CD collections to determine which songs a defendant legally owned and, if need be, contending with the fair use claims that may arise with respect to legally owned material.) Those methods may take more effort than hiring an investigator to troll file-sharing networks, but they are not unusually burdensome.

# CONCLUSION

For the reasons stated above, this Court should reject Plaintiffs' effort to radically expand the § 106(3) distribution right and grant Ms. Thomas' motion for a new trial.

Respectfully submitted,

Dated: June 20, 2008

Electronic Frontier Foundation
Public Knowledge
United States Internet Industry Association
Computer & Communications Industry Association

s/Rachel C. Hughey
Rachel C. Hughey (MN Bar No. 328042)
*rhughey@ccvl.com*
Carlson, Caspers, Vandenburgh & Lindquist
225 South Sixth Street
Suite 3200
Minneapolis, MN 55402
(612) 436-9600
Facsimile: (612) 436-9605

Corynne McSherry (admitted *pro hac vice*)
*corynne@eff.org*
Electronic Frontier Foundation
454 Shotwell Street
San Francisco, CA 94110
(415) 436-9333
Facsimile: (415) 436-9993

*Attorneys for Amici Curiae*