# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

-------------------------------------------------------- x

CAPITOL RECORDS INC.,
a Delaware Corporation, *et al.*

               Plaintiffs,

         v.

JAMMIE THOMAS,

              Defendant.

-------------------------------------------------------- x

Civil File No. 06-1497 (MJD/RLE)

**PROPOSED BRIEF OF
*AMICUS CURIAE*
MOTION PICTURE
ASSOCIATION OF AMERICA,
INC.**

**ORAL ARGUMENT
REQUESTED**

Christine L. Nessa (MN Bar #0277666)
Marie L. van Uitert (MN Bar #0387875)
OPPENHEIMER WOLFF &
 DONNELLY LLP
Plaza VII, Suite 3300
45 South Seventh Street
Minneapolis, Minnesota 55402-1609
(612) 607-7522

Robert Alan Garrett (*pro hac vice* pending)
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
(202) 942-5000

Eleanor M. Lackman (*pro hac vice* pending)
ARNOLD & PORTER LLP
399 Park Avenue
New York, New York 10022-4690
(212) 715-1000

*Attorneys for Amicus Motion Picture Association of America, Inc.*

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY ........................................................................ 1

ARGUMENT ..................................................................................................... 4

I.  Under Well-Established Principles Of Statutory Construction, Courts Interpret Federal Laws -- If At All "Possible" -- So That They Do Not Conflict With U.S. Obligations Under International Agreements ................................................................................. 4

II.  WCT, WPPT And Multiple Free Trade Agreements Obligate The U.S. To Include The Act Of Making Copyrighted Works Available Within A Copyright Owner's Exclusive Rights ................................ 6

III.  The Copyright Act Should Be Construed -- As The Executive And Legislative Branches And Several Courts Have Done -- To Include Making Available Within A Copyright Owner's Exclusive Rights ................................................................................. 9

    A. The Executive And Legislative Branches Have Properly Concluded That A Copyright Owner's Exclusive Rights Encompass The Act Of Making Available .................................... 9

    B. Judicial Precedent Supports The Conclusion That A Copyright Owner's Exclusive Rights Encompass The Act Of Making Available ................................................................. 13

    C. The Language And Legislative History Of The Copyright Act Confirm That A Copyright Owner's Exclusive Rights Encompass The Act Of Making Available ........................................... 14

IV.  Nothing In *National Car* Requires The Court To Construe The Copyright Act In Conflict With U.S. International Obligations ..................... 20

CONCLUSION .................................................................................................. 23

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

-------------------------------------------------------- x

CAPITOL RECORDS INC.,
a Delaware Corporation, *et al.*

         Plaintiffs,

         v.

JAMMIE THOMAS,

         Defendant.

Civil File No. 06-1497 (MJD/RLE)

**PROPOSED BRIEF OF**
***AMICUS CURIAE***
**MOTION PICTURE**
**ASSOCIATION OF AMERICA,**
**INC.**

**ORAL ARGUMENT**
**REQUESTED**

-------------------------------------------------------- x

The Motion Picture Association of America, Inc. ("MPAA") submits the following amicus brief in support of Jury Instruction No. 15 that "[t]he act of making copyrighted sound recordings available for electronic distribution on a peer-to-peer network, without license from the copyright owners, violates the copyright owners' exclusive right of distribution, regardless of whether actual distribution has been shown."

## INTRODUCTION AND SUMMARY

1.    Peer-to-peer ("P2P") software allows a single individual with Internet access to disseminate, to millions of computer users around the world, perfect digital copies of a virtually limitless number of motion pictures and other copyrighted works -- all without the authorization of affected copyright owners. One simply downloads the software and

places the works in a "shared" folder on an operating computer. The only purpose for placing copyrighted works in the shared folder is, of course, to "share," by making those works available to countless other P2P network members.

The fundamental issue raised by Jury Instruction No. 15 is whether the Copyright Act renders such conduct (the unauthorized making available of copyrighted works over a P2P network) unlawful, as that instruction states, or whether such conduct is unlawful only if "actual distribution has been shown" -- which, as MPAA understands it, means the copyright owner must provide direct proof that specific individuals downloaded specific works the defendant made available. It is often very difficult, and in some cases impossible, to provide such direct proof when confronting modern forms of copyright infringement, whether over P2P networks or otherwise; understandably, copyright infringers typically do not keep records of infringement. Mandating that proof could thus have the pernicious effect of depriving copyright owners of a practical remedy against massive copyright infringement in many instances.

2.      MPAA urges the Court not to impose any requirement of actual distribution because the Copyright Act imposes no such requirement. Section 106(3) of the Act, 17 U.S.C. § 106(3), provides copyright owners with a broad right of distribution, not simply "actual distribution;" and the act of making copyrighted works available over a P2P network or otherwise is included within that broad right.   For several reasons, MPAA believes the only proper reading of Section 106(3) is that it encompasses, and always has encompassed, the act of making available.

2

*First,* a well-established principle of statutory construction is that domestic legislation should be interpreted, if at all "possible," to avoid a conflict with U.S. obligations under international agreements. *Second,* at least two international copyright treaties and multiple bilateral free trade agreements to which the U.S. is a party obligate the U.S. to include within the exclusive rights of a copyright owner the act of making copyrighted works available to the public; thus, consistent with fundamental canons of statutory interpretation, the U.S. Copyright Act should be construed, if at all possible, to include the right of making available. *Third,* that construction finds ample support in the plain language and legislative history of Section 106 of the Copyright Act -- as well as in the fact that the Legislative and Executive branches have themselves repeatedly assured the international community that the U.S. Copyright Act already encompasses the making available right.

3.     The Eighth Circuit's statement in *National Car Rental System, Inc. v. Computer Assoc. Int'l, Inc.*, 991 F.2d 426 (8th Cir. 1993) -- that infringement of the distribution right requires "actual dissemination of either copies or phonorecords" -- does not require the Court to construe the Copyright Act in conflict with U.S. international obligations and the position of the Executive and Legislative branches. That statement was dicta unaccompanied by any analysis of the language or legislative history of Section 106(3) (or U.S. international obligations). The court, dealing with facts and issues that bear no resemblance to this case, merely quoted a single sentence in a treatise -- one that also lacked any supporting analysis or authority and the sole purpose for which was to

3

distinguish the right of distribution from the right of performance. In any event, the Eighth Circuit did not preclude this Court from following the approach of other courts that have distinguished *National Car* -- by "deeming" that any requirement of "actual dissemination of copies" is met where, as here, the defendant downloads P2P software onto his or her computer and places copyrighted works in a shared folder on that computer, thereby making those works available to millions of P2P network members.

## ARGUMENT

## I. Under Well-Established Principles Of Statutory Construction, Courts Interpret Federal Laws -- If At All "Possible" -- So That They Do Not Conflict With U.S. Obligations Under International Agreements

It is well-established that courts should interpret domestic statutes harmoniously with international obligations of the U.S. whenever possible. The Supreme Court recognized this principle over two hundred years ago, when Chief Justice Marshall wrote that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804). *Charming Betsy* remains an accepted "maxim of statutory construction." *Weinberger v. Rossi*, 456 U.S. 25, 32 (1982). *See also DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr.*, 485 U.S. 568, 575 (1988) (canon's relevance is "beyond debate"); Note, *The Charming Betsy Canon, Separation of Powers, and Customary International Law*, 121 Harv. L. Rev. 1215, 1215 (2008) (*Charming Betsy* "has become deeply embedded in American jurisprudence").

4

Courts have "invoked the *Charming Betsy* canon in a variety of contexts." Curtis Bradley, *The Charming Betsy Canon and Separation of Powers: Rethinking the Interpretive Role of International Law*, 86 Geo. L.J. 479, 488 (1998). The canon "presumably applies to all international obligations of the United States, regardless of whether they are viewed as enforceable domestic law." *Id.* at 483. *See, e.g., Kim Ho Ma v. Ashcroft*, 257 F.3d 1095, 1114 (9th Cir. 2001) (applying principle to interpret a domestic statute consistently with non-self-executing treaty to which the United States was a party). As the Restatement of Foreign Relations makes clear, "[w]here fairly possible, a United States statute is to be construed so as not to conflict with international law or with an international agreement of the United States." Restatement (Third) of the Foreign Relations Law of the United States § 114 (1987).

*Charming Betsy* reflects sound policy considerations. The "conduct of foreign relations of our Government is committed by the Constitution to the Executive and Legislative -- 'the political' -- Departments of the Government." *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918). *See* U.S. Const. art. II, § 2, cl. 2 (granting treaty power to the President with advice and consent of the Senate). *Charming Betsy* provides a "means of both respecting the formal constitutional roles of Congress and the President and preserving a proper balance and harmonious working relationship among the three branches of the federal government." Bradley, *supra*, at 525. It ensures that courts do not interpret statutes in a manner that undermines the foreign policy decisions of the political branches to enter into (and bind the country to) specific international agreements -- and

5

thereby unnecessarily impair the credibility of the Government in dealing with the international community.

*Charming Betsy* also has particular relevance to copyright law given "Congress' objective of achieving 'effective and harmonious' copyright laws among all nations," its "efforts to secure a more stable international intellectual property regime" and its concern with "'strengthen[ing] the credibility of the U.S. position in trade negotiations with countries where piracy is not uncommon.'" *Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*, 24 F.3d 1088, 1097-98 (9th Cir. 1994) (en banc) (quoting H.R. Rep. No. 100-609, at 20 & 4-5 (1988)). As the legislative history of the Copyright Act of 1976 states, "[i]n an era when copyrighted works can be disseminated instantaneously to every country on the globe, the need for effective international copyright relations . . . assume[s] ever greater importance." H.R. Rep. No. 94-1476, at 130 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5746 ("1976 House Report").

## II.  WCT, WPPT And Multiple Free Trade Agreements Obligate The U.S. To Include The Act Of Making Copyrighted Works Available Within A Copyright Owner's Exclusive Rights

In December 1996, a Diplomatic Conference of the World Intellectual Property Organization ("WIPO") adopted the WIPO Copyright Treaty ("WCT") and the WIPO Performances and Phonograms Treaty ("WPPT") by consensus of 160 countries including the United States. S. Rep. No. 105-190, at 5 & 9 (1998). A primary purpose of WCT and WPPT, known as the "Internet Treaties," was to provide adequate protection of

6

copyrighted works against unauthorized exploitation over the Internet. *Id.* at 10; H.R. Rep. No. 105-551(II), at 21 (1998).

To help achieve that objective, WCT and WPPT required signatory nations to include within a copyright owner's exclusive rights the act of making copyrighted works available. Article 8 of WCT states:

> [Copyright owners] shall enjoy the exclusive right of authorizing any communication to the public of their works, by wire or wireless means, *including the making available to the public of their works in such a way that members of the public may access these works from a place and at a time individually chosen by them.*

(Emphasis added). Article 6(1) of WCT, entitled "Right of Distribution," provides that copyright owners "shall enjoy the exclusive right of authorizing the making available to the public of the original and copies of their works through sale or other transfer of ownership." *See also* WPPT Art. 12(1) & Art. 14. The concept of "making available," although it has particular relevance to the digital age, was not new to international copyright treaties, having first appeared nearly a century earlier in the Berne Convention's definition of a "published work." *See* Dr. Mihaly Ficsor, *The Law of Copyright and the Internet: The 1996 WIPO Treaties, Their Interpretation and Implementation* 166-67 (2002).

A violation of the making available right does not require proof that copies were actually transferred to particular individuals. The essence of the right is that the copyright owner determines the manner and means for offering his or her work to the public. *See* WIPO, *Guide to the Copyright and Related Rights Treaties Administered by WIPO* at 208

(2003) (the treaties cover those acts "which only consist of making the work accessible to the public [where] . . . members of the public still have to cause the system to make it actually available to them"); Tilman Luder, *The Next Ten Years in E.U. Copyright: Making Markets Work*, 18 Fordham Intell. Prop., Media & Ent. L.J. 1, 33-36 (2007) (discussing judicial decisions in the European Union that applied the making available right to P2P file-sharing and other Internet-based services without proof that files had been physically transferred).

The primary debate at WIPO concerning making available involved the method by which signatory nations would implement that right. Rather than taking a one-size-fits-all approach, WCT and WPPT gave signatory nations the ability to choose the method of implementation. *See* Ficsor, *supra*, at 496–97 (discussing the "umbrella" approach which permits countries to provide the panoply of rights in Articles 6 and 8 of WCT and Articles 12 and 14 of the WPPT through a distribution right, a right of communication or other means). "Most national laws implement [making available] as part of the right of communication to the public, although some do as part of the right of distribution." WIPO, *Understanding Copyright and Related Rights* at 12 available at *http://www.wipo.int/freepublications/en/intproperty/909/wipo_pub_909.pdf* (last visited June 12, 2008).

In July 1997 the Clinton Administration submitted WCT and WPPT to the Senate with implementing legislation. *See* H.R. Rep. No. 105-551(II), at 21 (1998). In October 1998, Congress adopted legislation, as part of the Digital Millennium Copyright Act, to

implement fully WCT and WPPT.  *See* Pub. L. No. 105-304, 112 Stat. 2861 (1998).  On October 28, 1998, President Clinton signed the implementing legislation and, with implementation completed, he ratified WCT and WPPT on September 14, 1999.

The United States has since entered into multiple Free Trade Agreements that, like WCT and WPPT, obligate the United States to include making available within a copyright owner's exclusive rights.  *See, e.g.*, U.S.-Australia FTA, Art. 17.4.2, 17.5 & 17.6.3; U.S.-Korea FTA, Art. 18.4.2, 18.5 & 18.6.2.  In approving and implementing such agreements, Congress has explicitly recognized that they contain such an obligation.  *See, e.g.,* S. Rep. No. 109-364, at 27-28 (2006); S. Rep. No. 109-199, at 24 (2005); S. Rep. No. 109-128, at 31 (2005); S. Rep. No. 108-117, at 17 (2003); H.R. Rep. No. 108-224, pt. 2, at 4 (2003).

## III.   The Copyright Act Should Be Construed -- As The Executive And Legislative Branches And Several Courts Have Done -- To Include Making Available Within A Copyright Owner's Exclusive Rights

### A.   The Executive And Legislative Branches Have Properly Concluded That A Copyright Owner's Exclusive Rights Encompass Making Available

Congress intended to implement WCT and WPPT in their entirety without any reservation.  Nothing in the language or legislative history of the implementing legislation reflects an intent to exclude from U.S. law any obligation imposed by these treaties, including the obligation to afford a right of making available.  Congress in fact recognized that the WIPO treaties contained a "broad right of communication to the public that includes the Internet."  S. Rep. No. 105-190, at 10 (1998).  Congress, however, concluded

9

that there was no need to make any changes in existing copyright law to provide that right or any other right mandated by WCT and WPPT: "The treaties do not require any change in the substance of copyright rights or exceptions in the U.S. law." H.R. Rep. No. 105-551(I), at 9 (1998).

There is nothing remarkable about that conclusion. *See* Restatement (Third) of the Foreign Relations Laws of the United States § 111(3), cmt. h (1987) ("There can, of course, be instances in which . . . previously enacted legislation will be fully adequate to give effect to an apparently non-self-executing international agreement, thus obviating the need of adopting new legislation to implement it"). That conclusion also is consistent with the position taken by the President, the Register of Copyrights and the State Department:

- **The President.** The Senate required the President to "sign[] into law a bill that implements the [WIPO] Treaties" as a precondition to depositing the instruments of ratification for those treaties. *Resolution of Ratification, WIPO Copyright Treaty (WCT) and WIPO Performances and Phonograms Treaty (WPPT) (1996)*, Supplement to Treaty Doc. 105-17 (Oct. 21, 1998). Thus, when President Clinton ratified the WIPO treaties, he certified that U.S. law was in full compliance with the treaties, including their making available provisions. Similarly, "with respect to each Trade Agreement containing provisions regarding the 'making available' right, the President has informed Congress that no change to existing U.S. law was required to implement those provisions." Statement of Interest of the United States

at 6-7 (Apr. 21, 2006) in *Elektra Entm't Group, Inc. v. Barker*, __ F. Supp. 2d __, 2008 WL 857527 (S.D.N.Y. Mar. 31, 2008) ("*Barker*"). *E.g.,* United States-Australia Free Trade Agreement Implementation Act: Statement of Administrative Action at 1 & 24-25 (July 6, 2004).

- **Register of Copyrights.** The Register of Copyrights informed Congress that there was "no need to alter the nature and scope of the copyrights and exceptions, or change the substantive balance of rights embodied in the Copyright Act" in order to comply with the WIPO treaties. Statement of Marybeth Peters, Register of Copyrights, *WIPO Copyright Treaties Implementation Act and Online Copyright Liability Limitation Act: Hearing on H.R. 2281 & H.R. 2180 Before the H. Subcomm. on Courts and Intellectual Property of the Comm. on the Judiciary*, 105th Cong. 43 (1997). Following enactment of the WIPO implementing legislation, the Register advised Congress that "making [a work] available for other users of [a] peer to peer network to download . . . constitutes an infringement of the exclusive distribution right . . . ." Letter from Marybeth Peters to Rep. Howard L. Berman 1 (Sept. 25, 2002), *reprinted in Piracy of Intellectual Property on Peer-to-Peer Networks: Hearing Before the Subcommittee on Courts, the Internet, and Intellectual Property of the House Committee on the Judiciary*, 107th Cong. 114–15 (2002). *See also id.* ("In implementing WCT and WPPT, Congress determined that it was not necessary to add any additional rights to Section 106 of the Copyright Act in order to implement the 'making available' right . . ."); Jesse

Feder, *Keynote Address:  Fair Use, Public Domain, or Piracy . . . Should the Digital Exchange of Copyrighted Works be Permitted or Prevented*, 11 Fordham Intell. Prop. Media & Ent. L.J. 265, 269 (Winter 2001) (Copyright Office official discussing the WIPO treaties and stating "[w]e concluded that the . . . exclusive right of communication to the public[] was already covered in U.S. law   . . . under existing exclusive rights in the Copyright Act, so no change was made in that area").

- **State Department.**  The State Department also has advised the World Trade Organization ("WTO") that the unauthorized making available of copyrighted works constitutes infringement under U.S. copyright law.  *See, e.g.,* U.S. Submission to WTO Trade Policy Review Body, WT/TPR/M/126/Add.3, at 140 (Nov. 22, 2004); U.S. Submission to WTO Trade Policy Review Body, WT/TPR/M/88/Add.1, at 121 (Jan. 8, 2002) (citations omitted).

It is not necessary to argue that a court must interpret the Copyright Act one way simply because a government official has interpreted it that way. *But see United States v. Mead Corp.*, 533 U.S. 218, 229 (2001) (requiring deference to agency interpretations in certain circumstances); *Chevron U.S.A., Inc. v. Natural Res. Def. Counsel*, 467 U.S. 837, 844–45 (1984) (same); *Bonneville Int'l Corp. v. Peters,*  347 F.3d 485, 490 & n.9 (3d Cir. 2003) (describing circumstances where courts defer to Register of Copyrights' interpretation of the Copyright Act).  Nor is it necessary to argue that one Congress' understanding of a law enacted by an earlier Congress is necessarily determinative of how

a court should interpret that law. *But see Loving v. United States*, 517 U.S. 748, 770 (1996) ("[s]ubsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction") (citations omitted).

However, under *Charming Betsy,* courts should interpret the Copyright Act -- if at all "possible" -- to avoid a conflict with U.S. international obligations. The fact that the Congress, the President, the Register of Copyrights and the State Department have uniformly read the Copyright Act to include a making available right -- thereby avoiding a conflict with those obligations -- suggests that such a reading is not only "possible" but that it also is the correct reading. The policies underlying *Charming Betsy* are particularly applicable here where it is clear that the political branches of the government, with constitutional responsibility for foreign relations, have determined that the U.S. should be, and is, obligated to include making available within the copyright owner's exclusive rights. *See supra* pages 5-6.

### B. Judicial Precedent Supports The Conclusion That A Copyright Owner's Exclusive Rights Encompass Making Available

Several courts have considered whether Section 106 contains a making available right. Some have recognized that right; some have reached a contrary conclusion; others have reserved judgment; and one court has ruled one way only to reverse itself later. *See Atlantic Recording Corp. v. Howell*, __ F. Supp. 2d __, 2008 WL 1927353, at *5–6 (D. Ariz. Apr. 29, 2008) ("*Howell"*).

While the court in *Howell* stated that the "great weight of authority" had rejected making available (*id.* at *10), none of that authority even referenced, let alone discussed

and analyzed, the *Charming Betsy* canon of statutory construction.  Indeed, only one district court rejecting making available has even mentioned WCT and WPPT.  The *Barker* court refused to attach any significance to U.S. obligations under these treaties -- citing *Medellin v. Texas*, 2008 WL 762533 (U.S. Mar. 25, 2008) for the proposition that courts will not imply a private right of action for violation of a non-self-executing treaty.  *See Barker*, 2008 WL 857527 at *6 n. 7.  *Charming Betsy*, however, is a rule of statutory construction; its relevance, never discussed in *Barker* or *Medellin*, does not turn on whether WCT or WPPT creates a private right of action.  The critical difference between the present case and a case like *Medellin* is that here Congress has enacted a law (Section 106) that, as the Executive and Legislative branches have recognized, includes the right that the U.S. is obligated to provide under international  agreements.

### C.    The Language And Legislative History Of The Copyright Act Confirm That A Copyright Owner's Exclusive Rights Encompass Making Available

Section 106(3) of the Copyright Act, 17 U.S.C. § 106(3), affords copyright owners the exclusive rights "to do" and "to authorize," among other things, the following:  "To distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease or lending."  The act of making copyrighted works available falls squarely within the right "to distribute."  It also comes within the right "to authorize" distribution.  Construing Section 106 in this manner is consistent not only with the ordinary meaning of these terms but also with the Congressional purpose underlying Section 106 -- and with *Charming Betsy*.

1.     To Distribute.   The Copyright Act does not define either "distribute" or "distribution" in Section 106(3).  Absent a statutory definition, the courts "give words in a statute their ordinary meaning. . . ."  *Ashley v. United States Dep't of Interior*, 408 F.3d 997, 1001 (8th Cir. 2005).  In a related context, one court correctly concluded that the "ordinary meaning" of the term "distribute" includes the placing of material (child pornography) on a shared folder of a P2P network.  *See United States v. Shaffer,* 472 F.3d 1219, 1223–24 (10th Cir. 2007) (defendant engaged in distribution because he allowed other P2P network members "access to his computerized stash of images and videos and openly invited them to take, or download, those items"); *id.* at 1224–25 (collecting cases that define the ordinary meaning of the term "distribution").

Consistent with this "ordinary meaning," Congress has recognized explicitly in other provisions of the Copyright Act that "distribution" of a work includes making the work available.  *See* 17 U.S.C. § 506(a)(1)(i) (2006) (imposing criminal penalties for "the *distribution* of a work being prepared for commercial distribution, by *making it available* on a computer network accessible to members of the public. . . ") (emphasis added); *id.* § 901(a)(4) ("to distribute means to sell, lend, bail or otherwise transfer, or to offer to sell, lend, bail or otherwise transfer.")   Where Congress has intended in the Copyright Act to confine the term distribution to a physical transfer of copyrighted material, it has said so explicitly.  *See id.* at § 115(c)(2) ("For this purpose, and other as provided in [Section 115(c)(3)], a phonorecord is considered 'distributed' if the person exercising the compulsory license has voluntarily and permanently parted with its possession;" Section

15

115(c)(3) affords compulsory licensee the right "to distribute or authorize the distribution of a phonorecord" by means of certain digital transmissions).

The Supreme Court also has stated that the Section 106(3) distribution right includes "publication" as defined in Section 101 of the Copyright Act, 17 U.S.C. § 101. *See Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 552 (1985) ("'Clause (3) of section 106, establishes the exclusive right of publications. . . .") (quoting 1976 House Report at 62). *See also* H. Comm. on the Judiciary, 87th Cong., *Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law* 21 (Comm. Print 1961) (indicating that the distribution right was intended to replace the rights to "vend" and "publish" in the 1909 Copyright Act and explaining that these terms were "redundant" since "vending is a mode of publishing"). Because Section 101 defines "publication" to include the "offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display," the legislative history of the Copyright Act on which the Supreme Court relied in *Harper & Row* suggests that "offering" to distribute copies for certain purposes violates Section 106(3).

The district courts in *Howell*, *supra*, at *7–8, and *London-Sire Records, Inc. v. Doe 1*, 542 F. Supp. 2d 153, 169 (D. Mass. 2008), have refused to equate distribution with publication, notwithstanding the Supreme Court's contrary view in *Harper & Row*. The court in *Barker*, *supra*, at *10-19 has followed *Harper & Row* and reached a result inconsistent with *Howell* and *London-Sire*. It is not necessary for the Court to resolve this

16

conflict over whether "distribution" and "publication" are synonymous. That is because the ordinary meaning of the term "distribute" in Section 106(3) is itself sufficient to support the conclusion that making available is included within Section 106(3).

2. To Authorize. As noted above, Section 106(3) also affords copyright owners the exclusive right "to authorize" distribution of their works. Making works available to Internet users around the world, by placing those works in a shared folder on a computer, is precisely the type of activity that Section 106(3) gives copyright owners the exclusive right to authorize. P2P file-sharers cannot usurp that right for themselves without copyright owner authorization. Under the ordinary meaning of the term "authorize," Section 106(3) encompasses the right to license others to make copyrighted works available online.

There is a split of authority on the meaning of the term "authorize" in Section 106. *See Barker, supra*, at *9. Some courts believe Congress included the term "authorize" in Section 106 to cover only contributory infringement claims -- although at least one such court has acknowledged that the "better bare-language reading" of Section 106 does not support that view. *See Venegas-Hernandez v. Asociacion de Compositores y Editores de Musica Latinoamericana*, 424 F.3d 50, 58 (1st Cir. 2005). Other courts have concluded that the term "authorize" in Section 106 should be given its ordinary meaning and that Congress never intended to confine that term to contributory infringement. *See, e.g., Expediters Int'l v. Direct Line Cargo Mgmt. Servs.*, 995 F. Supp. 468, 475–76 (D.N.J. 1998); *Curb v. MCA Records,* 898 F. Supp. 586, 594 (M.D. Tenn. 1995) (same).

Those courts that interpret "authorize" in Section 106 narrowly have relied almost solely upon a single passage of the 1976 Report. That passage, however, says no more than that "[u]se of the phrase 'to authorize' is intended to avoid any questions as to the liability of contributory infringers." 1976 House Report at 57. There is nothing in that passage or any other legislative history of the Copyright Act to indicate that Congress meant the term "authorize" to refer *solely* to contributory infringement. Moreover, none of the courts adopting the narrow view of Section 106 have even mentioned (let alone attempted to reconcile) the contrary view of the Supreme Court in *New York Times Co. v. Tasini*, 533 U.S. 483 (2001).

In *Tasini,* the Supreme Court made clear that a violation of the Section 106 right to authorize is not limited to contributory infringement. The Supreme Court noted that the plaintiffs in that case had not made any contributory infringement claim. *See id.* at 504. Nevertheless, the Supreme Court held that the defendant Print Publishers had directly infringed "by authorizing the Electronic Publishers to place the Articles in the Databases and by aiding the Electronic Publishers in that endeavor." *Id.* at 506; *see also id.* at 498 ("the Print Publishers, through contracts licensing the production of copies in the Databases, 'authorize' reproduction and distribution of the Articles, [17 U.S.C.] § 106.") (footnote omitted). As *Tasini* makes clear, the term "authorize" in Section 106 is not limited to contributory infringement.

3. <u>Legislative Purpose</u>. The meaning of the terms "distribute" and "authorize" should be considered in light of the purpose of Section 106, which is to grant copyright

18

owners "broad" rights that are then limited by other provisions in Chapter 1 of the Copyright Act. *See* 1976 House Report at 61 ("The approach of the bill is to set forth the copyright owner's exclusive rights in broad terms in section 106, and then to provide various limitations, qualifications, or exemptions in the 12 sections that follow"). As the Register of Copyrights explained in submitting to Congress draft legislation that ultimately became the 1976 Copyright Act, the Section 106 rights should be broad enough to include all uses that materially affect the value of the copyright owner's work:

> [N]o one can foresee accurately . . . the evolving patterns in the ways author's works will reach the public [in the future]. Lacking that kind of foresight, the bill should, we believe, adopt a general approach aimed at providing compensation to the author for future as well as present uses of his work that *materially affect the value of his copyright.*

H. Comm. on the Judiciary, 89th Cong., 1st Sess., *Supplemental Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law* 13–14 (Comm. Print 1965) (emphasis added).

Making copyrighted works available to millions of Internet users is precisely the type of use that "materially affects" the value of those works -- and is thus the type of use that Congress contemplated as coming within the "broad" rights granted by Section 106 of the Copyright Act. Indeed, it is the very activity that copyright owners license, for valuable consideration, to services such as Apple's iTunes. Surely no one would contend that iTunes, for example, may provide its service without a license from copyright owners simply because there was no direct proof that any particular person downloaded a particular work from iTunes. Construing Section 106 to include a making available right

19

is thus consistent not only with the plain language of that provision but also with the legislative purpose of that provision.

## IV. Nothing In *National Car* Requires The Court To Construe The Copyright Act In Conflict With U.S. International Obligations

The Eighth Circuit stated in *National Car Rental System, Inc. v. Computer Assoc. Int'l, Inc.*, 991 F.2d 426 (8th Cir. 1993), that "'[i]nfringement of [the distribution right] requires an actual dissemination of either copies or phonorecords.'" *Id.* at 434 (quoting 2 Nimmer on Copyright § 8.11[A], at 8-124.1).

That statement, however, was dictum; while entitled to "respectful consideration" at least in factually similar cases, it is not binding precedent. *See Boyer v. County of Wash.*, 971 F.2d 100, 102 n.4 (8th Cir. 1992) (per curium) (dicta are statements that are "not necessary to decide the issue in the case and [are] not binding authority"); *Fix Fuel & Material Co. v. Wabash R.R. Co.*, 243 F.2d 110, 114 (8th Cir. 1957) ("[I]n view of the fact that the [quoted dicta] voice[s] the considered opinion of this court on *facts which are identical to those present in the instant case*, they may not be disregarded but are entitled to respectful consideration") (emphasis added); *Wilson v. Zoellner,* 114 F.3d 713, 722 (8th Cir. 1997) (citing *Boyer* and *Fix Fuel* approvingly).

*National Car* is not factually similar to the present case or any case involving on-line piracy; it involved the issue of whether the Copyright Act preempted a breach of contract claim for certain uses of computer programs prohibited under a license. Determining the scope of the distribution right was not necessary to resolution of that issue. *See* 991 F.2d at 427–28. Indeed, the court found that the action was not preempted

even before it made the statement in question, which was one of three reasons offered for rejecting an argument raised by the defendant. Moreover, the statement in *National Car* is not accompanied by any analysis of the language or history of the Copyright Act or judicial precedent. It is simply a quotation from the Nimmer treatise which, in turn, cited no authority for the proposition and provided no analysis. Examination of the entire passage from which the quotation is taken shows that Nimmer made the statement simply to distinguish the right of public performance from the right of distribution -- not to delineate the contours of the distribution right or to explain whether that right includes a making available right.

Under these circumstances, the Court should not rely upon *National Car* to construe the U.S. Copyright Act in violation of U.S. international obligations. But even if the Court credited the statement in *National Car* that distribution requires "actual dissemination of copies," the Court should follow the approach of other courts that have distinguished *National Car* and found infringement of the Section 106(3) distribution right.

For example, in *Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 199, 203 (4th Cir. 1997), the court cited *National Car* but went on to conclude that the defendant library infringed the Section 106(3) distribution right when, without authorization, it "adds a work to its collection, lists the work in its index . . . and *makes the work available* to the borrowing or browsing public." *Id.* (emphasis added); *see also id.* ("[T]he record does not contain any evidence showing specific instances . . . in which the

libraries loaned the infringing copies to members of the public.  But . . . proving the libraries held unauthorized copies in their collections, where they were available to the public, is sufficient to establish distribution within the meaning of the statute").  The court explained, "[w]ere this not to be considered distribution within the meaning of § 106(3), a copyright holder would be prejudiced by a library that does not keep records of public use."  *Id.  See Perfect 10, Inc. v. Amazon.com*, 487 F.3d 701, 718–19 (9th Cir. 2007) (under *Hotaling* and other precedent the "owner of a collection of works who makes them available to the public may be *deemed* to have distributed copies of the works.") (Emphasis added).

A defendant who makes copyrighted works available for file-sharing over a P2P network should likewise be "deemed" to have satisfied any requirement of "actual dissemination of copies or phonorecords" imposed by *National Car.*  Given the nature of P2P technology, applying the *Hotaling* "deemed distribution" rule to P2P file-sharing is particularly appropriate, since a contrary rule would reward infringers who use technology specifically configured not to retain direct evidence of wrongdoing.  *See Warner Bros. Records, Inc. v. Payne*, No. W-06-CA-051, 2006 WL 2844415, at *3 (W.D. Tex. July 17, 2006) ("[T]he same evidentiary concerns that were present in *Hotaling* are also present in a case involving peer-to-peer file sharing programs.  As Plaintiffs note, '[p]iracy typically takes place behind closed doors and beyond the watchful eyes of a copyright holder'") (citations omitted); *Arista Records, Inc. v. Mp3Board, Inc.*, No. 00 CIV. 4660 (SHS), 2002 WL 1997918, at *4 (S.D.N.Y. Aug. 29, 2002) ("[A] copyright holder may not be

required to prove particular instances of use by the public when the proof is impossible to produce because the infringer has not kept records of public use. . . .").

## CONCLUSION

For the reasons stated above, MPAA requests the Court to conclude that Jury Instruction No. 15 reflects a correct interpretation of the Copyright Act.

Dated: June 20, 2008

Respectfully submitted,

By:  s/Marie L. van Uitert
Christine L. Nessa (MN Bar #0277666)
Marie L. van Uitert (MN Bar #0387875
OPPENHEIMER WOLFF &
 DONNELLY LLP
Plaza VII, Suite 3300
45 South Seventh Street
Minneapolis, Minnesota  55402-1609
(612) 607-7522

Robert Alan Garrett (*pro hac vice* pending)
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
(202) 942-5000

Eleanor M. Lackman (*pro hac vice* pending)
ARNOLD & PORTER LLP
399 Park Avenue
New York, New York 10022-4690
(212) 715-1000

*Attorneys for Amicus Motion Picture
Association of America, Inc.*