## UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

CAPITOL RECORDS INC.,
a Delaware corporation, et al.,

                 Plaintiffs,

v.                          Civil File No. 06-CV-1497 (MJD/RLE)

JAMMIE THOMAS,

                 Defendant.

---

### MEMORANDUM OF *AMICUS CURIAE* INTELLECTUAL PROPERTY INSTITUTE OF WILLIAM MITCHELL COLLEGE OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR A NEW TRIAL

### STATEMENT OF INTEREST

The Intellectual Property Institute is an entity within the William Mitchell College of Law. An important part of the Institute's mission is to engage in the rigorous exploration of the balance between privately owned and publicly shared works of authorship. The Institute views copyright law as one tool that establishes and maintains that balance.

Among the Institute's activities is the advocacy for the responsible development of intellectual property law, including copyright law. One of the Institute's purposes is to raise issues and arguments in light of the public interest and the best interests of the copyright system as a whole.

Dockets.Justia.com

The Institute has no financial interest in any of the parties to the current action.

## BACKGROUND AND SUMMARY OF ARGUMENT

The Intellectual Property Institute of William Mitchell files this brief as *amici curiae* in support of Defendant Jammie Thomas.

On October 5, 2007 this Court entered judgment in the amount of $222,000 against Defendant Jammie Thomas after a jury determined that she had used a peer-to-peer network[1] to willfully infringe the copyrights of twenty-four sound recordings owned by major record labels. That determination came after this Court instructed the jury, in Jury Instruction No. 15, that

> [t]he act of making copyrighted sound recordings available for electronic distribution on a peer-to-peer network, without license from the copyright owners, violates the copyright owners' exclusive right of distribution, regardless of whether actual distribution has been shown.

Jury Instructions at 18, *Capitol Records Inc. v. Thomas*, 06-CV-01497 (D. Minn. Oct. 5, 2007) [hereinafter "Jury Instruction No. 15"].

*Amici curiae* respectfully believe that Jury Instruction No. 15 misstated a bedrock principle of copyright law: only the actual distribution of copies or phonorecords infringes the section 106(3) distribution right. *See* 17 U.S.C. § 106(3) (2006) (granting copyright holders the exclusive right "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease,

---

[1] The Court should take note that what Plaintiffs refer to in Plaintiffs' Statement of the Case as an "online media distribution network" assumes facts not in evidence that a distribution has taken place. The system involved is properly referred to as a peer-to-peer network because its hallmark architectural is the absence of a central computer server. Hence, "peer-to-peer" and not "client-server." *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 919-20 (2005).

or lending"). The Eighth Circuit Court of Appeals followed that rule in *National Car Rental System, Inc. v. Computer Associates International, Inc.*, 991 F.2d 426, 434 (8th Cir.) (reasoning that "'[i]nfringement of [the distribution right] requires an actual dissemination of either copies or phonorecords'" (quoting 2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8.11[A], at 8-124.1 (2007)), *cert. denied*, 510 U.S. 861 (1993).

Because Jury Instruction No. 15 plainly and indisputably disregarded the controlling law as reflected in the explicit language of the Copyright Act and the holding of *National Car Rental*, this Court should grant Defendant a new trial.

In support of Defendant's motion for a new trial, the Institute makes four arguments. First, to establish infringement under section 106(3), Plaintiffs must show that Defendant actually distributed copies or phonorecords to the public. Second, section 106(3) does not provide an independent making available right. Third, Plaintiffs must show more than copying by their own investigators to establish actual distribution. Fourth, public policy requires Congress, not the courts, to create a solution for Plaintiffs and those similarly situated, if and when Congress decides to amend the Copyright Act.

## STANDARD OF REVIEW

This matter is before the Court pursuant to the May 20, 2008 Order that contemplates a *sue sponte* motion for a new trial pursuant to Fed. R. Civ. P. 59(d). The Court's rationale for considering the motion for a new trial is that Jury Instruction No. 15 may have been contrary to binding Eight Circuit precedent and may constitute a manifest error of law. *Cf. Hagerman v. Yukon Energy Corp.*, 839 F.2d 407, 414 (8th Cir.), *cert.*

*denied*, 488 U.S. 820 (1988) ("manifest error" standard for Rule 59(e) motions for reconsideration). *Black's* defines a "manifest error" as "[a]n error that is plain and indisputable, and that amounts to a complete disregard of the controlling law or the credible evidence in the record." *Black's Law Dictionary* 582-83 (8th ed. 2004). Therefore, Jury Instruction No. 15 would constitute a manifest error of law if it is plainly and indisputably a complete disregard of the controlling law.

## ARGUMENT

## I.  SECTION 106(3) REQUIRES A SHOWING OF ACTUAL DISTRIBUTION OF COPIES OR PHONORECORDS

*Amici curiae* respectfully contend that the Court should grant Defendant Jammie Thomas a new trial because Jury Instruction No. 15 instructed the jury that the law does not require a showing of actual distribution in order to establish infringement of the distribution right under section 106(3):

> The act of making copyrighted sound recordings available for electronic distribution on a peer-to-peer network, without license from the copyright owners, violates the copyright owners' exclusive right of distribution, regardless of whether actual distribution has been shown.

Jury Instruction No. 15.

*Amici* believe that this instruction constituted manifest error.

### A.  The plain language of section 106(3) requires actual distribution

The plain language of section 106(3) of the Copyright Act only grants copyright holders the exclusive right "to distribute *copies or phonorecords* of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106(3) (emphasis added). Both the terms "copies" and "phonorecords" are

4

defined in the Copyright Act as "material objects." *See id.* §§ 101, 106(1). In carving

out the section 106 rights, Congress repeatedly and purposefully distinguished intangible

"copyrighted works" from tangible "copies or phonorecords."[2] H.R. Rep 94-1472, 94th

Cong., 2d Sess. at 53, *reprinted in* 1976 U.S.C.C.A.N. 5659, 5666 (1976). Thus, for

example, section 106(2) grants the copyright owner the right to make derivative works of

the *copyrighted work.* 17 U.S.C. § 106(2) (emphasis added). In contrast, by referring to

"copies" and "phonorecords" in section 106(3), Congress grants only "a right to

distribute . . . tangible, physical things." R. Anthony Reese, *The Public Display Right:*

*The Copyright Act's Neglected Solution to the Controversy over RAM Copies*, 2001 U of

Ill. L. Rev. 83, 126-35 (2001); *see* 2 Paul Goldstein, *Goldstein on Copyright* § 7.5.1 (3d

ed. 2007) ("The crux of the distribution right lies in the transfer . . . of a copy or

phonorecord. . . . [A]n actual transfer must take place."); 2 Nimmer & Nimmer, *supra*, §

8.11[A], at 8-124.1 n.2 ("the right of distribution apparently is not infringed by the mere

offer to distribute to members of the public") (internal citation omitted); 4 William F.

Patry, *Patry on Copyright* § 13:9 (2007) ("without actual distribution of copies . . . there

is no violation of the distribution right").

---

[2] The 1976 House Report calls the difference between a copyrighted work and the material object in which it is fixed a "fundamental distinction." *See* H.R. Rep. 94-1476 at 53 (1976) *reprinted in* 1976 U.S.C.C.A.N. 5659, 5666 (1976) ("'copies' and 'phonorecords' together will comprise all of the material objects in which copyrightable works are capable of being fixed."). Throughout the report, intangible "copyrighted works" are kept separate from tangible "copies" and "phonorecords," or "material objects." *See id.*

Therefore, the plain language of Section 106(3) requires the actual distribution of copies or phonorecords to establish infringement of the distribution right.

**B.      Case law requires actual distribution**

In *National Car Rental*, the Eighth Circuit Court of Appeals correctly followed the plain language of section 106(3), highlighting that an "'[i]nfringement of [the distribution right] requires an actual dissemination of either copies or phonorecords.'"  991 F.2d at 434 (quoting 2 Nimmer & Nimmer, *supra*, § 8.11[A], at 8-124.1).  At issue was whether the Copyright Act preempted Computer Associates' state court action for unauthorized use of software, which National alleged amounted to a claim of wrongful distribution of the software.  The court concluded that a claim of unauthorized use does not amount to distribution under section 106(3) because the right to distribute is only "the right to distribute *copies*."  *Id.* at 430 (emphasis in original).  *National Car Rental's* rule – that the plaintiff must show actual distribution of copies to establish infringement of section 106(3) – is indeed the proper rule for the case before this Court.

Recently, outside the Eighth Circuit, several district courts have also concluded that a showing of actual distribution of copies or phonorecords is required in the context of alleged copyright infringement by peer-to-peer users.  *See Atlantic Recording Corp. v. Howell*, __ F. Supp. 2d __, No. CV-06-02076, 2008 WL 1927353 at *6 (D. Ariz. 2008) [hereinafter *Howell*] ("Unless a copy of the work changes hands in one of the designated ways, a 'distribution' under § 106(3) has not taken place."); *London-Sire Records, Inc. v. Doe 1*, 542 F. Supp. 2d 153, 166 (D.Mass. 2008) ("[T]o constitute a violation of the distribution right under § 106(3), the defendants . . .  must actually 'do' it."); *Atlantic*

*Recording Corp. v. Brennan*, 534 F. Supp. 2d 278, 282 (D. Conn. 2008) [hereinafter *Brennan*] ("'without actual distribution of copies . . . there is no violation [of] the distribution right'" (quoting 4 Patry, *supra*, § 13:9 (2007)). *But see Elektra Entm't Group, Inc. v. Barker*, __ F. Supp. 2d __, No. 05-CV-7340, 2008 WL 857527 at *6 (S.D.N.Y. 2008) [hereinafter *Barker*] (concluding that "the offer to distribute" can violate the distribution right of section 106(3)).

Therefore, the overwhelming weight of the case law requires actual distribution of copies or phonorecords to establish infringement of the distribution right.

## II.  SECTION 106(3) DOES NOT PROVIDE AN INDEPENDENT "MAKING AVAILABLE" RIGHT

The Court should grant the Defendant a new trial because merely making a copyrighted work available on a peer-to-peer network does not constitute an infringement of the distribution right under section 106(3).  Jury Instruction No. 15, however, stated that

> [t]he act of making copyrighted sound recordings available for electronic distribution on a peer-to-peer network, without license from the copyright owners, violates the copyright owners' exclusive right of distribution . . . .

Jury Instruction No. 15.

Respectfully, a*mici curiae* believe that this instruction constitutes manifest error.

### A.  The plain language of section 106(3) does not allow an independent "making available" right

The plain language of section 106(3) does not support Plaintiffs' "making available" theory.  Section 106(3) does not express any right to make available, to attempt to distribute, or to offer to distribute – it expressly grants only the right "to

*distribute* copies or phonorecords of the copyrighted work to the public *by sale or other transfer of ownership or rental, lease, or lending*." 17 U.S.C. § 106(3) (emphasis added).

Plaintiffs, however, argue that the Court should interpret the preamble to section 106(3) to provide a "making available" right. The preamble to section 106 grants "the exclusive right to do and to authorize any of the following." 17 U.S.C. § 106. Plaintiffs interpret the word "authorize" to provide rights beyond the plain language of 106(3). Pls.' Statement of the Case, *Capitol Records Inc. v. Thomas*, 06-CV-01497, 5 (D. Minn. Oct. 5, 2007) (citing 17 U.S.C. § 106(3)). This right "to authorize," Plaintiffs conclude, amounts to a "making available" right. *Id.* at 6. Their argument is without merit.

According to other federal appellate courts, mere authorization does not equate to direct infringement. Both the First Circuit and the Ninth Circuit have concluded that the term "to authorize" is merely a continuation of pre-1976 contributory infringement rules. *See Latin Am. Music Co. v. Archdiocese of San Juan*, 499 F.3d 32, 46 (1st Cir. 2007), *cert. denied*, sub nom. *Latin Am. Music Co., Inc. v. Southern Music Pub. Co., Inc.*, 128 S. Ct. 1232 (2008) (mem.) ("Mere authorization of an infringing act is an insufficient basis for copyright infringement. . . . to prove infringement, a claimant must show 'an infringing act after the authorization.'") (quoting *Venegas-Hernandez v. Ass'n De Compositores & Editores de Música Latinoamericana*, 424 F.3d 50, 57-58 (1st Cir. 2005)); *Subafilms, Ltd. v. MGM-Pathe Commun's Co.*, 24 F.3d 1088, 1093 (9th Cir.) (concluding that that "'to authorize' [wa]s simply a convenient peg on which Congress chose to hang the antecedent jurisprudence of third party liability" (quoting 3 Nimmer & Nimmer, *supra*, § 12.04[A][3][a], at 12-84 n.81.)), *cert. denied*, 513 U.S. 1001 (1994);

s*ee also* 2 Goldstein, *supra*, § 6.3.2, at 6:44 (2d ed. 2005); 4 Patry, *supra*, § 13:9

("[C]ontributory infringement of the distribution right may occur since copyright owners

have the right to do and to 'authorize' any of the section 106 rights, *provided there is an*

*infringing act of direct distribution.* Thus, where a third party, without authorization,

makes a work available to others to access, e.g., via the Internet, a computerized search

service, or by a library, the distribution right will be violated, but only if the plaintiff

produces evidence of a direct, unauthorized act of infringement occurred: without such

direct infringement, there can be no third-party liability.") (emphasis in the original); 5 *id.*

§ 21:43 ("Authorization is a form of secondary liability, not direct infringement.").

These federal appellate courts' holdings are consistent with Congress, which has

asserted that its legislative intent in including the phrase "to authorize" in the preamble to

section 106 was to explicitly state that authorization does not amount to direct

infringement. Thus, both the First and the Ninth Circuits relied on House Report No.

1476 in concluding that the term "to authorize" is merely a continuation of the pre-1976

contributory infringement rules. *Venegas-Hernandez*, 424 F.3d at 58; *Subafilms*, 24 F.3d

at 1093. The report reads:

> The exclusive rights accorded to a copyright owner under section
> 106 are "to do and to authorize" any of the activities specified in the five
> numbered clauses. *Use of the phrase "to authorize" is intended to avoid*
> *any questions as to the liability of contributory infringers.* For example, a
> person who lawfully acquires an authorized copy of a motion picture would
> be an infringer if he or she engages in the business of renting it to others for
> purposes of unauthorized public performance.

H.R. Rep. No. 1476 at 61, *reprinted in* 1976 U.S.C.C.A.N. at 5674 (emphasis added).

Other district courts considering the term "to authorize" in peer-to-peer cases have agreed that it does not "create a new form of liability for 'authorization' that is completely divorced from the legal consequences of authorized conduct."  *Howell*, __ F. Supp. 2d __, No. CV-06-02076, 2008 WL 1927353, at *10 (citing *Subafilms*, 24 F.3d at 1093); *see London-Sire Records*, 542 F. Supp. 2d at 166 (concluding that "defendants' actions must do more than 'authorize' a distribution; they must actually 'do' it"); *Barker*, __ F. Supp. 2d __, 2008 WL 857527, at *9 (holding that "Section 106 does not create an infringeable right of authorization independent of the expressly enumerated rights set forth in the Section, and thus cannot form the basis for a 'make available' right").

For these reasons, the plain language of section 106(3) does not support an independent "making available" right.

### B.    The weight of case law does not create an independent "making available" right

Numerous courts faced with precisely the same issue as this Court have determined after extensive analysis that no independent "making available" right exists. In *Brennan*, Judge Areton denied Atlantic's request for default judgment because its allegation of infringement based on making works available was "problematic."  534 F. Supp. 2d at 281-282.  In *Howell*, Judge Wake held that "[m]erely making an unauthorized copy of a copyrighted work available to the public does not violate a copyright holder's exclusive right of distribution."  __ F. Supp. 2d __, No, CV-06-02076, 2008 WL 1927353 at *6.  In *Barker*, Judge Karas noted that section 106(3) did not contain a "making available" right, and thus, a violation of a "making available" right

could not even be pleaded.  __ F. Supp. 2d __, No. 05-CV-7340, 2008 WL 857527 at *8.

In *London-Sire*, Judge Gertner reasoned that the mere offering to sell a copy of a

copyrighted work to the public is not a "distribution."  542 F. Supp. 2d at 166, 169.  The

sum of these cases is clear:  peer-to-peer users that have merely made a copyrighted work

available to the public have not infringed the copyright holder's exclusive right to

distribute.

On limited facts and without argument or detailed analysis, a few courts have

accepted Plaintiffs' "making available" theory in granting plaintiffs' motions for default

judgment.  *See, e.g.*, *Motown Record Co. v. DePietro*, No. 04-CV-2246, 2007 WL

576284, at *3 (E.D. Pa. Feb.16, 2007); *Universal City Studios Prods. LLP v. Bigwood*,

441 F. Supp. 2d 185, 190-91 (D. Me. 2006).  Other courts have allowed Plaintiffs to

pursue a "making available" claim without actually approving the "making available"

theory.  *See, e.g.*, *Arista Records LLC. v. Greubel*, 453 F. Supp. 2d 961, 970-71 (N.D.

Tex. 2006); *Warner Bros. Records, Inc. v. Payne*, No. W-06-CA-051, 2006 WL 2844415,

slip op. at *3-4 (W.D. Tex. July 17, 2006); *Interscope Records v. Duty*, No. 05-CV-3744,

2006 WL 988086, slip op. at *2 n.3 (D. Ariz. Apr. 14, 2006).

Plaintiffs authority for the alleged "making available" right is misplaced.  In

attempting to establish a "making available" right under section 106(3), Plaintiffs cite

*Hotaling v. Church of Jesus Christ of Latter-Day Saints,* 118 F.3d 199, 203 (4th Cir.

1997).  Pls.' Statement of Case, *Capitol Records Inc. v. Thomas*, 06-CV-01497 (D. Minn.

Oct. 5, 2007).  *Hotaling* involved a dispute between the author of genealogical research

materials and the Church of Jesus Christ of Latter-Day Saints.  118 F.3d at 203.  The

Church added the author's materials to its main library's collection in Salt Lake City,

Utah and subsequently sent unauthorized copies made by the Church to other branch

libraries. *Id.* at 201. The author discovered these copies and sued the Church, alleging

that the Church and its libraries infringed her right to distribute the work under section

106(3). *Id.* at 202. The Fourth Circuit found in favor of the author, holding that

"distribution occurs, within the meaning of § 106, when a library holds a copy in its

collection, lists the copy in its card file, and makes the copy available to the public." *Id.*

at 204.

 *Amici curiae* respectfully believe that this Court should not follow *Hotaling*.

Several district courts have already reached the conclusion that *Hotaling* is "inconsistent

with the Copyright Act." *Howell*, __ F. Supp. 2d __, No. CV-06-02076, 2008 WL

1927353 at *5; *see London-Sire Records*, 542 F. Supp. 2d at 167-68 (noting a "lacuna in

the Fourth Circuit's reasoning" because "[i]t is a 'distribution' that the statute plainly

requires"); *Barker*, __ F. Supp. 2d __, No. 05-CV-7340, 2008 WL 857527 at *6

(explaining that *Hotaling* "did not cite any precedent" and that its holding was "not

grounded in the statute"); *see also* 4 PATRY, *supra*, § 13:9 (describing *Hotaling* as

"deeply flawed" and "beyond the outer limits").

 Moreover, the weight of case law rejects Plaintiffs' "making available" theory.

Persuasive precedent from other circuits heavily supports this position. *See Perfect 10,*

*Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1162 (9th Cir. 2007) (concluding that merely

making photographic images available does not violate a copyright owner's distribution

right); *Agee v. Paramount Commun's, Inc.,* 59 F.3d 317 (2d Cir. 1995) ("distribution is

generally thought to require transmission of a 'material object' in which the sound recording is fixed: a work that is of 'more than transitory duration'"); *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511 (9th Cir. 1993), (advertisements describing the availability of loaner computers and company president's admission that computers were available for loan did not provide evidence of distribution sufficient for summary judgment) *cert. dismissed*, 510 U.S. 1033 (1994); In re *Napster Inc.*, 377 F. Supp. 2d 796, 802 (N.D. Cal. 2005) ("merely listing a copyrighted musical composition or sound recording in an index of available files falls short of satisfying these 'actual dissemination' or 'actual transfer' standards"); *Obolensky v. G.P. Putnam's Sons,* 628 F. Supp. 1552, 1555-56 (S.D.N.Y. 1986), *aff'd,* 795 F.2d 1005 (2d Cir. 1986) (an unconsummated offer to sell a copyrighted work does not constitute infringement under the Copyright Act of 1976).

The three leading copyright treatises also reject an independent "making available" right. *See* 2 Goldstein, *supra*, § 7.5.1 ("a mere offer of sale will not infringe the right"); 2 Nimmer & Nimmer, *supra*, § 8.11[A], at 8-124.1 n.2 ("the right of distribution apparently is not infringed by the mere offer to distribute to members of the public") (citation omitted); 4 Patry, *supra*, § 13:9 ("the mere offering to sell copies . . . without actual distribution of copies" does not infringe section 106(3)).

Thus, both the plain language of section 106(3) and the weight of case law make it clear that section 106(3) does not grant an independent "making available" right.

## III. PLAINTIFFS MUST SHOW MORE THAN COPYING BY THEIR OWN INVESTIGATORS TO ESTABLISH ACTUAL DISTRIBUTION

The Court should grant Defendant a new trial because Plaintiffs have failed to show actual distribution under section 106(3). Plaintiffs have not even established infringing copying by the Defendant.[3] Indeed, Plaintiffs have merely shown authorized copying by their own investigators.

In other Eight Circuit cases involving investigators and allegations of copyright infringement, the activity that gave rise to infringement was the copying of the protected works for the investigator or providing substantial assistance to the investigator with the actual copying of the protected works. For example, in *Olan Mills v. Linn Photo Co.*, the plaintiff's investigator, acting undercover as a customer, provided Linn Photo with portrait photographs clearly bearing the plaintiff's copyright. 23 F.3d 1345, 1347 (8th Cir. 1994). The defendant's employee then reproduced the protected photographs at the request of the investigator. *Id.* In *RCA/Ariola Int'l Inc. v. Thomas & Grayston Co.*, the plaintiffs authorized investigators to investigate the use of duplicating machines that

---

[3] In *Howell*, the court found that peer-to-peer users do not necessarily make or distribute copies:

> "[I]n the KaZaA system the owner of the shared folder does not necessarily ever make or distribute an unauthorized copy of the work. The owner certainly does not distribute the copy that resides in the shared folder, for that copy never leaves its location on the owner's hard drive. Rather, a copy of the copy in the shared folder is made.
>
> If the owner of the shared folder simply provides a member of the public with access to the work and the means to make an unauthorized copy, the owner is not liable as a primary infringer of the distribution right, but rather is potentially liable as a secondary infringer of the reproduction right."

__ F. Supp. 2d __, No. CV-06-02076, 2008 WL 1927353 at *6 (citation omitted).

allowed customers to use specially slotted tapes to make copies of other tapes. 845 F.2d 773, 777 (8th Cir. 1988). Acting undercover as customers, the plaintiffs' investigators feigned ignorance of the duplicating machine's operation, persuading the clerk to do as much of the copying as possible. *Id.* The clerks provided assistance ranging from putting the originals in the appropriate slot in the machine to completing the entire copying process.[4] *Id.*

In both *Olan Mills* and *RCA/Ariola*, the Eighth Circuit Court of Appeals scrutinized the extent of the defendants' active participation in the copying when considering infringement. In *Olan Mills*, without making a detailed infringement analysis, the court concluded that unauthorized copying by the defendant's employees was infringement. 23 F.3d at 1348. In *RCA/Ariola*, the court explained that "the most obvious basis for holding the retailers liable [was that] the retailers' employees actively assisted in copying the protected material by inspecting the copyrighted tape and selecting a blank tape of the proper length to copy the protected work and by actually operating the machine." 845 F.2d at 781.

These Eighth Circuit cases establish that to prove infringement, a plaintiff must show actual infringing conduct by a defendant, and not just by the plaintiff's investigators. In both *Olan Mills* and *RCA/Ariola*, the defendants engaged in active conduct (actually making copies), which was the basis for their infringement. In contrast, here Plaintiffs allege that Defendant did something passive, i.e. "made copyrighted works

---

[4] The Eight Circuit Court of Appeals noted that the employees were not shown to have understood their own actions to be culpable and, thus, their infringements were not willful. 845 F.2d at 779-80.

available," which is not actually making copies, and therefore, not infringement.  Indeed, even Plaintiffs' investigators did not infringe, because Plaintiffs gave them permission to copy their works by downloading the music files.  *See Olan Mills*, 23 F.3d at 1348 ("The lawful owner of a copyright cannot infringe its own copyright.").  Plaintiffs cannot establish a *prima facie* claim of infringement by showing two non-infringing acts.

This Court should grant the Defendant a new trial and require Plaintiffs to meet the evidentiary burden of showing that Defendant actively copied or actively assisted the copying of the Plaintiff's copyrighted work.

## IV. PUBLIC POLICY DICTATES THAT ONLY CONGRESS SHOULD CREATE A "MAKING AVAILABLE" RIGHT

The Court should grant the Defendant a new trial because public policy has always favored that Congress, not the courts, establish the scope of copyright law.  The task of accommodating the rights of the numerous participants in copyright exploitation is best suited for the legislature.  "Courts are less well suited than Congress to the task of 'accommodat[ing] fully the varied permutations of competing interests that are inevitably implicated by such new technology.'"  *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 965 (2005) (quoting *Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 431 (1984)); *see also Eldred v. Ashcroft*, 537 U.S. 186, 198 (2003) (affirming the Court's historic deference to Congress' judgment regarding copyright).

### A. Copyright law represents a delicate balance of complex interests

Congress' authority to create copyright law comes from the Constitution, which provides that "Congress shall have the Power . . . [t]o promote the Progress of Science

. . . by securing [to Authors] for limited Times . . . the exclusive Right to their . . . Writings." Art. I, § 8, cl. 8. The Copyright Clause assigns to Congress alone the task of creating a limited copyright monopoly for authors in order to further the creation of new works and public access to those works. As the Supreme Court has explained, this task involves the careful balancing of both "the interests of authors and inventors in the control and exploitation of their writings and discoveries on the one hand, and society's competing interest in the free flow of ideas, information, and commerce on the other hand." *Sony*, 464 U.S. at 429. Peer-to-peer technology highlights this tension between the competing values of artistic protection and the free flow of information. *See Metro-Goldwyn-Mayer Studios*, 545 U.S. at 928 (stating the subject of the case as the "tension" between "the respective values of supporting creative pursuits through copyright protection and promoting innovation in new communication technologies").

Courts should leave to Congress the resolution of this tension between expanding copyright owners' monopoly, on the one hand, and expanding access to copyrighted works, on the other. Positivist rulings by the judiciary that expand copyright protections, even under the guise of protecting authors' interests, risk upsetting the delicate balance established by Congress. "[T]he policies served by the Copyright Act are more complex, more measured, than simply maximizing the number of meritorious suits for copyright infringement." *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 526 (1994). Even where "demand for the [author's] original" is "kill[ed]," the Court has not invented "a harm cognizable under the Copyright Act," *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 592 (1994), because, "[t]he primary objective of copyright is not to reward the labor of

authors, but '[t]o promote the Progress of Science and useful Arts.'" *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*, 499 U.S. 340, 349-350 (1991). Ultimately, the Court is "not at liberty to second-guess congressional determinations and policy judgments . . . however debatable or arguably unwise they may be." *Eldred,* 537 U.S. at 208 (concluding that "[t]he CTEA reflects judgments of a kind Congress typically makes").

B.     **Congress routinely amends the Copyright Act to accommodate new technology**

Congress could enlarge the scope of the distribution right quite easily, by adding the language that Plaintiffs would have this Court read into the Act. As noted by the Supreme Court in *Sony*, statutory revisions to the Copyright Act have historically accommodated technological changes affecting the balance in copyright law:

> [T]he development and marketing of player pianos and perforated roles of music preceded the enactment of the Copyright Act of 1909; innovations in copying techniques gave rise to the statutory exemption for library copying . . . the development of the technology that made it possible to retransmit television programs by cable or by microwave systems prompted the enactment of . . . complex provisions . . . after years of detailed congressional study. By enacting the Sound Recording Amendment of 1971, Congress also provided the solution to the "record piracy" problems that had been created by the development of the audio tape recorder.

*Sony,* 464 U.S. at 431 n.11 (citations omitted). That Congress has thus far declined to amend section 106(3) is not a wrong this Court should redress.

When Congress perceives a need to amend the Copyright Act, it does not hesitate to do so. For example, in 1982 Congress increased the penalties for trafficking in counterfeit labels for phonorecords, motion pictures, and audiovisual works and for

criminal infringement. Piracy and Counterfeiting Amendments Act of 1982, Pub. L. No. 97-180, 96 Stat. 91 (1982) (codified at 18 U.S.C. 2318). On numerous other occasions, Congress has amended the Copyright Act to accommodate the rights of the participants in copyright exploitation. *See, e.g.*, Family Movie Act of 2005, Title II of the Family Entertainment and Copyright Act of 2005, Pub. L. No. 109-9, 119 Stat. 218, 223 (2005) (codified at various sections of 17 and 18 U.S.C.); Digital Millennium Copyright Act, Pub. L. No. 105-304, 112 Stat. 2860, 2887 (1998) (codified at 17 U.S.C. §§ 512, 1201-05, 1301-22; 28 U.S.C. § 4001); Fairness in Music Licensing Act of 1998, title II of Pub. L. No. 105-298, 112 Stat. 2827, 2830 (1998) (codified at various sections of 17 U.S.C.); Sonny Bono Copyright Term Extension Act, title I of Pub. L. No. 105-298, 112 Stat. 2827 (1998) (codified at 17 U.S.C. §§ 302-304); Digital Performance Right in Sound Recordings Act of 1995, Pub. L. No. 104-39, 109 Stat. 336 (1995) (amending, *inter alia,* 17 U.S.C. §§ 114, 115); No Electronic Theft Act, Pub. L. No. 105-147, 111 Stat. 2678, (1997) (amending 17 U.S.C. § 506(a)); Audio Home Recording Act of 1992, Pub. L. No. 102-563, 106 Stat. 4237 (1992) (codified at 17 U.S.C. § 1001, et seq.); Computer Software Rental Amendments Act of 1990, title VIII of the Judicial Improvements Act of 1990, Pub. L. No. 101-650, 104 Stat 5089, 5134, (1990) (codified at 17 U.S.C. § 109); Visual Artists Rights Act of 1990, title VI of the Judicial Improvements Act of 1990, Pub. L. No. 101-650, 104 Stat. 5089, 5128 (1990); Satellite Home Viewer Act of 1988, title II of Pub. L. No. 100-667, 102 Stat. 3935, 3949 (1988); Record Rental Amendment of 1984, Pub. L. No. 98-450, 98 Stat. 1727 (1984) (amending 17 U.S.C §§109, §115 with respect to rental, lease or lending of sound recordings).

Previous to these Amendments, the Supreme Court, in *Sony*, stated that Congress should be the source of changes to the Copyright Act. The Supreme Court stated this in 1984:

> Sound policy, as well as history, supports our consistent deference to Congress when major technological innovations alter the market for copyrighted materials. Congress has the constitutional authority and the institutional ability to accommodate fully the varied permutations of competing interests that are inevitably implicated by such new technology.

464 U.S. at 431. The Court recognized that long before the 1976 Act, courts had consistently held that copyright protections as well as remedies for infringement are entirely statutory. *Id.* (citing *Wheaton v. Peters*, 33 U.S. (8 Peters) 591, 661-662 (1834); *Thompson v. Hubbard*, 131 U.S. 123, 151 (1889)). Numerous cases before the 1976 Act emphasized the need for congressional guidance before judicial expansion of such statutory rights. *Id.* (citing *Williams and Wilkins v. United States*, 420 U.S. 376 (1975); *Teleprompter Corp. v. CBS,* 415 U.S. 394 (1974); *Fortnightly Corp. v. United Artists,* 392 U.S. 390 (1968); *White-Smith Music Publishing Co. v. Apollo Co.*, 209 U.S. 1 (1908)). Such guidance routinely occurred, with comprehensive revisions of copyright law occurring every 40 to 50 years. H.R. Rep. 94-1476 at 47, *reprinted in* 1976 U.S.C.C.A.N. at 5660 (noting revisions after 1790 in 1831, 1870, and 1909).

Consistent with that history, the Supreme Court has repeatedly eschewed granting protection beyond the scope of the Constitution and the Copyright Act. For example, in the context of industrial design, the Court declined to alter copyright law to create greater industrial design protections: "Congress explicitly refused to take this step in the copyright laws and despite sustained criticism for a number of years, it has declined to

alter the patent protections presently available for industrial design." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141 (1989) (citations omitted). Again, in *Feist*, the Supreme Court declined to expand the scope of the Copyright Act. 499 U.S. at 354. In *Feist*, the Court addressed the judicially created "sweat of the brow" theory, a belief by some courts that facts or ideas could be copyrighted because of an author's labor in collecting and arranging them. *Id.* Instead of accepting this "new theory" the Court explained that it had "numerous flaws" and "flouted basic copyright principles" – most notably the principle that "[t]he primary objective of copyright is not to reward the labor of authors, but "[t]o promote the Progress of Science and useful Arts." *Id.* at 353, 359 (quoting Art. I, § 8, cl. 8). The Court then asserted that Congress had "ma[de] explicit the originality requirement, . . . to clarify[] existing law." *Id* at 355 (citing H.R. Rep. No. 94-1476 at p. 51, *reprinted in* 1976 U.S.C.C.A.N. at 5664). These cases consistently direct that courts should not read the Copyright Act to create rights that are not explicit.

In light of the history of the Copyright Act, the Supreme Court's direction in *Sony*, preceding and subsequent case law, the proper recourse for Plaintiffs is to engage Congress through the legislative process.

## **CONCLUSION**

Section 106(3) and precedent of the Eight Circuit require the actual distribution of copies or phonorecords to show infringement of a copyright holder's distribution right. Merely making a copyrighted work available, without the showing of actual distribution of copies or phonorecords, is not infringement. Any future "making available" right is for Congress, not the courts, to create. Respectfully, *amici* conclude that for these

reasons the Court committed manifest error in Jury Instruction No. 15 and should grant

Defendant Jammie Thomas a new trial.

Respectfully submitted,

Carl E. Christensen (No. 350412)
Christensen Law Office PLLC
1422 West Lake Street, Suite 216
Minneapolis, MN 55408
Telephone:  (612) 823-4016
Facsimile:   (612) 832-4777
COUNSEL OF RECORD FOR *AMICI CURIAE.*
INTELLECTUAL PROPERTY INSTITUTE,
WILLIAM MITCHELL COLLEGE OF LAW

By

s/Carl E. Christensen_____  June 20, 2008
CARL E. CHRISTENSEN