# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

_____

CAPITOL RECORDS, INC., *et al.,*

                   Plaintiffs,

    v.

JAMMIE THOMAS,

                 Defendant.

_____

)
)
)
)
)
)
)
)
)
)
)
)

Civil File No. 06-1497 (MJD/RLE)

## *AMICUS CURIAE* BRIEF OF THOMAS D. SYDNOR OF THE PROGRESS & FREEDOM FOUNDATION OPPOSING THE MOTION FOR A NEW TRIAL

## INTRODUCTION

The Court has asked potential *amici* "whether the Court committed a manifest error of law in instructing the jury that '[t]he act of making copyrighted sound recordings available for electronic distribution on a peer-to-peer network, without license from the copyright owners, violates the copyright owners' exclusive right of distribution, regardless of whether actual distribution has been show'. . . ." May 20, 2008 Order. We argue that the Court correctly instructed the jury that U.S. law does grant copyright owners the "making-available right" expressly required by nine binding international agreements—two treaties and seven bilateral or multilateral Free Trade Agreements.

In *Eldred v. Ashcroft,* the Supreme Court refused to adopt "'an isolationist reading of the Copyright Clause that is in tension with America's international copyright relations over the last hundred or so years.'" 537 U.S. 186, 206 n.13 (2003) (quoting Graeme W. Austin, *Does the Copyright Clause Mandate Isolationism?*, 26 COLUM. J.L. & ARTS 17, 59 (2002)). In this case, this Court has correctly refused to adopt an isolationist reading

5396417v1

of the Copyright Act that would needlessly undermine the international copyright relations of the United States, the world's leading producer and exporter of expressive works.

## BACKGROUND

The Court's jury instruction asserted that "the act of making copyrighted sound recordings available for electronic distribution on a peer-to-peer network" can infringe the exclusive rights of copyright owners. Recently, phrases like "making available" have appeared in several other district-court opinions. *Electra Entm't Group, Inc. v. Barker,* Case No. 05-CV-7340 (KMK), 2008 U.S. Dist. LEXIS 25913 (Mar. 31, 2008); *London-Sire Records, Inc. v. Doe 1,* 542 F. Supp. 2d 153 (D. Mass. 2008); *Atlantic Recording Corp. v. Howell,* No. CV-06-02076-PHX-NVW, 2008 U.S. Dist. LEXIS 35284 (D. Ariz. Apr. 29, 2008). *See also* Thomas D. Sydnor II, *The Making-Available Right and the Barker Decision: Improving the Rationale for a Sound Result* (PFF May, 2008) at http://www.pff.org/issues-pubs/pops/pop15.7barker.pdf. But this rather awkward phrase originated in neither judicial opinions nor the minds of Plaintiffs' counsel. It derives from the multilateral treaties that prescribe international norms for digital-age copyright protection—treaties that the United States crafted, ratified, and purportedly implemented in its domestic law.

**A.  In the Copyright Act of 1976, Congress Enacted "Futureproof" Copyright Protection That Moved America Toward International, Berne-Convention Norms.**

The Copyright Act of 1976 reflected "a major legislative reexamination of copyright doctrine." *Harper & Row Pubs., Inc. v. Nation Ent.,* 471 U.S. 539, 552 (1985). Two aspects of it are relevant here.

First, the Act corrected a problem that was undermining the Constitution's ideal of granting authors exclusive rights in their works.  Prior copyright acts had defined copyrights in narrow, technology-specific terms that were often found inapplicable to new technologies.  *See Teleprompter Corp. v. Columbia Broadcasting Sys., Inc.,* 415 U.S. 394 (1974) (cable-television systems retransmitting "distant" broadcast television programs did not "perform" them); *Fortnightly Corp. v. United Artists Tel., Inc.,* 392 U.S. 390 (1968) (cable-television systems retransmitting broadcast television programs did not "perform" them); *White-Smith Music Pub. Co. v. Apollo Co.,* 209 U.S. 1 (1908) (paper rolls that let player pianos reproduce songs were not "copies" of those songs). Such findings would then force Congress to fill the resulting "gap" in protection by denying exclusive rights and granting rights to revenues from compulsory licenses. *See* 17 U.S.C. § 111, 115.[1]

---

[1]  Exclusive rights differ profoundly from compulsory licenses.  Exclusive rights are property rights that let private markets encourage the production of expression. *See, e.g.,* Armen A. Alchian, *Property Rights, in* THE CONCISE ENCYCLOPEDIA OF ECONOMICS 422-425 (David R. Henderson, ed., 2008).  Compulsory licenses are statutory price-fixing schemes that let the government decide the value of expression and the terms under which it can be received.

The Copyright Act of 1976 tried to halt this slide toward compulsory licensing by defining copyrights in technology-neutral terms applicable *even as to then-unknown technologies*. For example, it defines "copies" and "phonograms," the triggers of the reproduction and distribution rights, as material objects "fixed by any method *now known or later developed,* from which the [work or sounds] can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 101 (emphasis added); *see id.* at § 102(a) ("Copyright protection subsists … in any tangible medium of expression, now known or later developed..."); H.R. Rep. No. 94-1476, at 52 (1976) (criticizing "cases such as *White-Smith*" as "artificial and largely unjustifiable").

Second, in the Act, Congress also began working to craft truly international norms for copyright protection. Congress began by conforming aspects of U.S. law to the *de-facto* international norms prescribed in the Berne Convention for the Protection of Literary and Artistic Works. *See* H.R. Rep. No. 94-1476, at 135-36 (increasing copyright term to that "required for adherence to the Berne Convention"). This domestic harmonization process concluded in 1988, when the U.S. acceded to the Berne Convention. *See* Berne Convention Implementation Act of 1988, Pub. L. 100-568, § 2(1), 102 Stat. 2853, 2853 (1988).

As it conformed U.S. law to Berne norms, Congress also adopted a "major trade policy goal of the United States:" Make Berne-compliance a condition of membership in the World Trade Organization. S. Rep. 100-352, at 5 (1988). That goal was achieved in 1994, when the international community adopted the Agreement on Trade-Related

Aspects of Intellectual Property Rights ("TRIPS"). *See* Marrakesh Agreement Establishing the World Trade Organization, Art. II, §2, 1867 U.N.T.S. 154, 33 IL.M. 1144 (Apr. 15, 1994); Uruguay Rounds Agreements Act, Pub. L. 103-465, 108 Stat. 4809 (1994).

But TRIPS alone could not complete the harmonization process that Congress had begun in 1976. By the mid 1990s, effective international copyright protection clearly required more consensus on how international norms applied to interactive digital communications networks—in other words, to the Internet.

The U.S. and the E.U. thus urged the World Intellectual Property Organization ("WIPO") to convene a Diplomatic Conference to clarify and update the Berne-Convention norms. In 1996, that Conference promulgated the WIPO Copyright Treaty (WCT) and the WIPO Performances and Phonograms Treaty (WPPT). Collectively, these treaties are called the "WIPO Internet Treaties."

### B. When Negotiating the WIPO Internet Treaties, the U.S. Tried to Craft a Self-Executing "Making-Available" Right.

During the Diplomatic Conference that produced the WIPO Internet Treaties, the conferees worked to devise Internet-Age norms for copyright protection. When possible, they tried to devise norms that would be self-executing in most countries.[2]

---

[2] Treaty obligations satisfied by existing laws are self-executing. *See Restatement of the Law, Third, Foreign Relations Law of the United States*, § 111(3) (1987) ("Some provisions of an international agreement may be self-executing and others not self-executing.… There can, of course, be instances in which … previously enacted legislation will be fully adequate to give effect to an apparently non-self-executing international agreement, thus obviating the need of adopting new legislation to implement it.").

For example, most nations agreed that copyright owners should (or already did) have exclusive rights to post or share their works over interactive digital networks like the Internet, but their existing national laws granted such rights in different ways. Many European countries concluded that they granted such rights through their existing communication-to-the-public rights. Other countries, like the U.S., concluded that they granted such rights through different existing rights, particularly their distribution rights. The Diplomatic Conference thus adopted an "umbrella solution"—the Treaties use the "neutral" term "making available" in order to ensure that this obligation could be executed through either existing distribution or communication-to-the-public rights. *See* MIHALY FICSOR, GUIDE TO THE COPYRIGHT AND RELATED RIGHTS TREATIES ADMINISTERED BY WIPO 208-09, CT-8.6 to 8.10 (WIPO 2003); *see also Zicherman v. Korean Air Lines Co.,* 516 U.S. 217, 226 (1996) (treating a treaty's drafting and negotiating history as "aids to its interpretation"). Article 8 of the WCT thus states, "[A]uthors of literary and artistic works shall enjoy the exclusive right of authorizing … the making available to the public of their works in such a way that members of the public may access these works from a place and at a time individually chosen by them."

### C. After Ratifying the WIPO Internet Treaties, the President and Congress Enacted Eight Implementing Statutes That Construed the Copyright Act to Grant a Making-Available Right.

After the WIPO Internet Treaties were promulgated, they were ratified by the required two-thirds majority of the Senate—but with a proviso: The President could not deposit instruments of ratification with WIPO until the U.S. enacted domestic legislation implementing the treaties. *See* S. Treaty Doc. No. 105-17, § (c)(1) (Oct. 21, 1998).

Both Houses of Congress thus held extensive hearings, drafted legislation, and produced several committee reports. *See Davidson & Assocs. v. Jung,* 422 F.3d 630, 639-40 & n.10 (8th Cir. 2005) (discussing this history). For example, the Register of Copyrights testified that existing exclusive rights need not be changed to implement the Treaties. *Hearing on WIPO Copyright Treaties Implementation Act (H.R. 2281) and On-Line Copyright Liability Limitation Act (H.R. 2180) before the Subcomm. On Courts, the Internet and Intellectual Property of the House Comm. On the Judiciary*, 105th Cong., 1st Sess., Sept. 16, 1997 (testimony of Marybeth Peters, the Register of Copyrights) (citing and summarizing then-existing cases addressing on-line liability for copyright infringement); *see also Piracy of Intellectual Property on Peer-to-Peer Networks: Hearing before the Subcomm. On Courts, the Internet and Intellectual Property of the House Comm. On the Judiciary*, 107th Cong. 114-115 (2002) (Letter from Marybeth Peters).

Similar testimony was given by both Co-Chairs of the U.S. Delegation to the WIPO Diplomatic Conference, including the Director of the U.S. Patent & Trademark Office. *Hearing on WIPO Copyright Treaties Implementation Act (H.R. 2281) and On-Line Copyright Liability Limitation Act (H.R. 2180) before the Subcomm. On Courts, the Internet and Intellectual Property of the House Comm. On the Judiciary*, 105th Cong., 1st Sess., Sept. 16, 1997 (testimony of Bruce Lehman, Assistant Secretary of Commerce for Intellectual Property); *WIPO Copyright Treaty (WCT) (1996) and WIPO Performances and Phonograms Treaty (WPPT) (1996), before the Comm. On Foreign Relations,* Exec.

Rpt. 105-25, 105th Cong., 2nd Sess. at 29-30, Oct. 14, 1998 (testimony of Alan P. Larson, Assistant Secretary of State for Economic and Business Affairs).

The relevant House and Senate Committees also agreed that existing law provided a making-available right. H.R. 105-551, pt.1, 105th Cong., 2nd Sess. at 9 ("The …treaties do not require any change in the substance of copyright rights or exceptions in U.S. law."); S. Rep. 105-190, 105th Cong., 2nd Sess. at 10-11 ("to adhere to the WIPO treaties, legislation is necessary in two primary areas—anticircumvention of technological protection measures and protection of the integrity of rights management information"). Both Houses of Congress and the President then agreed as well, and the WIPO Copyright and Performances and Phonograms Treaties Implementation Act of 1998 was enacted as part of the Digital Millennium Copyright Act of 1998 (the "DMCA"). *See* 105 P.L. 304, §§ 101-05, 112 Stat. 2860 (1998).[3] Believing that the DMCA had fully implemented the Treaties, the President then deposited with WIPO ratifications of the WCT and WPPT on September 14, 1999. *See, e.g.,* WIPO, *Ratification by the United States of America*, at http://www.wipo.int/edocs/notdocs/en/wct/treaty_wct_10.html.

Subsequently, seven Free Trade Agreements ("FTAs") again required the President and Congress to determine whether U.S. law provided a making-available right. To enter into an FTA, the President must submit to Congress, (1) the negotiated agreement, (2) a Statement of Administrative Action (SAA) describing whether U.S. laws must be amended to implement the agreement's provisions, and (3) proposed

---

[3]     *See also id.* at preamble (describing the act as one "[t]o amend title 17, United States Code, to implement the World Intellectual Property Organization Copyright Treaty and Performances and Phonograms Treaty").

implementing legislation that conforms U.S. law to the agreement. *See* 19 U.S.C. §§ 3805, 3830(b). Congress itself then approves the SAA when it enacts the FTA's implementing legislation. Consequently, Congress has now enacted—and the President has signed—seven sets of FTA-implementation legislation predicated upon seven congressionally approved SAAs recording seven Presidential conclusions that then-existing U.S. law provided a required making-available right.[4]

For example, Chapter 16 of the U.S.-Singapore FTA requires each Party to provide copyright owners with a making-available right. *See* U.S.-Singapore Free Trade Agreement at Art.6.4.2(a), http://www.ustr.gov/assets/Trade_Agreements/Bilateral/ Singapore_FTA/Final_Texts/asset_upload_file708_4036.pdf. In the SAA for this FTA, the President concluded, "No statutory or administrative changes will be required to implement Chapter 16." Statement of Administrative Action at 34, U.S.-Singapore Free Trade Agreement Implementation Act (2003) http://waysandmeans.house.gov/ media/pdf/singapore/hr2739SingaporeSAA7-15-03.pdf. When considering the SAA and its proposed implementing legislation, Committees of both houses of Congress

---

[4]     *See* An Act To implement the United States-Oman Free Trade Agreement, PL 109-283, Title I, Sec 101 (a) (2), 120 Stat. 1191 (2006); An Act To implement the United States-Bahrain Free Trade Agreement, PL 109-169, Title I, Sec 101 (a) (2), 119 Stat. 3581 (2006); An Act To implement the Dominican Republic-Central America-United States Free Trade Agreement, PL 109-53, Title I, Sec 101 (a) (2), 119 Stat. 463 (2005); An Act To implement the United States-Morocco Free Trade Agreement, PL 108-302, Title I, Sec 101 (a) (2), 118 Stat. 1104 (2004); An Act To implement the United States-Australia Free Trade Agreement, PL 108-286, Title I, Sec 101 (a) (2), 118 Stat. 920 (2004); An Act To implement the United States-Chile Free Trade Agreement, PL 108-77, Title I, Sec 101 (a) (2), 117 Stat. 910 (2003); An Act To implement the United States-Singapore Free Trade Agreement, PL 108-78, Title I, Sec 101 (a) (2), 117 Stat. 949 (2003).

specifically praised the Agreement's making-available obligation that "aimed at protecting music, videos, software, or text from widespread unauthorized sharing via the Internet." H.R. Rep. 108-225, pt.2, at 3; *see also* S. Rep. 108-117, at 17. Congress then passed, and the President signed, the United States-Singapore Free Trade Agreement Implementation Act, in which Congress specifically approved "the statement of administrative action proposed to implement the Agreement…." Pub. L. 108-78 at § 101(a)(2), 117 Stat. 948 (2003). Both Congress and the President thus concluded—through an *unusually formal* legislative process—that existing U.S. law implemented the U.S.-Singapore FTA's making-available obligation.

In summary, if this Court committed a manifest error of law when instructing the jury in this case, then that error was also committed by the Register of Copyrights, the Director of the U.S. Patent and Trademark Office, both Co-Chairs of the U.S. Delegation to the Diplomatic Conference that promulgated the WIPO Internet Treaties, Presidents Bush and Clinton, and the Members of the 98th, 108th, and 109th Congresses.

## ARGUMENT

The validity of this Court's "making available" jury instruction implicates the question of statutory interpretation that several Congresses and Presidents had to resolve in order to implement nine international agreements of the United States: Do the exclusive rights "to do and to authorize" the acts stated in Section 106 of the Copyright Act of 1976 grant copyright owners the exclusive right to make their works available to users of global, interactive digital communications networks like the Internet or the FastTrack file-sharing network?

The Copyright Act of 1976 was *intended* to raise such questions because it was intended to apply as to technologies unimagined in 1976. *See* 17 U.S.C. §§ 101, 102(a). Nevertheless, nothing suggests that the 94th Congress had some specific intent about whether the Section-106 exclusive rights would be infringed by unauthorized use of a so-called "third-generation" file-sharing program like KaZaA to "share" a file encoding a copyrighted song. Consequently, while the Act's technology-neutral copyrights may prevent exclusive rights from eroding into a jumble of compulsory licenses, they will also require the Judicial, Executive, and Legislative Branches to confront circumstances in which it may be unclear how the Act's exclusive rights were intended to apply. As a result, courts deciding particular cases may have to decide whether to defer to interpretations of the Act that the Congress and the President adopted when enacting legislation needed to conduct the international relations of the United States.

At least when the political branches have construed the Copyright Act to implement the international obligations of the United States, a 207-year-old legal rule governs such decisions: "Where fairly possible, a United States statute is to be construed so as not to conflict with international law or an international agreement of the United States." *Restatement of the Law, Third, Foreign Relations Law of the United States*, § 114 (1987). This principle can be called the "*Charming Betsy* rule." *See Murray v. Charming Betsy*, 6 U.S. 64, 118 (1804); *Talbot v. Seeman,* 5 U.S. 1, 43 (1801).[5] For

---

[5] Potential conflicts cannot trigger the *Charming-Betsy* rule until the United States has actually entered into an international agreement. *See Quality King Distribs. v. L'Anza Research Int'l,* 523 U.S. 135, 153-54 (1998) (giving no weight to the terms of *unratified* trade agreements).

example, in *Lauritzen v. Larsen,* the Supreme Court interpreted a statute according to "the long-heeded admonition of Mr. Chief Justice Marshall that 'an act of congress ought never to be construed to violate the law of nations if any other possible construction remains.'" *Lauritzen v. Larsen,* 345 U.S. 571, 578 (1953) (quotation omitted).

The *Charming-Betsy* rule does not require courts to defer to international law or international organizations in general. Indeed, it permits U.S. laws to violate international laws and obligation. *See, e.g., Chae Chan Ping v. United States,* 130 U.S. 581, 599-602 (1889) (interpreting a statute to abrogate existing treaty obligations).[6] Instead, the rule implements two fundamental principles of domestic constitutional law.

First, the *Charming-Betsy* rule implements separation-of-powers principles: It prevents unelected judges from intruding upon the exercise of the Treaty and Foreign Commerce Powers that the Constitution delegates to the elected President and Congress. Were courts to unnecessarily interpret U.S. statutes in ways that would violate international agreements, they could undermine the exercise of these powers delegated to other Branches, disrupt international trade, and trigger retaliatory trade wars.

---

[6] Some scholars favor an "internationalist" interpretation of the rule that *would* more closely integrate domestic and international law and prevent the Executive Branch from violating international obligations unless explicitly authorized by statute. *See, e.g.,* Ralph G. Steinhardt, *The Role of International Law as a Canon of Domestic Statutory Construction,* 43 VAND. L. REV. 1103 (1990). But most scholars argue that the *Charming-Besty* rule derives from the purely domestic principles of comity and separation-of-powers discussed here. *See, e.g.,* Curtis A. Bradley, *The Charming Betsy Canon and Separation of Powers*, 86 GEO. L.J. 479 (1998). Here, such disputes are academic: The narrower interpretation of the *Charming-Betsy* rule suffices to resolve a case in which both the Executive and Legislative branches have interpreted a statute to implement U.S. international obligations.

Consequently, courts will, when possible, interpret U.S. statutes to accord with U.S. international obligations:

> For us to run interference in such a delicate field of international relations there must be present the affirmative intention of Congress clearly expressed. It alone has the facilities necessary to make fairly such an important policy decision where the possibilities of international discord are so evident and retaliative action so certain.

*Benz v. Compania Naviera Hidalgo, S.A.,* 353 U.S. 138, 147 (1957).[7]

Second, the *Charming Betsy* rule—like the rule favoring constitutional constructions of statutes—implements a principle of comity: When possible, it presumes that neither the President nor the Congress negligently or deliberately violate international agreements and obligations. This principle of comity is critical to international trade because the Treaty and Foreign Commerce Powers cannot be exercised effectively unless other nations can trust Congress and the President to execute agreements competently and in good faith:

> The statute should be construed in the light of the purpose of the Government to act within the limitation of the principles of international law, the observance of which is so essential to the peace and harmony of nations, and it should not be assumed that Congress proposed to violate the obligations of this country to other nations….

---

[7] *See also, e.g., Weinberger v. Rossi,* 456 U.S. 25, 31-32 (1982) (rejecting a statutory interpretation that "would have had foreign policy implications"); *McCulloch v. Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10, 21 (1963) ("such highly charged international circumstances brings to mind the admonition … that 'an act of congress ought never to be construed to violate the law of nations if any other possible construction remains'") (*quoting Pigeon River Improvement, Slide & Boom Co. v. Charles W. Cox, Ltd.,* 291 U.S. 138, 160 (1934)).

*MacLeod v. United States,* 229 U.S. 416, 434 (1913).[8]  The *Charming-Betsy* rule thus promotes "a harmony particularly needed in today's interdependent commercial world." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.,* 542 U.S. 155, 164-65 (2004).  As the *en banc* Ninth Circuit recently noted, a different judicial approach might "disrupt Congress's efforts to secure a more stable international intellectual property regime … [and] might undermine Congress's objective of achieving 'effective and harmonious' copyright laws among all nations."  *Subafilms, Ltd. v. MGM-Pathe Comms. Co.,* 24 F.3d 1088, 1097 (9th Cir. 1994) (en banc); *cf. Brown v. Duchesne,* 60 U.S. 183, 197 (1857) (refusing to interpret the patent laws in a way that would "seriously embarrass the commerce of the country with foreign nations").

The *Charming-Betsy* rule articulated by the Supreme Court and the *Restatement* favors any reasonable interpretation of the Copyright Act that would grant Plaintiffs a making-available right and validate this Court's jury instruction: Only such interpretations ensure that the U.S. complies with nine adopted, ratified-or-enacted, and implemented multilateral or bilateral international agreements that require the United States to provide a making-available right.

Nevertheless, some might argue that this rule is inapplicable because almost all of the *Charming-Betsy* cases interpret statutes enacted *after* the United States had assumed a

---

[8]      *See also*, e.g., *Trans World Airlines, Inc. v. Franklin Mint Corp.,* 466 U.S. 243, 281(1984) ("There is… a firm and obviously sound canon of construction against finding implicit repeal of a treaty in ambiguous congressional action."); *Washington v. Washington State Comm. Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 690 (1979); *Menominee Tribe v. United States,* 391 U.S. 404, 412-13 (1968).

given international obligation.[9] Here, the Copyright Act of 1976 was enacted *before* the WIPO Treaties and the FTAs were ratified or enacted and then implemented. The question is whether this temporal reversal makes the *Charming-Betsy* rule inapplicable.

It does not. For example, *In re Rath,* 402 F.3d 1207, 1211 (Fed. Cir. 2005), stated that the *Charming-Betsy* rule requires ambiguous provisions of the 1946 Lanham Act to be construed to accord with the trademark-related provisions of the 1967 version of the non-self-executing Paris Convention for the Protection of Industrial Property.

Similarly, many U.S. tariff laws were also enacted before the U.S. adopted the more-recent and *expressly* non-self-executing General Agreement on Tariffs and Trade (GATT). *See* 19 U.S.C. § 3512(a)(1). Nevertheless, courts apply the *Charming-Betsy* rule to avoid interpretations of U.S. tariff and antidumping laws that would conflict with GATT. *See Federal Mogul Corp. v. United States,* 63 F.3d 1572, 1580-82 (Fed. Cir. 1995) (holding that when the Executive Branch construed a pre-GATT statute to avoid a conflict with GATT, the *Charming Betsy* rule, considerations of relative expertise, and

---

[9] The precedent suggesting that subsequent international agreements do affect the interpretation of earlier statutes is *Cook v. United States,* 288 U.S. 102 (1933). During Prohibition, U.S. agents invoked the Tariff Act of 1922 to seize alcohol carried in British ships that came near the U.S.—until this practice was prohibited by a 1924 Treaty between the U.S. and Britain. *Id.* at 107. Later, the Tariff Act of 1930 re-enacted the Tariff Act of 1922 without change, which should have shown intent to ratify prior seizure practices. *E.g., National Lead Co. v. United States,* 252 U.S. 140, 146-47 (1920). After U.S. agents again seized alcohol from a British ship, the Supreme Court had to decide whether the 1930 re-enactment of the 1922 statutory language abrogated the 1924 Treaty. The Court invoked the *Charming-Betsy* rule and found that it did not. *Id.* at 120.

potential "foreign policy repercussions" showed that the trial court erred by rejected the GATT-compliant interpretation).[10]

The *Charming-Betsy* rule applies in such cases because its underlying principles are implicated even if a domestic statute was enacted before an international obligation was incurred. Separation-of-powers principles remain relevant: If the Court holds that the Copyright Act of 1976 fails to provide a making available right, then the United States, the world's leading producer and exporter of copyrighted works, is violating nine subsequently adopted-and-implemented copyright-related international agreements—two treaties and at least seven multilateral or bilateral FTAs—*of which it was a principle proponent*. This is surely a context in which "the possibilities of international discord are so evident and retaliative action so certain." *Benz v. Compania Naviera Hidalgo, S.A.,* 353 U.S. 138, 147 (1957).

Principles of comity also remain relevant. Granted, neither the 94th Congress nor President Ford would have acted incompetently or duplicitously by enacting a Copyright Act that failed to implement a making-available-right obligation that did not exist in 1976. But the same could not be said as to the 98th, 108th, and 109th Congresses and Presidents Bush and Clinton: If the Copyright Act of 1976 did *not* provide a making-available right, then these Congresses and Presidents *did* execute their constitutional powers incompetently or duplicitously when enacting eight statutes intended to

---

[10]    *See also Allegheny Ludlum Corp. v. Armco, Inc.,* 367 F.3d 1339, 1347-48 (Fed. Cir. 2004) (*cited in Caddo Valley R.R. Co. v. Surface Transp. Bd.,* 512 F.3d 1021, 1023 (8th Cir. 2008)); *Luigi Bormioli Corp. v. United States,* 304 F.3d 1362, 1368 (Fed. Cir. 2002).

implement nine international agreements of the United States. Consequently, when Congress and the President must interpret an existing statute to determine what legislation must be enacted to implement an international agreement, principles of comity remain highly relevant when courts subsequently interpret the same statute. *See Federal Mogul Corp. v. United States,* 63 F.3d 1572, 1582 (Fed. Cir. 1995) ("For the [trial court] to read a GATT violation into the statute, over Commerce's objection, may commingle powers best kept separate.")

Indeed, the facts of this case forcefully implicate both separation-of-powers and comity principles. Courts have often applied the *Charming-Betsy* rule when the Executive Branch has construed an existing statute to violate an international obligation of the United States. *See, e.g., MacLeod v. United States,* 229 U.S. 416, 434 (1913) (rejecting the government's claim that a statute authorized the collection of tariffs prohibited by the Hague Convention).[11] But here, both the Executive and Legislative Branches have consistently and repeatedly interpreted the Copyright Act to execute a nine-times-incurred international obligation to provide a making-available right. *See Medellin v. Texas,* 128 S. Ct. 1346, 1361 (2008) (finding a treaty provision non-self-executing because the Executive Branch had "unfailingly adhered to its view" that the

---

[11] *See also McCulloch v. Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10, 21 (1963) (holding that courts will review even non-final agency actions predicated on statutory interpretations that would violate international law); *Chew Hong v. United States* 112 U.S. 536, 560 (1884) (rejecting the government's claim that a statute authorized the exclusion of Chinese nationals when doing so would violate U.S. treaty obligations).

provision was non-self executing, and its interpretation was "entitled to great weight") (citations omitted).[12]

Nor can their interpretations be dismissed as "subsequent legislative history." *Barker,* 2008 U.S. Dist. LEXIS 25913 at *21 n.7. The Supreme Court has unanimously distinguished subsequent *legislation* from subsequent legislative history: "'Subsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction' … [because] Congress has proceeded formally through the legislative process." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 118 n.13 (1980) (citations omitted).[13] Indeed, the Constitution treats the WIPO Treaties

---

[12]    *Barker,* 2008 U.S. Dist. LEXIS 25913 at *21 n.7, errs by claiming that *Medellin* shows that the making-available provisions of the WIPO Internet Treaties are "non-self executing." *Medellin* actually shows that these obligations were intended to be self-executing. *See* 128 S.Ct. at 1364 ("we have held treaties to be self executing when the provisions indicate that the President and Senate intended for the agreement to have domestic effect"). For example, in *Bacardi Corp. v. Domenech,* 311 U.S. 150, 163 (1940), the Court held that the directory language "shall" make Article 3 of the General Inter-American Convention for Trade Mark and Commercial Protection self-executing. Because most intellectual-property treaties, including the WIPO Internet Treaties, use language like that held self-executing in *Bacardi,* their implementing legislation usually declares their provisions to be *non-self-executing. See, e.g.,* Berne Convention Implementation Act of 1988, Pub. L. 100-568, §§ 2(1), 3, 102 Stat. 2853, 2853-54 (1988); 19 U.S.C. § 3512(a)(1) (declaring that the provisions of TRIPS are not self-executing). No such declarations appear in the legislation implementing the WIPO Internet Treaties: They *were* intended to be partially self-executing.

[13]    *See also Federal Housing Admin. v. The Darlington, Inc.,* 358 U.S. 84, 90 (1958) ("[s]ubsequent legislation which declares the intent of an earlier law… is entitled to weight when it comes to the problem of construction"); *United States v. Stanoff,* 260 U.S. 477, 480 (1923) ("a statute purporting to declare the intent of an earlier one might be of great weight in assisting a Court") (dicta); *Stockdale v. The Ins. Cos.,* 87 U.S. 323, 331 (1874) ("it may be taken to be established, that a legislative body may be statute declare the construction of previous statutes so as to bind the courts in reference to all transactions occurring after the passage of the law"); *United States v. Freeman,* 44 U.S. 556, 564-65 (1845) ("if it can be gathered from a subsequent statute in pari materia, what

Implementation Act and the Statements of Administrative Action and implementing legislation associated with each FTA as "the supreme Law of the Land" and states that "the Judges in every State shall be bound thereby…." U.S. Const. art. VI, cl.2.

Here, the Executive and Legislative Branches of the government, acting under lawful constitutional and statutory delegations of power, had to interpret the previously enacted Copyright Act of 1976 during formal lawmaking processes in order to decide which domestic laws had to be amended in order to execute their legal and constitutional duties to implement international obligations of the United States. The interpretation that these Branches adopted reflected the consistent views of the relevant expert agencies. *See* 17 U.S.C. § 701(b)(1)-(2); 35 U.S.C. § 35 U.S.C. § 2(b)(8)-(9). It also reflected a survey of then-existing judicial decisions. *See supra* at n.6.[14] Eight times, multiple

---

meaning the legislature attached to the words of a former statute, they will amount to a legislative declaration of its meaning, and will govern the construction of the first statute); *Alexander v. Mayor of Alexandria,* 9 U.S. 1, 7-8 (1809) ("if a subsequent act on the same subject affords complete demonstration of the legislative sense of its own language, the rule … requiring that the subsequent should be incorporated into the foregoing act, is a direction to courts in expounding the provisions of the law").

[14] By 1998, judicial decisions in addition to some of those summarized by the Copyright Office had found that unauthorized making-available infringed the distribution right. *See Marobie-FL, Inc. v. National Ass'n of Fire Equip. Distribs. and Northwest Nexus, Inc.,* 983 F. Supp. 1167, 1173 (N.D. Ill. 1997); *Playboy Ent., Inc. v. Russ Hardenburgh, Inc.,* 982 F. Supp. 503, 513 (N.D. Ohio 1997); *Playboy Ent., Inc. v. Chuckleberry Pub., Inc.,* 939 F. Supp. 1032, 1044 (S.D.N.Y. 1996); *see also Hotaling v. Church of Jesus Christ of Latter-Day Saints,* 118 F.3d 199, 203 (4th Cir. 1997). In *Subafilms, Ltd. v. MGM-Pathe Comm. Co.*, *dicta* did suggest a narrow construction of the statutory term "to authorize," but *Subafilms* held only that one does not infringe by authorizing *noninfringing* acts. 24 F.3d 1088, 1094 n. 8 (9th Cir. 1994) (en banc). The Ninth Circuit later held that making-available does violate the distribution right. *See Perfect 10, Inc. v. Google, Inc.,* 508 F.3d 1146, 1162 (9th Cir. 2007) (citing *Hotaling* and finding that "distribution rights …were infringed by Napster *users* … when they used the

Congresses and Presidents found that the Copyright Act of 1976 implement making-available-right obligations imposed by two treaties and seven FTAs.

In such situations, courts will defer to reasonable statutory interpretations adopted by the political branches of the government. *See Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc.,* 467 U.S. 837 (1984) (holding that such deference respects the expertise and greater political accountability of the political branches); *National Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005) (deferring to political-branch interpretations of ambiguous statutes even when they conflict with pre-existing and otherwise precedential judicial interpretations); *see also* Tim Wu, *Treaties' Domain*, 93 VA. L. REV. 571, 574 (2007) (reporting that a comprehensive, descriptive survey of treaty-enforcement and *Charming-Betsy* cases "shows the rough development of a system with some similarity to the system of deference to agency statutory interpretations known as *Chevron* deference"). Consequently, in the aftermath of *Chevron,* cases like *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 118 n.13 (1980), support a simple proposition: When the elected members of Congress and the elected President enact laws that both state, and are predicated upon, an interpretation of an existing law, courts will grant their interpretation the deference that

---

Napster software to make their collections available to all other Napster users"); *see also A&M Records v. Napster, Inc.,* 239 F.3d 1004, 1014 (9th Cir. 2001).

they would routinely accord to an interpretation adopted by unelected agency officials during an agency rulemaking.[15]

## CONCLUSION

For the above reasons, the Court should deny the motion for a new trial and hold that it correctly instructed the jury.

Dated:  June 20, 2008

s/ Tracey Holmes Donesky
Tracey Holmes Donesky (#302727)
LEONARD, STREET AND DEINARD
   *Professional Association*
150 South Fifth Street, Suite 2300
Minneapolis, MN 55402
Telephone:  (612) 335-1500
Fax (612)335-1657

**ATTORNEYS FOR *AMICUS CURIAE*
THOMAS D. SYDNOR OF THE
PROGRESS & FREEDOM
FOUNDATION**

---

[15]  Were such deference denied, it would be unwise for Congress and the President to try to amend the copyright act whenever it was even arguably ambiguous.  Courts presume that Congress does not amend statutes to provide what is already there.  *See, e.g., Stone v. INS,* 514 U.S. 386, 397 (1995).  Consequently, an amend-if-ambiguous strategy could systematically reduce copyright protections.

For example, when implementing the Berne Convention, Congress found that its "moral right" of attribution was provided by the state and federal laws of torts and unfair competition, including the Lanham Act. S. Rep. 100-352, at 9-10 (1988).  But in the Visual Artists Rights Act of 1990, Congress amended the copyright act to clarify how these rights applied as to a narrow class of "works of visual art."  *See* 17 U.S.C. § 106A(a)(1)(A).  *Dastar Corp. v. Twentieth Century Fox Film Corp.,* 539 U.S. 23, 34-35 (2003) then cited the 1990 amendment as evidence that the Lanham Act did not protect a right of attribution.  In short, courts concluded that an amendment that clarified rights that Congress thought were already provided actually showed that existing laws did not provide those rights.