# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

CAPITOL RECORDS INC.,
a Delaware corporation, *et al.*,

                Plaintiffs,

v.

JAMMIE THOMAS,

                Defendant.

Case No. 06-1497 (MJD/RLE)

## PLAINTIFFS' SUPPLEMENTAL BRIEF PURSUANT TO MAY 15, 2008 ORDER

Timothy M. Reynolds (pro hac vice)
David A. Tonini (pro hac vice)
Andrew B. Mohraz (pro hac vice)
HOLME ROBERTS & OWEN LLP
1700 Lincoln, Suite 4100
Denver, Colorado 80203
Telephone: (303) 861-7000
Facsimile: (303) 866-0200

Felicia J. Boyd (No. 186168)
Leita Walker (No. 387095)
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402-3901
Telephone: (612) 766-7000
Facsimile: (612) 766-1600

ATTORNEYS FOR PLAINTIFFS

Pursuant to the Court's May 15 Order ("Order"), Plaintiffs respectfully submit this supplemental brief. There is no basis in law or fact for setting aside the jury's verdict of willful copyright infringement and requiring a new trial.

As a threshold matter, the verdict should be sustained whether or not Jury Instruction 15 correctly states the law, because the verdict rests on unimpeachable findings of willful infringement. In all events, Instruction 15 correctly stated the law. The statutory text and decades of precedent compel the conclusion that making copyrighted sound recordings available for distribution violates a copyright owner's exclusive right of distribution even if it has not been proven that specific unauthorized copies have changed hands. The Eighth Circuit's decision in *National Car Rental System, Inc. v. Computer Associates, International, Inc.*, 991 F.2d 426 (8th Cir. 1993), is not to the contrary. That case involved a wholly different question that has no bearing on this case. The *National Car Rental* court held that allowing an authorized party to *use* software for an unauthorized purpose was not a distribution. The case did not raise — much less resolve — the question whether making software available for copying constitutes infringement.

Finally, restricting the copyright laws in the manner contemplated in this Court's Order would blow a gaping hole in the protections the law affords copyright owners. Congress cannot possibly have intended to allow a person to set up a business selling copyrighted works without a license and invite customers in to acquire the infringing works when the customer wants, so long as they were never caught in the act of actually transferring copies of copyrighted works to others. That regime serves no valid public

policy purpose. A person who makes infringing works available for copying by others has done everything that person needs to do to transfer infringing copies to the public, and there is no reason to allow a person to do so with impunity. Such a rule would invite abuse and cripple copyright enforcement, especially in the digital era. Millions of people use services like KaZaA to make copyrighted works available for illegal downloading. Copyright owners typically have no way to monitor — much less prove — the actual transfer of those files. If Defendant Thomas and others cannot be held liable when they make thousands of works available for unauthorized copying, copyright owners' exclusive right to distribute their works will be rendered worthless. That result would defy common sense and Congress's clear intent.

## INTRODUCTION

As the trial evidence showed, Defendant Thomas played an active role in the distribution of Plaintiffs' copyrighted works across the Internet. Defendant copied hundreds of Plaintiffs' copyrighted works onto her hard drive in a shared folder for the sole purpose of uploading further copies of those sound recordings to others, for free. Plaintiffs' investigators established that Thomas made those copies available to anyone who wanted them. Indeed, Plaintiffs downloaded numerous examples of infringing works. Defendant Thomas knew precisely what she was doing: she was intentionally infringing Plaintiffs' copyrights by offering illegal copies of sound recordings to anyone who wanted them on a medium (KaZaA) that millions of people use every day to steal copyrighted works. Those facts fully justify the jury's finding that Thomas committed willful infringement.

The Court's Order suggests a concern that Thomas's conduct may not have violated Plaintiffs' exclusive right to distribute copyrighted works and that there should be a new trial with a revised Instruction 15 that would require Plaintiffs to show that third parties actually copied the particular works that Thomas provided. Such a retrial would fly in the face of clear statutory language and depart sharply from decades of case law holding that a copyright owner's right to "distribute" works includes an exclusive right to control the "making available" of those works to others. Long before illegal uses of KaZaA and other peer-to-peer systems wreaked havoc on Plaintiffs' business, courts took a common-sense approach to distribution: If the owner of a video rental store made an unauthorized copyrighted video available on the shelves of his store, courts did not require copyright owners to sit monitoring the store and waiting for someone — if they could catch him — to rent or buy the video in question. Rather, the *offer* to sell, rent, or give away the video has always been enough. Nothing about the Internet context warrants any change in that common-sense understanding. Requiring a plaintiff to show actual transfers would cripple copyright owners' ability to protect themselves in the digital era. Nothing in the law requires that counterintuitive result.

## ARGUMENT

## I. THE JURY VERDICT SHOULD BE UPHELD EVEN IF THE COURT HAS DOUBTS ABOUT INSTRUCTION 15.

Jury Instruction 15 correctly stated copyright law. But this Court can and should uphold the verdict without reconsidering Instruction 15. The parties, the Court, and the jurors have invested substantial effort and resources to reach a definitive resolution. The

3

jury had no difficulty concluding that Thomas perpetrated massive, deliberate infringement, and that her conduct justified a substantial damages award. That considered judgment should not be disturbed unless the alleged error in Instruction 15 prejudiced the defendant. *See United States v. Jiminez*, 487 F.3d 1140, 1146 (8th Cir. 2007); *Eich v. Board of Regents for Cent. Mo. State Univ.*, 350 F.3d 752, 761 (8th Cir. 2003); *United States v. Wilson*, 103 F.3d 1402, 1408 (8th Cir. 1997) (weighing "waste [of] judicial resources" in refusing to overturn jury verdict). In the Eighth Circuit, a new trial is "necessary only when the errors misled the jury or had a probable effect on the jury's verdict." *Slidell, Inc. v. Millennium Inorganic Chemicals, Inc.*, 460 F.3d 1047, 1054 (8th Cir. 2006). Defendant Thomas cannot meet that test for two reasons.

*First*, as even Defendant's *amici* appear to concede, *see* Copyright Law Professors Amicus Br. at 8 ("a person who makes an unauthorized copy or phonorecord of a copyrighted work, for purposes of uploading it onto a peer-to-peer network, violates the reproduction right"), EFF Amicus Br. at 17, the jury's finding that Thomas engaged in the unauthorized reproduction of Plaintiffs' sound recordings suffices to sustain the verdict. Evidence showed that Defendant had 1,702 audio files in the KaZaA shared folder on her computer. Plaintiffs' witnesses went through pages and pages of screenshots identifying recordings in that folder to which they owned the rights. Pls. Trial Ex. 6. Defendant had copied the bulk of these sound recordings from other KaZaA users, and she had previously studied the *Napster* decision and knew that copying and sharing copyrighted music files over the Internet was illegal. Moreover, Defendant

refused to take responsibility for her actions and connived to destroy evidence of her massive infringement by replacing her hard drive.

This conduct indisputably establishes a willful violation of Plaintiffs' exclusive right of reproduction under Section 106(1). *See, e.g., BMG Music v. Gonzalez*, 430 F.3d 888, 890-91 (7th Cir. 2005); *Atlantic Recording Corp. v. Visione*, No. 07-CV-2268, 2008 WL 1924892, at *3 (N.D. Ill. Apr. 29, 2008); *see also* 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 14.04[B][3][a], at 14-77 - 78 (2008) ("'[W]illfully' means with knowledge that the defendant's conduct constitutes copyright infringement.") (footnotes omitted); *Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1335 n.3 (9th Cir. 1990). Because the reproduction charge was proper, the jury's verdict must be upheld.

*Second*, Thomas violated Plaintiffs' exclusive right to distribute under Section 106(3) even under the unduly restrictive definition suggested in this Court's Order. The trial evidence establishes that MediaSentry initiated the download of *every* file in Defendant's shared folder (to confirm that it was actually being distributed), and completed downloads of numerous files. Thus, unlawful distribution is proven here even if an actual transfer of an infringing copy is required (and it is not).

It does not matter that a representative of the copyright owners downloaded the copies. In *Olan Mills, Inc. v. Linn Photo Co.*, 23 F.3d 1345, 1347 (8th Cir. 1994), the plaintiff hired an investigator to obtain reproductions of photographs from the defendant. The court rejected the argument that the infringement was not actionable because it was "licensed" by the plaintiffs via their investigator:

5

> Olan Mills did not authorize the investigator to validate Linn
> Photo's unlawful conduct. Indeed, the investigator's
> assignment was part of Olan Mills' attempt to stop Linn
> Photo's infringement. Accordingly, the copies made by Linn
> Photo at the request of the investigator were copyright
> violations.

*Id.* at 1348.

The Eighth Circuit has also recognized that evidence of infringements involving

the public at large is unnecessary once a copyright owner has shown an infringement

initiated by its own investigator. In *RCA/Ariola International, Inc. v. Thomas &*

*Grayston Co.*, 845 F.2d 773 (8th Cir. 1988), plaintiffs used an investigator to gather

evidence on the illegal usage of tape-duplicating machines at retail establishments. The

investigator provided evidence only of his own interactions with the retailers; he "made

no effort to observe whether or not any of the bona fide customers copied copyrighted

recordings." *Id.* at 777. Liability was nonetheless obvious based on "the retailers'

actions." *Id.* at 782.[1]

---

[1] *See also, e.g., Microsoft Corp. v. Rechanik*, 249 F. App'x 476, 478 (7th Cir. 2007)
(distribution liability based on sales to Microsoft private investigators), *cert. denied*, No.
07-9250, 2008 WL 2002100 (U.S. May 12, 2008); *Atlantic Recording Corp. v. Howell*,
No. Cv-06-2076, 2008 WL 1927353, at *8 (D. Ariz. Apr. 29, 2008) (distribution liability
based on MediaSentry's downloads); *Interscope Records v. Leadbetter*, No. C05-1149,
2007 WL 1217705, at *4 (W.D. Wash. Apr. 23, 2007) (MediaSentry declaration was
evidence that files "were actually disseminated out of the shared folder ('uploaded') and
captured ('downloaded')")); *U2 Home Entm't, Inc. v. Fu Shun Wang*, 482 F. Supp. 2d
314, 317-18 (E.D.N.Y. 2007) (distribution liability based on rentals to plaintiffs'
investigator); *Universal City Studios Prods. LLLP v. Bigwood*, 441 F. Supp. 2d 185, 190
(D. Me. 2006) (distribution liability based on MediaSentry's downloads); *Columbia
Pictures Indus., Inc. v. Garcia*, 996 F. Supp. 770, 771 (N.D. Ill. 1998) (distribution
liability based on MPAA's investigator's "determin[ation] that Garcia was renting
unauthorized duplicate videotapes"); *Paramount Pictures Corp. v. Labus*, No. 89-C-797-

Thus, there is no basis for questioning the jury's verdict that Thomas infringed Plaintiffs' exclusive rights to control reproduction and distribution. Nor is there any basis for revisiting the jury's damages award. In addition to finding liability for infringing all of the works in question, the jury awarded the same amount of *damages* for works that were fully downloaded as it did for works that were only partially downloaded. The jury did not base its damages figure on whether there was a complete transfer.[2]

## II. THE COPYRIGHT ACT DEFINES UNLAWFUL DISTRIBUTION TO INCLUDE MAKING DIGITAL FILES AVAILABLE FOR COPYING BY OTHERS.

Under 17 U.S.C. § 106, "the owner of copyright under this title has the exclusive rights to *do* and to *authorize* any of the following: ... (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." That text, reinforced by its legislative history, conclusively establishes that a copyright owner's exclusive right to "distribute" is violated when another party, without authorization, makes digital copies of copyrighted works available for download by others. *First*, the term "distribute" in Section 106 necessarily encompasses the act of making copies available for others to take, whether or not a copy is transferred. That is the plain meaning of the term "distribute" — as the Supreme Court, lower courts, and the Register of Copyrights have concluded under the Copyright Act and in related contexts, and as the statutory context and legislative history

---

C, 1990 WL 120642, at *5 (W.D. Wis. Mar. 23, 1990) (rejecting as "completely without merit" argument that video rentals to investigator could not establish infringement).

[2] In any event, the jury indisputably found statutory damages of $9,250 for each of the seven confirmed infringements, for a minimum damages award of $64,750.

of Section 106 confirm. *Second,* Defendant has further violated Plaintiffs' distribution

right by purporting to "authorize" distribution by inviting millions of users to download

copies of Plaintiffs' works from her shared folder.

### A. The Right To "Distribute" Encompasses Making Works Available for Copying by Others.

#### 1. The Plain Meaning of "Distribute" in Section 106 Encompasses the Exclusive Right To "Make Available."

Section 106(3) grants a copyright owner the exclusive right to "distribute" copies

of copyrighted works to the public by any means of transfer of ownership or by rental,

lease or lending. By definition, a person who possesses the *exclusive* right to distribute

works also possesses the exclusive right to make works available for copying by others.

Making a work available for copying is a critical and indispensable part of the process of

transferring ownership of copies of a work. Thus, a copyright owner's exclusive right to

distribute necessarily includes the right to control how a work is made available to the

public. When someone makes a copyrighted work available for copying by others

without authorization — as Defendant did here with thousands of works — that person is

doing something that Section 106 gives the copyright owner the exclusive right to "do."

That the person's acts of distribution have not yet resulted in the actual transfer of a copy

does not mean that the person has the right to "do" those acts. To the contrary, that

person is invading the sphere of activity that Section 106 gives the copyright owner the

exclusive right to control.

This is precisely what the Supreme Court held in *New York Times Co. v. Tasini,*

533 U.S. 483, 488 (2001). In *Tasini,* the defendants were electronic publishers licensed

8

to "reproduce or distribute" the plaintiffs' copyrighted articles only as part of a compilation. *Id.* at 496-97. The publishers, however, made individual copies of articles available for download from their database. Even though plaintiffs had not proved that the publishers transferred actual digital copies to users of the database, the Supreme Court held that "it is clear" that the defendants "distribute copies" of the plaintiffs' articles merely by making them available for download. *Id.* at 498, 505. Critically, the Court rejected the argument that defendants were not liable for direct infringement of the right to "distribute" because their *subscribers* were responsible for actually downloading the articles. *Id.* at 504. That ruling leaves no doubt that making articles available for copying by others constitutes infringement of the distribution right.

Similarly, the Register of Copyrights has concluded that "making [a work] available for other users of a peer to peer network to download ... constitutes an infringement of the exclusive distribution right, as well as of the reproduction right." *See* Letter from Marybeth Peters to Rep. Howard L. Berman at 1, Sept. 25, 2002, *reprinted in Piracy of Intellectual Property on Peer-to-Peer Networks, Hearing Before the Subcomm. on Courts, the Internet, and Intellectual Property of the House Comm. on the Judiciary*, 107th Cong. 114-15 (2002). That interpretation is entitled to particular respect. *De Sylva v. Ballentine,* 351 U.S. 570, 577-78 (1956). Indeed, Congress itself has acknowledged that Section 106 encompasses a right of making available; in the Digital Millennium Copyright Act, Congress specifically authorized copyright owners to issue takedown notices for copyrighted works made available online — and then directs copyright owners to bring suit for infringement if Internet service providers do not take the

9

infringing work down or put the work back up, regardless of whether there has been an actual transfer. 17 U.S.C. § 512(c), (g).

In similar contexts, courts routinely hold that the plain meaning of the statutory term "distribution" includes making an item available to others, and have rejected the argument that no "distribution" occurs until a physical object actually changes hands. For example, the Tenth Circuit held that a person violates 18 U.S.C. § 2252A, which prohibits the "distribution" of child pornography, by doing nothing more than placing child pornography in a shared folder in KaZaA. *United States v. Shaffer*, 472 F.3d 1219 (10th Cir. 2007). The court reviewed multiple dictionary definitions of "distribute," which included "to deliver," "to dispense" and "to disperse," and expressly rejected the argument that a distribution required proof of an actual download. *Id.* at 1223 (quoting from Black's Law Dictionary 508 (8th ed. 2005) and Webster's Third New Int'l Dictionary Unabridged 660 (2002)). To the contrary, the Tenth Circuit held that as "a matter of plain meaning," the statutory term "distribution" encompassed making copies available. *Id.* at 1223; *accord United States v. Carani*, 492 F.3d 867, 876 (7th Cir. 2007) ("The notion that Carani could knowingly *make his child pornography available* for others to access and download without this qualifying as 'distribution' does not square with the plain meaning of the word."), *cert. denied*, 128 S.Ct. 932 (2008); *United States v. Abraham*, No. Cr. 05-344, 2006 WL 3052702, at * 8 (W.D. Pa. Oct. 24, 2006); *United States v. Christy*, 65 M.J. 657, 664-65 (A. Ct. Crim. App. 2007), *review denied*, 66 M.J. 189 (C.A.A.F. Feb. 13, 2008); *see also Moodie v. School Book Fairs, Inc.*, 889 F.2d 739, 743-44 (7th Cir. 1989) (interpreting "distribute" in state dealership statute to encompass

the activity of delivering books, placing them on shelves, and making them available for purchase by others).[3]

The Eighth Circuit has repeatedly recognized this point. In *United States v. Clawson*, 408 F.3d 556 (8th Cir. 2005), the Eighth Circuit concluded that a defendant had "distributed" computer disks containing pornography to a minor by making the disks available to the minor in a house, without any proof that the minor actually took possession of them. *Id.* at 558. The Eighth Circuit also held that "the ordinary, contemporary, common meaning of 'distribution'" includes not merely completed transfers but the entire "process of getting goods from the manufacturer to the consumer, including marketing, handling of orders and transport of goods." *United States v. Brummel*, 15 F.3d 769, 773 (8th Cir. 1994) (internal quotation marks omitted). The *Brummel* court expressly rejected the argument that a person could not validly be charged with violating a federal law prohibiting the "distribution or attempted distribution" of

---

[3] Across the U.S. Code, "distribution" is regularly defined to encompass the act of offering or making a thing available. In some instances, Congress specifically treats the concepts as synonyms:

> *Distribution* to air carriers.—The Administrator shall *make available*, beginning not later than July 1, 2008, blast-resistant cargo containers to air carriers.

49 U.S.C. § 44901(j)(3) (emphases added); *see also* 47 U.S.C. § 522(13) (defining "multichannel video programming distributor" to include one "who makes available for purchase" certain programming). Elsewhere, Congress defines "distribution" as including offers to distribute or actions taken with an intent to distribute. *See, e.g.*, 17 U.S.C. § 901(a)(4); 42 U.S.C. § 4902(8); 42 U.S.C. § 6291(16); 15 U.S.C. § 2052(a)(11); 15 U.S.C. § 2301(13); 15 U.S.C. § 2801(6) The act of placing a work in a shared folder is necessarily an offer to distribute. "[W]here a word is given a consistent meaning throughout the United States Code, then the courts assume it has *that same meaning* in any particular instance of that word." *Firstar Bank, N.A. v. Faul*, 253 F.3d 982, 990 (7th Cir. 2001).

adulterated meat if the person merely packaged the meat and did not actually transfer it to consumers.[4]

This Court therefore need go no further than the plain meaning of the statutory term "distribute" in Section 106 to conclude that the reference to "making available" in Instruction 15 is correct and should not be revisited.

### 2.    The Statutory Context and Legislative History Confirm that the Right To "Distribute" Encompasses "Making Available."

Even if the meaning of "distribute" were not so clear, the statutory context and legislative history confirm that Plaintiffs' exclusive right to "distribute" encompasses the exclusive right to control when and how works are made available for copying by others. As numerous courts have observed, although the term "'[d]istribute' is not defined in the Copyright Act, . . . the Supreme Court has equated the term with 'publication,' which is defined under the Act." *Warner Bros. Records, Inc. v. Payne*, No. 06-CA-051, 2006 WL 2844415, at *3 (W.D. Tex. July 17, 2006). The defined statutory term "publication" indisputably encompasses "offers to distribute" as well as actual transfers of physical copies. Because "the right of distribution" set forth in Section 106 is "synonymous with the publication of a copyrighted work" any action that constitutes a "publication" under the Act also constitutes a "distribution." *Arista Records LLC v. Greubel*, 453 F. Supp. 2d 961, 969 (N.D. Tex. 2006); *see also Agee v. Paramount Commc'ns, Inc.*, 59 F.3d 317,

---

[4] That courts in criminal cases have so readily construed the plain meaning of the term "to distribute" to include the concept of "making available" is particularly significant. Unlike in civil cases, the rule of lenity requires courts to construe ambiguous statutory terms in favor of criminal defendants. *See United States v. Oetken*, 241 F.3d 1057, 1060 (8th Cir. 2001). It would be odd to give the term a narrower meaning in civil cases than in criminal cases.

325 (2d Cir. 1995); *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 299 (3d Cir. 1991) ("Publication and the exclusive right protected by section 106(3), then, are for all practical purposes, synonymous."); *Atlantic Recording Corp. v. Anderson*, No. H-06-3578, 2008 WL 2316551, at *7 (S.D. Tex. Mar. 12, 2008). *See generally Harper & Row Publs., Inc. v. Nation Enters.*, 471 U.S. 539, 552 (1985).

Section 101 defines "publication" as "the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 101. The statute goes on to state that:

> The *offering to distribute* copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication.

*Id.* (emphasis added). Because "[m]aking an unauthorized copy of a sound recording available to countless users of a peer-to-peer system for free certainly contemplates and encourages further distribution," the act is a "publication." *Warner Bros. Records, Inc. v. Payne*, 2006 WL 2844415, at *4.[5]

A "publication," in turn, is a "distribution" under the Act. Throughout the legislative process leading to the 1976 Copyright Act, Congress repeatedly referred to

---

[5] The Court should not be misled by efforts to take legislative history out of context to suggest that a publication (and thus a distribution) requires a copy to "change hands." H.R. Rep. 94-1476, at 138 (1976), as reprinted in 1976 U.S.C.C.A.N. 5659, 5754. Not only would that interpretation contradict the statutory definition's clear terms, which cover "offer[s] to distribute," 17 U.S.C. § 101, but context shows the Committee was making an entirely different point. The Committee Report was distinguishing between the exclusive rights that involve a purely ephemeral experience — "performances or displays on television, for example" — from copy-based rights like distribution and publication, in which it is possible for another person to take possession. H.R. Rep. 94-1476, at 138, as reprinted in 1976 U.S.C.C.A.N. at 5754.

Section 106(3)'s distribution right as a right of *publication*. For example, the House

Judiciary Committee described Section 106 as protecting "five fundamental rights … –

the exclusive rights of reproduction, adaptation, *publication*, performance, and display,"

H.R. Rep. 94-1476, at 61 (1976), as reprinted in 1976 U.S.C.C.A.N. 5659, 5674

(emphasis added), without mentioning the statute's actual use of the term "distribute,"

and described Section 106(3) as follows:

> *Public Distribution.* – Clause (3) of section 106 establishes
> the exclusive right of *publication*: The right "to *distribute*
> copies or phonorecords of the copyrighted work to the public
> by sale or other transfer of ownership, or by rental, lease, or
> lending."

*Id.* at 62, as reprinted in 1976 U.S.C.C.A.N. at 5675 (emphasis added). The Committee

that drafted Section 106(3) thus both used the word 'publication' as a stand-in for

'distribution,' and further interpreted the right of distribution as "establish[ing] the

exclusive right of publication" – so that if an act constitutes an unauthorized publication

as the Copyright Act defines it, that action infringes upon the right of distribution. As the

Register of Copyrights described Section 106(3) in an earlier bill, "The language of this

clause is virtually identical with that in the definition of 'publication' in Section 101,"

which is simply "restated" in Section 106(3).[6]  H. Comm. on the Judiciary, 89th Cong.,

---

[6] Congress referred to distribution as "publishing copies" as early as 1961. *See
Discussion of Proposed Amendment*, Chapter III, Recommendations, Report of Register
of Copyrights on the General Revision of the U.S. Copyright Law, 87th Cong., 1st Sess.
(1961), *in The Kaminstein Legislative History Project: A Compendium and Analytical
Index of Materials Leading to the Copyright Act of 1976* (Alan Latman & James F.
Lightstone eds., 1981) ("[T]he statute should continue [as it did under the prior 1909 Act]
to accord to copyright owners the exclusive rights to exploit their works by (1) making
[reproducing] and publishing [distributing] copies.").

Supplementary Report of the Register of Copyright Law: 1965 Revision Bill (Comm. Print May 1965).

Section 106(3) therefore provides copyright owners with the exclusive right to *offer* their work for distribution. Placing a work in a shared folder indisputably constitutes a publication, which in turn is a "distribution." *See, e.g., Atlantic Recording Corp. v. Anderson*, 2008 WL 2316551, at *8 (calling it "self-evident" that placing works "in a shared folder … constituted a 'distribution'"); *Arista Records LLC*, 453 F. Supp. 2d at 969-71.

The statutory context and legislative history thus provide further confirmation that Instruction 15 is correct.

**B. "Offering To Distribute" Copyrighted Works without Authorization from the Copyright Owner Violates the Owner's Exclusive Right under Section 106 To "Authorize" Distribution.**

Instruction 15 is correct for the additional reason that Section 106 establishes the exclusive right not merely to distribute copies of their works but also the exclusive right to "authorize" distribution. 17 U.S.C. § 106(3); *Frasier v. Adams-Sandler, Inc.*, 94 F.3d 129, 130 (4th Cir. 1996). Even if making copyrighted works available for copying did not itself constitute a prohibited "distribution" — which it does — Defendant has plainly authorized the reproduction and distribution of Plaintiffs' works by making them available for copying in her shared folder.

Courts must give force to the ordinary meaning of "authorize," *see United States v. Friedrich*, 402 F.3d 842, 845 (8th Cir. 2005); *United States ex rel. Harlan v. Bacon*, 21 F.3d 209, 210 (8th Cir. 1994), which is well-understood by both lexicographers and

courts. To "authorize" means to "give legal authority; to empower . . . ; [t]o formally approve; to sanction." *Black's Law Dictionary* 143 (8th ed. 2004) (examples omitted). *The American Heritage Dictionary* (4th ed. 2000) defines the word to mean "[t]o grant authority or power to," or "[t]o give permission for; sanction." *Id.* at 121. Citing such definitions, the Supreme Court has noted that the word "authorize" "ordinarily denotes affirmative enabling action," and "sometimes means simply 'to permit.'" *Washington County v. Gunther*, 452 U.S. 161, 169 (1981). Other courts have reached similar conclusions. *E.g.*, *United States v. Plavcak*, 411 F.3d 655, 661 (6th Cir. 2005) ("to grant authority or power to," "to give permission for," or "to sanction"); *Confederated Salish and Kootenai Tribes v. United States ex rel. Norton*, 343 F.3d 1193, 1196 (9th Cir. 2003) (interpreting term as "permissive, rather than mandatory").

By placing infringing music files in their shared folders, the Defendant "permit[ted]," "sanction[ed]," "enable[d]," and "empower[ed]" KaZaA users to help themselves to copies of those works. In a word, Defendant "authorize[d]" the actual dissemination of those works and thereby infringed the Plaintiffs' exclusive rights. *See Venegas-Hernández v. Asociación de Compositores y Editores de Música LatinoAmericana*, 424 F.3d 50, 58 (1st Cir. 2005) (recognizing that "the better bare-language reading" of Section 106 confers on copyright holders the right to make available their works for distribution).[7]

---

[7] The *Venegas-Hernández* court went on to reject the making-available right because "the case is so close and the stakes [are] low enough." 424 F.3d at 58. Its reasoning is peculiar and patently incorrect. As explained herein, the stakes for copyright owners are quite high. And the First Circuit has subsequently clarified that, while listing a work in a

The Court thus need look no further than the text of Section 106 to conclude that

Instruction 15 was entirely proper.

III. **A NEW TRIAL WOULD DEPART FROM DECADES OF CASE LAW RECOGNIZING THE MAKING-AVAILABLE RIGHT IN MANY CONTEXTS.**

    A. **Courts Have Long Recognized that Distribution Does Not Require an Actual Transfer.**

Consistent with the statutory text, context and history, for decades courts have

found book stores, music stores, and video rental stores who made copies of copyrighted

works available without authorization liable for infringement, without requiring

additional monitoring to catch a member of the public accepting the defendant's offer.

As the Fourth Circuit explained in holding a library liable for offering copyrighted

genealogical material:

> When a public library adds a work to its collection, lists the
> work in its index or catalog system, and makes the work
> available to the borrowing or browsing public, it has
> completed all the steps necessary for distribution to the
> public. At that point, members of the public can visit the
> library and use the work.

*Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 199, 203 (4th Cir.

1997). The *Hotaling* court explained that identifying the act of distribution at this point,

when the distributor has completed all necessary acts, is critical lest the inquiry become a

mere record-keeping battle divorced from the wrongdoer's actions: "Were this not to be

---

catalog may not be a distribution, one who actually makes the copyrighted work itself
available — specifically, on a website — is likely in a much different category. *See Latin
American Music Co., Inc. v. Archdiocese of San Juan of the Roman Catholic & Apostolic
Church*, 499 F.3d 32, 46-47 (1st Cir. 2007) (vacating for district court to consider
question).

considered distribution within the meaning of § 106(3), a copyright holder would be prejudiced by a library that does not keep records of public use, and the library would unjustly profit by its omission." *Id.*

*Hotaling* broke no new ground. For example, another federal court concluded that a video rental store had infringed distribution rights, based on the seizure of videos "from the portion of the store where the videocassettes were available for rental." *Walt Disney Co. v. Video 47, Inc.*, 972 F. Supp. 595, 599 (S.D. Fla. 1996). Apart from a rental to an authorized agent of the copyright owners, the plaintiff did not prove any actual transfers, *see id.* at 597-601; the store owners violated the distribution right by "*holding out for rental* counterfeit videocassette tapes." *Id.* at 602 (emphasis added).[8] The principle is clear: When a store owner places videos in the portion of the store from which videos are rented, the owner has taken all of the steps he or she can possibly take for a distribution. Whether the offer is accepted, and whether it is possible to track any such transfer, is irrelevant. Indeed, here Defendant did not just "offer" to provide copyrighted works to others; she took every action necessary so that others could simply take them, at their leisure, within a KaZaA system designed to hide any trace of who is copying what. Copyright liability should not depend on whether the owner has hidden the receipt.

Indeed, any uncertainty prior to the 1976 Copyright Act about whether the right to "vend" included an offer to vend, *compare American Code Co. v. Bensinger*, 282 F. 829, 834 (2d Cir. 1922) (upholding a copyright claim for "selling *or offering to sell* the

---

[8] The court there also noted that the defendants there had offered the videos "for financial gain," which is irrelevant to the distribution inquiry but which was relevant to the defendants' violation of a prior court order. *Id.* at 602, 598.

infringing book at retail") (emphasis added), *with Greenbie v. Noble*, 151 F. Supp. 45, 64 (S.D.N.Y. 1957) ("[A] mere offer without more does not constitute vending."), was resolved by the 1976 Act's use of "distribute," which is broader than the right to vend under the 1909 Act. *See Encyclopaedia Britannica Educ. Corp. v. Crooks*, 558 F. Supp. 1247, 1254 (W.D.N.Y. 1983). Since then, an unauthorized offer to distribute has routinely been found to constitute prohibited distribution without the need for any additional showing that an actual physical copy of the work has changed hands. *See, e.g., U2 Home Entm't, Inc.*, 482 F. Supp. 2d at 317-18 (E.D.N.Y. 2007); *Columbia Pictures Indus., Inc. v. T&F Enters., Inc.*, 68 F. Supp. 2d 833, 839 (E.D. Mich. 1999) (finding prima facie case of infringement based on admission that defendants "held these video cassettes out for distribution"); *Wildlife Internationale, Inc. v. Clements*, 591 F. Supp. 1542, 1544, 1546 (D. Ohio 1984) (finding distribution based only on evidence that "artwork was being offered").

This common-sense understanding of "distribution" applies fully to the on-line context. In addition to the Supreme Court's decision in *Tasini*, courts have routinely held that the unauthorized act of making copies available for download by others violates the copyright owner's exclusive right to distribute. For example, the Ninth Circuit concluded in *A&M Records, Inc. v. Napster, Inc.* that "users who upload file names to the search index for others to copy violate plaintiffs' distribution rights." 239 F.3d 1004, 1014 (9th Cir. 2001); *see also Perfect 10 v. Amazon.com, Inc.*, 487 F.3d 701, 718-19 (9th Cir. 2007) (confirming that defendant who makes actual files available for distribution, not just links to files, "distributes" them). In *Advance Magazine Publishers, Inc. v. Leach*, 466 F.

Supp. 2d 628, 637-38 (D. Md. 2006), an online publisher violated a copyright owner's distribution rights by posting the publications online. Citing no evidence of any actual downloads, the court specifically reasoned that "by making available unauthorized copies of Plaintiff's publications, he has infringed its right to distribution." *Id.*; *accord Playboy Enters., Inc. v. Russ Hardenburgh, Inc.*, 982 F. Supp. 503, 509 (N.D. Ohio. 1997) (finding distribution without actual transfer, and rejecting argument that defendants "had never 'distributed' [plaintiffs'] photographs to their customers because it was the customers themselves who chose whether or not to download" the photographs from defendants' server); *Marobie-FL, Inc. v. Nat'l Ass'n of Fire Equip. Distribs. & Northwest Nexus, Inc.*, 983 F. Supp. 1167, 1173-74 (N.D. Ill. 1997) (finding infringement without transfers, and noting that "once the files were uploaded, they were available for downloading"); *State v. Perry*, 697 N.E.2d 624, 628 (Ohio 1998) (finding state criminal law preempted by federal copyright law, because "[p]osting software on a bulletin board where others can access and download it is distribution").

Just as putting a video in the rental section of a store constitutes every act the storeowner must take to distribute it, placing copyrighted music files in a shared folder in KaZaA constitutes an invitation for others to collect whatever files they like at their leisure. This is no secret; as the Eighth Circuit noted, "Kazaa's *purpose* is to allow users to download each other's shared files." *United States v. Sewell*, 513 F.3d 820, 820 (8th Cir. 2008) (emphasis added), *cert. denied*, No. 07-1339, 2008 WL 1826056 (U.S. May 27, 2008). Another circuit analogized a KaZaA shared folder like Defendant's to a self-serve gas station:

20

> [T]he owner has a roadside sign letting all passersby know
> that, if they choose, they can stop and fill their cars for
> themselves, paying at the pump by credit card. Just because
> the operation is self-serve, or ... passive, we do not doubt for
> a moment that the gas station owner is in the business of
> "distributing," "delivering," "transferring" or "dispersing"
> gasoline; the *raison d'etre* of owning a gas station is to do
> just that.

*Shaffer*, 472 F.3d at 1223-24. Similarly, the *raison d'etre* of the shared folder is to share

files. Just as the gas station owner distributes gasoline, Defendant distributes Plaintiffs'

copyrighted works.

Any other conclusion would contravene sound policy and common sense, because

it would preclude proving infringement where the Defendant's intent to infringe and the

certainty of infringements are clear but evidence of the actual act of transfer is nearly

impossible to detect. Piracy typically takes place behind closed doors, beyond the ability

of even a vigilant copyright owner to detect. The purpose of peer-to-peer networks like

KaZaA is to allow users to disseminate massive amounts of copyrighted materials

without having a direct relationship with the people who benefit from their illegal actions.

With substantial monitoring, copyright owners can identify those who publicly broadcast

offers to disseminate copyrighted works to anyone who desires them, and after discovery

against such a distributor, analysis can often determine how the distributor obtained the

files in question. But because the transfer of files occurs in a direct connection between

the distributor's computer and the recipient's, there is currently no way to capture the

transfer as it happens. Requiring proof of actual transfers would cripple efforts to enforce

copyright owners' rights online — and would solely benefit those who seek to freeload off Plaintiffs' investment.

### B. Neither *National Car Rental* nor Recent District Court Opinions Call Instruction 15 into Question.

#### 1. *National Car Rental* Is Inapposite.

The Court has raised concern that the Eighth Circuit's decision in *National Car Rental* compels a reading of "distribution" that would preclude liability for making copyrighted works available for copying and further distribution without authorization. But *National Car Rental* has nothing to do with the issue here. While a few courts have misinterpreted stray language from the decision, *National Car Rental* does not hold, or even imply, that a plaintiff must prove an actual completed transfer in order to prove infringement.

To understand why this is so, it is necessary to focus carefully on the facts of the case. The plaintiff licensed data-processing software to National Car Rental and its vendor. *Id.* at 427-28. Under the license agreement, "use of the Licensed Program[s] is restricted to the internal operations of Licensee and for the processing of its own data." *Id.* at 428. The plaintiff later discovered that National Car Rental had used the software to process transactions for third parties, in violation of the license. *Id.*

Plaintiff brought a contract claim, alleging that National Car Rental had exceeded the scope of its license. Copyright law was relevant only because National Car Rental asserted that the Copyright Act preempted the plaintiff's common law claim. Specifically, National Car Rental contended that "using the program in a fashion not

allowed under the contract [implicates] a right equivalent to one of the exclusive copyright rights," and therefore the plaintiff's breach of contract was preempted. *Id.* at 430-31. In other words, the question was whether the defendant's *use* of software *for the benefit of* third parties was a "distribution" under Section 106 of the Act.

The court concluded that such use was not a distribution, and that the contract suit was not preempted. *Id.* at 432-33. The court rejected the defendant's novel theory that using software to process third-party data should be treated as the equivalent of actually transferring that software to the third parties because the third parties could take advantage of the software's function. *Id.* at 434. The court emphasized that "copyright protection in computer software does not extend to the software's *function*," *id.* at 434 (emphasis added), but protects "only the right to distribute *copies*," *id.* (emphasis in original).

That holding is irrelevant to the question before this Court. The defendant in *National Car Rental* was not making a work available for copying by third parties; it was merely using copyrighted software beyond the scope of its license. The Eighth Circuit never considered whether the right to distribution is violated by the unauthorized "making available" of copies, or whether an actual transfer of a copy must occur.[9] The

---

[9] The sentence quoted from Professor Nimmer's treatise is similarly lifted out of context: In stating that the distribution right "requires an actual dissemination of either copies or phonorecords," 2 *Nimmer on Copyright* § 8.11[A] at 8-149, Nimmer addresses not the distinction between actual transfers and making available, but between dissemination of copies and live, ephemeral performances that do not involve copies of any kind. Indeed, Nimmer himself cites only *National Car Rental*, which does not implicate making-available in any way. Nimmer's treatise is consistent with the decades of case law recognizing that the distribution right can be infringed without an actual transfer. *See* 3

Eighth Circuit's decision simply does not address *what it means* to "distribute" under the Copyright Act. The question in *National Car Rental* was only *what had to be distributed*: copies or functionality.

### 2. Both *Howell* and *London-Sire* Rest on Fundamental Errors.

The Court's briefing order notes the decision in *Atlantic Recording Corp. v. Howell*, No. CV-06-2076, 2008 WL 1927353 (D. Ariz. Apr. 29, 2008). But both that decision and the recent decision in *London-Sire Records, Inc. v. Doe I*, 542 F. Supp. 2d 153, 2008 WL 887491 (D. Mass. 2008), on which *amici* rely, rest on fundamental mistakes. *London-Sire* violates two basic precepts of statutory interpretation. First, in concluding that the right "to authorize" distribution does not include the act of offering to distribute copyrighted works, the court looked to legislative history indicating that the words "to authorize" refer to actions that constitute contributory infringement. *Id.* at 166. However, nothing in the legislative history suggests that the words "to authorize" refer *only* to contributory infringement; the committee report states only that "to authorize" *does* encompass contributory infringement. That court thus made the mistake not only of using legislative history to limit an otherwise expansive term, but misinterpreted that legislative history as *excluding* a concept simply because it did not *mention* the concept. The Supreme Court has made clear that committee reports ought not be given this force. *See Standefer v. United States*, 447 U.S. 10, 20 n.12 (1980) (stating that Court was "unwilling to apply [*expression unius*] to the language employed in a *committee report*,"

---

*Nimmer on Copyright* § 10.02[A] at 10-21 ("[I]f another dealer were *to attempt to distribute* the same paper ... the first dealer could sue the second for infringement of his distribution right.") (emphasis added).

which "would permit an omission in the legislative history to nullify the plain meaning of a statute").

Second, after relying on legislative history to override the plain meaning of "to authorize," the *London-Sire* court refused even to look at legislative history that provides a clear definition for the critical undefined term, "distribute." The court noted that "distribution" is undefined, but concluded that it could not mean the same thing as "publication," *see London-Sire*, 542 F. Supp. 2d at 169 ("Plainly 'publication' and 'distribution' are not identical."), without looking at extensive legislative history showing Congress used the terms interchangeably, *see supra* Part II.A.2. Thus, the only way to reach the *London-Sire* court's conclusion was to use legislative history in exactly the wrong manner: to override the meaning of a clear statutory term (and only because the legislative history did not specifically enumerate a concept covered by the term), and then to ignore how that history explained a critical but undefined statutory term.

The District of Arizona's decision in *Howell* makes a similar error. First, it imposes a cramped reading of the Supreme Court's *Harper & Row* decision, arguing that the Court's treatment of "distribution" and "publication" as synonymous should be limited to the context of that case, which involved "first publication," *Howell*, 2008 WL 1927353, at *7, even though *Harper & Row*'s logic encompasses *all* publications. *Howell* then incorrectly states that nothing in the statute or legislative history equates "publication" with "distribution." *Id.*; *see supra* Part II.A.2. The *Howell* court's conclusion is surprising, but had it implemented its analysis correctly, it would have reached the same conclusion as this Court did in Jury Instruction 15.

## IV. REJECTING THE MAKING-AVAILABLE RIGHT WOULD BRING THE UNITED STATES INTO CONFLICT WITH ITS INTERNATIONAL OBLIGATIONS.

That Section 106(3) provides a making-available right is confirmed by Congress's response to numerous international agreements that explicitly require the United States to provide one. The right of making available is embedded in copyright laws across the world. When the United States has agreed to treaties requiring protection of copyright owners' making- available right, the legislative and executive branches have consistently— and explicitly — concluded that the Copyright Act already protects that right. Granting a new trial here would override the interpretations of these co-equal branches and bring the United States into conflict with its international obligations.

Two treaties are particularly relevant. The World Intellectual Property Organization's ("WIPO") Copyright Treaty, adopted Dec. 20, 1996, 36 I.L.M. 65 (1997) ("WIPO Copyright Treaty"), and its Performances and Phonograms Treaty, adopted Dec. 20, 1996, 36 I.L.M. 76 (1997) ("WPPT Treaty") both include a making-available right. Under Article 8 of the Copyright Treaty,

> [A]uthors of literary and artistic works shall enjoy the
> exclusive right of authorizing any communication to the
> public of their works, by wire or wireless means, *including
> the making available to the public of their works* in such a
> way that members of the public may access these works from
> a place and at a time individually chosen by them.

WIPO Copyright Treaty, art. 8 (emphasis added); *accord* WPPT Treaty, art. 10.

In implementing these treaties, Congress heard from Commerce Department, State Department, and Copyright Office witnesses. None objected to the treaties' making-

available right, and, more significantly, none suggested that changes in U.S. law were necessary to comply with it.[10] The Copyright Office addressed the question head-on, and found no changes were needed: "After an extensive analysis the Copyright Office concluded that existing protections are adequate to fulfill all but two of the substantive treaty obligations." *WIPO Copyright Treaties Implementation Act and Online Copyright Liability Limitation Act Hearing on H.R. 2281 and H.R. 2280 before the Subcomm. on Courts and Intellectual Property of the H. Comm. on the Judicary*, 105th Cong. 43-44 (Sept. 16, 1997) (Marybeth Peters, Register of Copyrights) (hereinafter "Peters Statement"). Neither of these two changes had anything to do with the making-available right.

Relying on this testimony, Congress implemented the treaties in full. The Senate Judiciary Committee cited the treaties' "broad right of public distribution," S. Rep. No. 105-190, at 10-11 (1998), and the House Judiciary Committee concluded that "[t]he treaties do not require any change in the substance of copyright rights or exceptions in U.S. law," H. R. Rep. No. 105-551(I), at 9 (1998). The Copyright Office advised that the implementation bill "fully and adequately implements the obligations of the new WIPO

---

[10] *See, e.g.*, *WIPO Copyright Treaties Implementation Act and Online Copyright Liability Limitation Act Hearing on H.R. 2281 and H.R. 2280 before the Subcomm. on Courts and Intellectual Property of the H. Comm. on the Judicary*, 105th Cong. 37 (Sept. 16, 1997) (Bruce Lehman, PTO Commissioner) ("nothing in these Treaties or the implementing legislation affects the issue of liability for particular acts of copyright infringement"); *WIPO Copyright Treaty (WCT) (1996) and WIPO Performances and Phonograms Treaty (WPPT) (1996)*, Sept. 10, 1998, S. Exec. Rep. No. 105-25, at 27 (Oct. 14, 1998) (Alan Larson, Assistant Secretary of State ) ("[T]he Department of State unequivocally endorses the WIPO Copyright Treaty and the WIPO Performances and Phonograms Treaty.").

treaties," thereby recognizing a making-available right in Section 106(3). *See* Peters Statement. Like the many courts that have long recognized that distribution encompasses making copyrighted works available to anyone who wants them, Congress and the Executive Branch have concluded that the Copyright Act creates such a right. Otherwise the United States could not have acceded to the treaties in full. But because the right is long-established, Congress could commit to protecting it. This Court should not overrule those bodies and bring the United States into conflict with its international obligations. *See Lauritzen v. Larsen*, 345 U.S. 571, 578 (1953).[11]

## CONCLUSION

For the foregoing reasons, the motion for a new trial should be denied.

---

[11] As discussed in the amicus brief of the Progress & Freedom Foundation, Congress has also approved seven separate free-trade agreements that require the United States to recognize the making-available right. Congress there relied on presidential statements advising that current U.S. law was sufficient to meet its obligation. PFF Amicus Br. at 8-10 & n. 4.

Respectfully submitted this 30th day of June 2008.

/s/ Timothy M. Reynolds
Timothy M. Reynolds (pro hac vice)
David A. Tonini (pro hac vice)
Andrew B. Mohraz (pro hac vice)
HOLME ROBERTS & OWEN LLP
1700 Lincoln, Suite 4100
Denver, Colorado 80203
Telephone: (303) 861-7000
Facsimile: (303) 866-0200

Felicia J. Boyd (No. 186168)
Leita Walker (No. 387095)
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402-3901
Telephone: (612) 766-7000
Facsimile:  (612) 766-1600

ATTORNEYS FOR PLAINTIFFS