# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

_____

CAPITOL RECORDS INC.,
a Delaware corporation;
SONY BMG MUSIC ENTERTAINMENT,
a Delaware general partnership;
ARISTA RECORDS LLC,
a Delaware limited liability company;
INTERSCOPE RECORDS,
a California general partnership;
WARNER BROS. RECORDS INC.,
a Delaware corporation; and
UMG RECORDINGS, INC.,
a Delaware corporation;

          Plaintiffs,


v.                                        **MEMORANDUM OF LAW & ORDER**
                                          Civil File No. 06-1497 (MJD/RLE)


JAMMIE THOMAS,

          Defendant.

_____

Donald B. Verrilli, Jr., Jenner & Block; Andrew B. Mohraz, David A. Tonini, and Timothy M. Reynolds, Holme Roberts & Owen, LLP; and Felicia J. Boyd, Kara L. B. Barrow, and Mary Andreleita Walker, Faegre & Benson LLP; Counsel for Plaintiffs

Brian N. Toder and Bryan L. Bleichner, Chestnut & Cambronne, PA, Counsel for Defendant.

Dockets.Justia.com

Adam D. Kirschner, United States Department of Justice, and Gregory G. Brooker, Assistant United States Attorney, Counsel for Intervenor United States of America.

Corynne McSherry, Electronic Frontier Foundation, and Rachel C. Hughey, Carlson Caspers Vandenburgh & Lindquist, Counsel for Amicus Electronic Frontier Foundation.

Prentiss E. Cox, University of Minnesota Law School, Counsel for Amicus Copyright Law Professors.

Carl E. Christensen, Christensen Law Office, PLLC, Counsel for Amicus The Intellectual Property Institute at William Mitchell College of Law.

Christine L. Nessa and Marie L. van Uitert, Oppenheimer Wolff & Donnelly LLP, and Eleanor M. Lackman and Robert Alan Garrett, Arnold & Porter LLP, Counsel for Amicus Motion Picture Association of America, Inc.

Tracey Holmes Donesky, Leonard Street and Deinard, PA, Counsel for Amicus The Progress & Freedom Foundation.

_____

## I.     INTRODUCTION

This matter is before the Court on Defendant's Motion for New Trial, or in

the Alternative, for Remittitur.  [Docket No. 109]  Defendant Jammie Thomas

asserts that the amount of the statutory damages award is excessive and in

violation of the due process clause of the United States Constitution.  Also before

the Court is Plaintiffs' Motion to Amend Judgment.  [Docket No. 116]  The Court

2

has sua sponte raised the issue of whether it erred in instructing the jury that making sound recordings available for distribution on a peer-to-peer network, regardless of whether actual distribution was shown, qualified as distribution under the Copyright Act. [Docket No. 139] The Court heard oral argument on August 4, 2008.

## II.    BACKGROUND

Plaintiffs are recording companies that owned or controlled exclusive rights to copyrights in sound recordings, including 24 at issue in this lawsuit. On April 19, 2006, Plaintiffs filed a Complaint against Defendant Jammie Thomas alleging that she infringed Plaintiffs' copyrighted sound recordings pursuant to the Copyright Act, 17 U.S.C. §§ 101, 106, 501-505, by illegally downloading and distributing the recordings via the online peer-to-peer file sharing application known as Kazaa. Plaintiffs sought injunctive relief, statutory damages, costs, and attorney fees.

Trial on this matter began on October 2, 2007. The jury instruction regarding the definition of distribution under the Copyright Act was submitted as Plaintiffs' Proposed Jury Instruction No. 8. Thomas opposed inclusion of the instruction. After argument by the parties, the Court decided to give Plaintiffs'

proposed jury instruction number 8, which became final Jury Instruction No. 15.

In Jury Instruction No. 15, the Court instructed: "The act of making copyrighted sound recordings available for electronic distribution on a peer-to-peer network, without license from the copyright owners, violates the copyright owners' exclusive right of distribution, regardless of whether actual distribution has been shown."

On October 4, 2007, the jury found that Thomas had willfully infringed on all 24 of Plaintiffs' sound recordings at issue, and awarded Plaintiffs statutory damages in the amount of $9,250 for each willful infringement. [Docket No. 100] On October 5, the Court entered judgment on the jury's verdict. [Docket No. 106]

On October 15, Defendant filed a Motion for New Trial, or in the Alternative, for Remittitur, based solely on the issue of the constitutionality of the Copyright Act's statutory damages provision in the case. [Docket No. 109]

On October 19, Plaintiffs filed an unopposed Motion to Amend Judgment [Docket No. 116] asking that the Court enter an injunction barring Thomas from further infringement and requiring Thomas to destroy all infringing copies of Plaintiffs' sound recordings in her possession.

On May 15, 2008, the Court issued an Order stating that it was

contemplating granting a new trial on the grounds that it had committed a manifest error of law in giving Jury Instruction No. 15. [Docket No. 139] The Court ordered the parties to brief the issue and also permitted the filing of amicus briefs. Five parties sought and gained permission to file amicus briefs: the Electronic Frontier Foundation, Public Knowledge, United States Internet Industry Association, and Computer & Communications Industry Association; the Copyright Law Professors; The Intellectual Property Institute at William Mitchell College of Law; the Motion Picture Association of America, Inc.; and The Progress & Freedom Foundation.

## III.  DISCUSSION

### A.  Standard for Motion for a New Trial

"After giving the parties notice and an opportunity to be heard, the court may grant a timely motion for a new trial for a reason not stated in the motion." Fed. R. Civ. P. 59(d). After Thomas filed a timely motion for a new trial, the Court gave the parties notice of the possible alternative grounds for a new trial. The Court accepted additional briefing by the parties and by amici and also heard oral argument on Jury Instruction No. 15. Under Rule 59, the Court has the power to grant a new trial on the alternative grounds.

The authority to grant a new trial is within the discretion of the district court. Federal Rule of Civil Procedure 59 confirms the trial court's historic power to grant a new trial based on its appraisal of the fairness of the trial and the reliability of the jury's verdict. A new trial is appropriate when the first trial, through a verdict against the weight of the evidence, an excessive damage award, or legal errors at trial, resulted in a miscarriage of justice. [The appellate court] review[s] the trial court's denial of a new trial under an abuse of discretion standard.

Gray v. Bicknell, 86 F.3d 1472, 1480-81 (8th Cir. 1996) (citations omitted).

"In reviewing a substantive challenge to jury instructions, the pertinent query is whether the instructions, taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury." Horstmyer v. Black & Decker, (U.S.), Inc., 151 F.3d 765, 771 (8th Cir. 1998) (citation omitted). "The key question is whether a new trial should have been granted to avoid a miscarriage of justice." Harrison v. Purdy Bros. Trucking Co., Inc., 312 F.3d 346, 351 (8th Cir. 2002) (citation omitted).

**B. Prejudicial Effect of Any Error of Law**

**1. Standard**

Thomas argues that if the Court erred in giving Jury Instruction No. 15, it must grant a new trial because the Special Verdict Form did not specify whether the jurors had found an actual distribution or not. Therefore, the jurors might

have found that Thomas infringed by making a copyrighted song available even if there was no actual distribution.  Plaintiffs assert that, even if the Court erred in its instruction, that error had no effect on the jury verdict because Thomas violated the reproduction right and because Plaintiffs proved that their agent, MediaSentry, downloaded songs from Thomas.

The Court "will reverse a jury verdict only if the erroneous instruction affected a party's substantial rights, and thus a new trial is necessary only when the errors misled the jury or had a probable effect on the jury's verdict."  Slidell, Inc. v. Millenium Inorganic Chems., Inc., 460 F.3d 1047, 1054 (8th Cir. 2006) (citation omitted).  "[W]hen it is impossible to know, in view of the general verdict returned, whether the jury imposed liability on a permissible or an impermissible ground, the judgment must be reversed . . . ."  Exxon Shipping Co. v. Baker, 128 S. Ct. 2605, 2615 n.3 (2008) (citation omitted).

### 2.    Reproduction Right

Plaintiffs argue that regardless of the correctness of Jury Instruction No. 15, Plaintiffs had an indisputably valid reproduction claim, so even an erroneous instruction did not mislead the jury or prejudice Thomas.

The Special Verdict Form provides no insight as to whether the jurors

found Thomas liable because of Jury Instruction No. 14, dealing with Plaintiffs'
reproduction right, or because of Jury Instruction No. 15, dealing with Plaintiffs'
distribution right. The Court cannot know whether the jury reached its verdict
on permissible or impermissible grounds. Additionally, even if Thomas were
liable under the reproduction right, there is no way for the Court to determine if
the jury would have granted the same high statutory damage award based solely
on violation of the reproduction right.

### 3.     Distribution to MediaSentry

The parties agree that the only evidence of actual dissemination of
copyrighted works was that Plaintiffs' agent, MediaSentry, copied songs.
Plaintiffs argue that even if distribution requires an actual transfer, the trial
evidence established transfers of copyrighted works to MediaSentry. Thomas
retorts that dissemination to an investigator acting as an agent for the copyright
owner cannot constitute infringement.

"It is well-established that the lawful owner of a copyright cannot infringe
its own copyright." Olan Mills, Inc. v. Linn Photo Co., 23 F.3d 1345, 1348 (8th
Cir. 1994) (citation omitted). However, the Eighth Circuit holds that a copyright
owner's authorization of an investigator to pursue infringement does "not

authorize the investigator to validate [the third party's] unlawful conduct." Id.

"Indeed, the investigator's assignment [i]s part of [the copyright owner's]

attempt to stop . . . infringement." Id. See also RCA/Ariola Int'l, Inc. v. Thomas

& Grayston Co., 845 F.2d 773, 781-82 (8th Cir. 1988) (holding retailer liable for

actively assisting in reproduction of copyrighted works at request of authorized

investigative agent of copyright owners); Atl. Recording Corp. v. Howell, 554 F.

Supp. 2d 976, 985 (D. Ariz. 2008) ("'[T]he investigator's assignment was part of

[the recording companies'] attempt to stop [Howell's] infringement,' and

therefore the 12 copies obtained by MediaSentry are unauthorized.") (quoting

Olan Mills, 23 F.3d at 1348).

Plaintiffs further argue that even if the law required a defendant's active

involvement in making distributions, Thomas is liable because she took the active

steps of willfully reproducing copyrighted works without authorization and

affirmatively choosing to place them in a shared folder making them available to

anyone who wanted them on a computer network dedicated to the illegal

distribution of copyrighted works.

Thomas's supporters argue that this case is unique because, here,

MediaSentry completed the actual downloading of the copies of the works at

issue. She asserts that she did not significantly participate in any distribution to MediaSentry, so she cannot be liable. In Olan Mills, it was the defendant, not the investigator, who made the copies. The appellate court explained:

> The investigator in this case merely approached Linn Photo in a conventional manner and offered Linn Photo an opportunity to infringe upon four clearly marked copyrights. Olan Mills did not authorize the investigator to validate Linn Photo's unlawful conduct. Indeed, the investigator's assignment was part of Olan Mills' attempt to stop Linn Photo's infringement. Accordingly, the copies made by Linn Photo at the request of the investigator were copyright violations.

Olan Mills, 23 F.3d at 1348.

Thomas asserts that RCA/Ariola is inapposite because the defendant "retailers had substantial participation in the infringements in this case and [the defendants] were vicariously liable for retailers' acts." RCA/Ariola, 845 F.2d at 779. In that case, the defendants asserted that the district court erred in holding them to be direct infringers. The Eighth Circuit responded:

> This argument ignores the most obvious basis for holding the retailers liable: the retailers' employees actively assisted in copying the protected material by inspecting the copyrighted tape and selecting a blank tape of the proper length to copy the protected work and by actually operating the machine. This sort of direct participation in the illegal copying . . . has been held the basis for direct liability. The retailers' employees did more than simply supply tape . . . ; the retailers here also picked the proper tape to

reproduce a particular copyrighted work.  They did more than
demonstrate the machine . . . ; here, the employees helped the
customers copy a whole tape, not just enough to demonstrate
operation of the machine, and the customers kept the tape, rather
than erasing it.

RCA/Ariola, 845 F.2d at 781 (citations omitted).  Thomas concludes that the

defendants in RCA/Ariola did more than make copyrighted songs available.

They sold blank disks to the customers and physically assisted in the making and

transfer of copyrighted works.  Thomas argues that, in this case, the copying was

done by someone who had never met or heard of Thomas.

　　　　The Court holds that distribution to MediaSentry can form the basis of an

infringement claim.  Eighth Circuit precedent clearly approves of the use of

investigators by copyright owners.  While Thomas did not assist in the copying

in the same manner as the retail defendant in Olan Mills – by actually completing

the copying for the investigator – or as the retail defendants in RCA/Ariola – by

assisting in selecting the correct tape on which to record and helping customers

copy – she allegedly did assist in a different, but substantial manner.  Plaintiffs

presented evidence that Thomas, herself, provided the copyrighted works for

copying and placed them on a network specifically designed for easy,

unauthorized copying.  These actions would constitute more substantial

participation in the infringement than the actions of the defendants in the Eighth Circuit cases who merely assisted in copying works provided by the investigators.

Although the Court holds that distribution to an investigator, such as MediaSentry, can constitute unauthorized distribution, in light of Jury Instruction No. 15, it is impossible to determine upon which basis the jury entered its verdict or how the erroneous jury instruction affected the jury's damage calculation. Therefore, if the Court determines that Jury Instruction No. 15 was incorrect, it will grant a new trial.

## C.    Statutory Framework

The Copyright Act provides that "the owner of copyright under this title has the exclusive rights to do and to authorize any of the following: . . . (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106(3). The Act does not define the term "distribute."

Courts have split regarding whether making copyrighted materials available for distribution constitutes distribution under § 106(3). The parties address four main arguments regarding the validity of the "making-available"

interpretation: 1) whether the plain meaning of the term "distribution" requires actual dissemination of the copyrighted work; 2) whether the term "distribution" is synonymous with the term "publication," which, under the Copyright Act, does not require actual dissemination or transfer; 3) whether a defendant can be primarily liable for authorizing dissemination; and 4) whether U.S. treaty obligations and executive and legislative branch interpretations of the Copyright Act in relation to those obligations require a particular interpretation of the term "distribution."

### D.     Plain Meaning of the Term "Distribution"

There is a "strong presumption that the plain language of the statute expresses congressional intent [that] is rebutted only in rare and exceptional circumstances." United States v. Clintwood Elkhorn Mining Co., 128 S. Ct. 1511, 1518 (2008) (citations omitted).  Each party asserts that the Court should adopt the plain meaning of the term "distribution;" however, they disagree on what that plain meaning is.  Thomas and her supporters argue that the plain meaning of the statute compels the conclusion that merely making a work available to the public does not constitute a distribution.  Instead, a distribution only occurs when a defendant actually transfers to the public the possession or ownership of

copies or phonorecords of a work. Plaintiffs and their supporters assert that making a work available for distribution is sufficient.

### 1. Statutory Language

Starting with the language in § 106(3), the Court notes that Congress explains the manners in which distribution can be effected: sale, transfer of ownership, rental, lease, or lending. The provision does not state that an offer to do any of these acts constitutes distribution. Nor does § 106(3) provide that making a work available for any of these activities constitutes distribution. An initial reading of the provision at issue supports Thomas's interpretation.

### 2. Secondary Sources

The ordinary dictionary meaning of the word "distribute" necessarily entails a transfer of ownership or possession from one person to another. See, e.g., Merriam-Webster's Collegiate Dictionary (10th ed. 1999) (defining "distribute" as, among other things, "1: to divide among several or many: APPORTION . . . 2 . . . b: to give out or deliver esp. to members of a group").

Additionally, the leading copyright treatises conclude that making a work available is insufficient to establish distribution. See, e.g., 2-8 Nimmer on Copyright, § 8.11[A] (2008); 4 William F. Patry, Patry on Copyright, § 13.11.50

(2008).

### 3.  Opinion of the Register of Copyrights

Register of Copyrights, Marybeth Peters, has opined to Congress that

making a copyrighted work available violates the distribution right.  <u>See, e.g.</u>,

Letter from Marybeth Peters, Register of Copyrights, to Rep. Howard L. Berman,

Rep. from the 28th Dist. of Cal. (Sept. 25, 2002) ("[M]aking [a work] available for

other users of [a] peer to peer network to download . . . constitutes an

infringement of the exclusive distribution right, as well as the production right."),

<u>quoted in</u> <u>Motown Record Co., LP v. DePietro</u>, No. 04-CV-2246, 2007 WL 576284,

at *3 n.38 (E.D. Pa. Feb. 16, 2007) (unpublished).  However, opinion letters from

the Copyright Office to Congress on matters of statutory interpretation are not

binding and are "entitled to respect insofar as they are persuasive."  <u>Broadcast</u>

<u>Music, Inc. v. Roger Miller Music, Inc.</u>, 396 F.3d 762, 778 (6th Cir. 2005) (citation

omitted).

### 4.  Use of the Term in Other Provisions of the U.S. Code

As Plaintiffs note, in other provisions of federal copyright law, Congress

has explicitly defined "distribute" to include offers to distribute.  <u>See</u> 17 U.S.C.

§ 901(a)(4) (stating, in context of copyright protection of semiconductor chip

products, that "to 'distribute' means to sell, or to lease, bail, or otherwise transfer, or to offer to sell, lease, bail, or otherwise transfer"); 17 U.S.C. § 506(a)(1)(C) (imposing criminal penalties for "the distribution of a work being prepared for commercial distribution, by making it available on a computer network accessible to members of the public"). In other portions of the Copyright Act, Congress has explicitly confined the term "distribution" to a physical transfer of copyrighted material. For example, in the section of the Act providing compulsory licenses for nondramatic musical works, Congress provides: "For this purpose, and other than as provided [in Section 115(c)(3)], a phonorecord is considered 'distributed' if the person exercising the compulsory license has voluntarily and permanently parted with its possession." 17 U.S.C. § 115(c)(2).

The differing definitions of "distribute" within copyright law demonstrate that there is not one uniform definition of the term throughout copyright law. Cf. Firstar Bank, N.A. v. Faul, 253 F.3d 982, 990 (7th Cir. 2001) (noting that "identical words used in different parts of the same act are intended to have the same meaning") (citation omitted). However, the Court notes that when Congress intends distribution to encompass making available or offering to transfer, it has demonstrated that it is quite capable of explicitly providing that definition within

the statute. In this case, Congress provided the means by which a distribution occurs – "by sale or other transfer of ownership, or by rental, lease, or lending" – without also providing that a distribution occurs by an offer to do one of those actions, as it did in § 901(a)(4). While the Copyright Act does not offer a uniform definition of "distribution," the Court concludes that, in light of the examined provisions, Congress's choice to not include offers to do the enumerated acts or the making available of the work indicates its intent that an actual distribution or dissemination is required in § 106(3).

Plaintiffs and their supporters also urge the Court to consider an entirely separate title of the U.S. Code, Title 18, addressing criminal penalties for distribution of child pornography. In that context, the term "distribute" has been interpreted to include placing the material on a shared folder of a peer-to-peer network. See, e.g., United States. v. Shaffer, 472 F.3d 1219, 1223-24 (10th Cir. 2007) (interpreting term "distribute" in 18 U.S.C. § 2252A(a)(2) to include placing child pornography in Kazaa folder and freely allowing others to access and download the files). The criminal statute regarding distribution of child pornography is unrelated to the Copyright Act. The Court does not find the comparison to criminal law persuasive. When the definition of "distribute"

varies within the Copyright Act itself, the Court is not convinced that a criminal statute addressing child pornography should carry weight. Moreover, in <u>Shaffer</u>, the court noted that there was, in fact, evidence that the defendant "<u>knew</u> other people had downloaded child pornography from his shared folder." <u>Id.</u> at 1224. Additionally, while there is no liability for an attempt to infringe under the Copyright Act, there is corresponding liability for attempted distribution in the criminal context. <u>See</u> 18 U.S.C. § 2252A (b)(1) (providing penalties for "[w]hoever violates, or attempts or conspires to violate" the distribution prohibition).

The Court does not find the definitive interpretation of the term "distribute" in other titles of the U.S. Code. However, the Court does note that, while Congress has not added "offer to distribute" to § 106(3) of the Copyright Act, it has added "offers to sell" in the related field of patent law. 35 U.S.C. § 271(a). <u>See also</u> <u>Eldred v. Ashcroft</u>, 537 U.S. 186, 201-02 (2003) (citing patent practice as persuasive precedent in a copyright case). Before Congress amended the Patent Act to expressly include "offers to sell," courts strictly interpreted the statutory language, which expressly forbade sales but not offers to sell, as requiring proof of an actual sale. <u>Rotec Indus. v. Mitsubishi Corp.</u>, 215 F.3d 1246, 1251 (Fed. Cir. 2000). Court and congressional actions with regard to the Patent

Act demonstrate two principles: 1) in the absence of a statutory definition that explicitly includes or excludes offers to sell or distribute, courts interpret liability narrowly to not include offers; and 2) Congress can and will amend a statute, when necessary, to explicitly include liability for an offer to do a prohibited act.

The Court's examination of the use of the term "distribution" in other provisions of the Copyright Act, as well as the evolution of liability for offers to sell in the analogous Patent Act, lead to the conclusion that the plain meaning of the term "distribution" does not including making available and, instead, requires actual dissemination. The Court now turns its attention to Plaintiffs' additional arguments regarding the existence of a making-available right.

### E.     Whether "Distribution" Is Synonymous with "Publication"

Plaintiffs advocate that, within the Copyright Act, the term "distribution" is synonymous with the term "publication."

> "Publication" is the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication. A public performance or display of a work does not of itself constitute publication.

17 U.S.C. § 101. Under this definition, making sound recordings available on

19

Kazaa could be considered distribution.

The first sentence of the definition of "publication" and § 106(3) are substantially identical. However, there is additional language in the definition of "publication." Relying primarily on legislative history, Plaintiffs assert that the sentence defining publication as "[t]he offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display" should also apply to the definition of distribution.

Plaintiffs note that the text of § 106 grants a copyright owner the following five exclusive rights: "(1) to reproduce the copyrighted work . . . (2) to prepare derivative works . . . (3) to distribute copies of the work . . . (4) . . . to perform the copyrighted work publicly; and (5) . . . to display the work publicly." 17 U.S.C. § 106. However, the House and Senate Committees evaluating the Copyright Act, described the following five rights: "the exclusive rights of reproduction, adaptation, publication, performance, and display." Elektra Entm't Group, Inc. v. Barker, 551 F. Supp. 2d 234, 241 (S.D.N.Y. 2008) (quoting H.R. Rep. No. 94-1476, at 61 (1976); S. Rep. No. 94-473, at 57 (1976)) (emphasis added in Barker). The Committee Reports identified the "Rights of Reproduction, Adaptation, and

Publication" as "[t]he first three clauses of section 106."  Id. (quoting H.R. Rep. at

61; S. Rep. at 57).  Also, the House Committee Report stated that § 106(3)

"'establishes the exclusive right of publication' and governs 'unauthorized public

distribution' – using the words 'distribution' and 'publication' interchangeably

within a single paragraph."  Id. (citing H.R. Rep. at 62; S. Rep. at 58).  The Court

does not find these snippets of legislative history to be dispositive of the

definition of distribution.  Nowhere in this legislative history does Congress state

that distribution should be given the same broad meaning as publication.  In any

case, even if the legislative history indicated that some members of Congress

equated publications with distributions under § 106(3), that fact cannot override

the plain meaning of the statute.

Amici assert that the Supreme Court has held that the § 106(3) distribution

right includes publication as defined in § 101.  In Harper & Row Publishers, Inc.

v. Nation Enterprises, the Supreme Court examined the extent of the fair use

exception to the right of first publication under the Copyright Act.  471 U.S. 539

(1985).  It explained that the Copyright Act "recognized for the first time a

distinct statutory right of first publication."  Id. at 552.  In that discussion, the

Supreme Court quoted the Report of the House Committee on the Judiciary,

which stated: "Clause (3) of section 106, establishes the exclusive right of publication . . . .  Under this provision the copyright owner would have the right to control the first public distribution of an authorized copy . . . of his work." Id. at 552 (ellipsis in original) (quoting H.R. Rep. No. 94-1476, at 62 (1976), 1976 U.S.C.C.A.N. 5659, 5675).

In Harper & Row, the Supreme Court narrowly addressed the issue of first publication.  It did not discuss the meaning of the term distribution; nor did it discuss publication or distribution in general.  Elsewhere within the Harper & Row opinion, the Supreme Court used language that recognized that publication and distribution are two distinct concepts.  For instance, it wrote, "Section 106 of the Copyright Act confers a bundle of exclusive rights to the owner of the copyright.  Under the Copyright Act, these rights – to **publish**, copy, and **distribute** the author's work – vest in the author of an original work from the time of its creation.  § 106." Id. at 546-47 (emphasis added) (footnote omitted).  If Harper & Row stood for the proposition that publication and distribution were synonymous, then the Supreme Court would not have named the right to "publish" as a right separate from the right to "distribute."  This Court concludes that the Harper & Row opinion does not hold that publication and distribution

are synonymous.

A review of the Copyright Act as a whole also supports the conclusion that publication and distribution remain distinct concepts. Publication still triggers certain consequences such as a duty to deposit copies of the work with the Copyright Office, 17 U.S.C. § 407(a), and the calculation of the date of copyright termination for works made for hire, anonymous, and pseudonymous works, § 302(c).

The Court concludes that simply because all distributions within the meaning of § 106(3) are publications does not mean that all publications within the meaning of § 101 are distributions. The statutory definition of publication is broader than the term distribution as used in § 106(3). A publication can occur by means of the "distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease or lending." § 101. This portion of the definition of publication defines a distribution as set forth in § 106(3). However, a publication may **also** occur by "offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display." § 101. While a publication effected by distributing copies or phonorecords of the work is a distribution, a publication

effected by merely offering to distribute copies or phonorecords to the public is merely an offer of distribution, not an actual distribution.

Congress's choice to use both terms within the Copyright Act demonstrates an intent that the terms have different meanings.  "It is untenable that the definition of a different word in a different section of the statute was meant to expand the meaning of 'distribution' and liability under § 106(3) to include offers to distribute."  <u>Atl. Recording Corp. v. Howell</u>, 554 F. Supp. 2d 976, 985 (D. Ariz. 2008).  The language of the Copyright Act definition of publication clearly includes distribution as part of its definition – so all distributions to the public are publications, but not all publications are distributions to the public.

### F.     Existence of a Protected Right to Authorize Distribution

Plaintiffs and their supporters also take the position that authorizing distribution is an exclusive right protected by the Copyright Act.  They base this argument on the fact that § 106 states "the owner of copyright under this title has the exclusive rights **to do** and **to authorize** any of the following . . . (3) to distribute . . . ." (emphasis added).  Plaintiffs claim that the statute grants two separate rights – the right to "do" distribution and the right to "authorize" distribution.  Therefore, making sound recordings available on Kazaa violates the

copyright owner's exclusive right to authorize distribution.

The Court concludes that the authorization clause merely provides a statutory foundation for secondary liability, not a means of expanding the scope of direct infringement liability.  See H.R. Rep. 94-1476, at 61 (1976), 1976 U.S.C.C.A.N. 5659, 5674 ("Use of the phrase 'to authorize' is intended to avoid any questions as to the liability of contributory infringers.  For example, a person who lawfully acquires an authorized copy of a motion picture would be an infringer if he or she engages in the business of renting it to others for purposes of unauthorized public performance."); Venegas-Hernandez v. ACEMLA, 424 F.3d 50, 58 (1st Cir. 2005) (holding that authorize language merely applies to contributory infringement and relying on legislative history and previous case law); Subafilms, Ltd. v. MGM-Pathe Commc'ns Co., 24 F.3d 1088, 1093 (9th Cir. 1994) (en banc) (holding that "'to authorize' [wa]s simply a convenient peg on which Congress chose to hang the antecedent jurisprudence of third party liability") (citation omitted).  Without actual distribution, there can be no claim for authorization of distribution.  See, e.g., Latin Amer. Music Co. v. Archdiocese of San Juan, 499 F.3d 32, 46 (1st Cir. 2007) ("[T]o prove infringement, a claimant must show an infringing act after the authorization.") (citation omitted).

Equating making available with distribution would undermine settled case law holding that merely inducing or encouraging another to infringe does not, alone, constitute infringement unless the encouraged party actually infringes. See, e.g., Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 936-37 (2005) ("[O]ne who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable **for the resulting acts of infringement** by third parties.") (emphasis added). If simply making a copyrighted work available to the public constituted a distribution, even if no member of the public ever accessed that work, copyright owners would be able to make an end run around the standards for assessing contributor copyright infringement.

The Court also rejects Plaintiffs' assertion that its interpretation is foreclosed by the Supreme Court's opinion in New York Times Co. v. Tasini, 533 U.S. 483 (2001). In Tasini, the plaintiffs were freelance authors who sold their copyrighted articles to the defendant print newspaper publishers under contracts that did not provide for placement of the articles in electronic databases. The defendants later licensed and provided copies of the freelance articles to electronic publishers who placed the articles in their electronic databases that

26

were available to subscribers.  The Supreme Court examined whether the

privilege permitting the publisher of a collective work to reproduce and

distribute the contributing authors' works "as part of . . . [a] revision of that

collective work" applied.  17 U.S.C. § 201(c).  The Supreme Court concluded that

the privilege did not apply.  Tasini, 533 U.S. at 506.

Plaintiffs claim that, in Tasini, the Supreme Court held that a violation of

the § 106 right to authorize is not limited to contributory infringement.  The

Supreme Court noted that the plaintiffs had not made any contributory

infringement claims.  Id. at 504.  See also Tasini v. New York Times Co., 972 F.

Supp. 804, 809 n.3 (S.D.N.Y. 1997) ("Plaintiffs do not advance the distinct claim

that defendants are contributorily liable for potential copyright infringement by

users of the disputed electronic services.") (citation omitted).  Although there was

no claim for contributory infringement, the Supreme Court stated:

> We conclude that the Electronic Publishers infringed the Authors'
> copyrights by reproducing and distributing the Articles in a manner
> not authorized by the Authors and not privileged by § 201(c).  We
> further conclude that the Print Publishers infringed the Authors'
> copyrights by authorizing the Electronic Publishers to place the
> Articles in the Databases and by aiding the Electronic Publishers in
> that endeavor.

533 U.S. at 506.  See also id. at 498 ("[T]he Print Publishers, through contracts

licensing the production of copies in the Databases, 'authorize' reproduction and distribution of the Articles, § 106.") (footnote omitted).  However, the Supreme Court's <u>Tasini</u> opinion recounts no indication of evidence in the case that any particular user had actually downloaded any of the copies of the articles.

While, in isolation, the language cited by Plaintiffs could be construed to indicate the Supreme Court's approval of an independent right to authorize, the Court concludes that, as a whole, the <u>Tasini</u> opinion dispels that interpretation.

The Supreme Court noted that the Electronic Publishers had "exercised" the distribution right "by selling copies of the Articles through the NEXIS Database, [thus] distribut[ing] copies of the Articles to the public by sale" and that the Print Publishers had exercised exclusive rights "through contracts licensing the production of copies in the Databases, [thus] authoriz[ing] reproduction and distribution of the Articles."  533 U.S. at 498 (citations omitted). However, these statements do not presuppose that the Articles were offered to the public but not downloaded or that the Print Publishers were directly liable for making available the Articles to the public.  Rather, the Supreme Court was generally discussing the multiple exclusive rights that are violated in the general scenario in which the Print Publisher provides copies of the Articles to the

Electronic Publishers, who distribute those copies to the public, who then download the copies themselves. When the Supreme Court defined the specific legal issue in the case and when it made its holding, it made clear that the primary liability by the Print Publishers, which occurred without any proof of actual dissemination to the public, was the violation of the reproduction right, 17 U.S.C. § 106(1).

The Supreme Court clearly stated the legal issue before it: "We granted certiorari to determine whether the **copying** of the Author's Articles in the Databases is privileged by 17 U.S.C. § 201(c)." 533 U.S. at 493 (emphasis added). The district court opinion clarified that the plaintiffs alleged a violation of the reproduction right by the placement of copies of their articles in the electronic databases: "Plaintiffs complain that the electronic reproductions of their articles, on NEXIS and on disc, directly infringe their copyrights. They seek to hold defendants contributorily liable only to the extent that defendants have cooperated with one another in creating these allegedly infringing works." Tasini, 972 F. Supp. at 809 n.3. The Supreme Court emphasized the copying violations that occurred in violation of the exclusive right to reproduction: "The Electronic Publishers . . . are selling copies of the Articles. And, as we have

explained, it is the copies themselves, without any manipulation by users, that fall outside the scope of the § 201(c) privilege." <u>Tasini</u>, 533 U.S. at 504. These passages support the conclusion that when the Supreme Court wrote "that the Print Publishers infringed the Authors' copyrights by authorizing the Electronic Publishers to place the Articles in the Databases and by aiding the Electronic Publishers in that endeavor," it was not recognizing an independent authorization right. <u>Id.</u> at 506. Instead, it was recognizing that the Print Publishers were directly liable for aiding in the reproduction of the articles for their use by the Electronic Publishers. As the Supreme Court explicitly held: "In agreement with the Second Circuit, we hold that § 201(c) does not authorize the **<u>copying</u>** at issue here." <u>Id.</u> at 488 (emphasis added).

The Court concludes that the text of § 106, case law, and legislative history clearly indicate that the authorization right is a means for secondary liability, which only applies if there is an actual dissemination.

### G. Eighth Circuit Precedent: <u>National Car Rental System, Inc. v. Computer Associates International, Inc.</u>

Although the Eighth Circuit Court of Appeals has not addressed the specific question of whether making a sound recording available for distribution

is the equivalent of distribution, the appellate court has, in fact, addressed and rejected the making-available argument. In <u>National Car Rental System, Inc. v. Computer Associates International, Inc.</u>, the Eighth Circuit addressed whether a claim that National Car Rental System, Inc. ("National") had violated its license agreement with Computer Associates International, Inc. ("CA") by using a licensed computer program to process data for other companies was preempted by the Copyright Act. 991 F.2d 426, 430-31 (8th Cir. 1993). In order to answer this question, the Eighth Circuit addressed "whether CA's allegation that National breached their contract by using the program in a fashion not allowed under the contract protects a right equivalent to one of the exclusive copyright rights." <u>Id.</u> The Eighth Circuit concluded "that the contractual restriction on use of the programs constitutes an additional element making this cause of action not equivalent to a copyright action." <u>Id.</u> at 432.

National argued that "an allegation that it used the program for another is in fact an allegation that it distributed the 'functionality' of the program." <u>Id.</u> at 434. It concluded that, therefore, the claim would be preempted because it would protect a right equivalent to one of the exclusive rights in copyright. The Eighth Circuit rejected this argument, reasoning, among other things:

> [E]ven with respect to computer software, the distribution right is only the right to distribute *copies* of the work. As Professor Nimmer has stated, "[i]nfringement of [the distribution right] requires an actual dissemination of either copies or phonorecords." 2 Nimmer on Copyright § 8.11[A], at 8-124.1.

Id. at 434. Therefore, making the programs available for use for third parties did not constitute distribution.

The National Car Rental decision is the binding law of the Eighth Circuit on the meaning of § 106(3) and has been relied upon by numerous district courts in the peer-to-peer network downloading context. See, e.g., Atl. Recording Corp. v. Howell, 554 F. Supp. 2d 976, 981 (D. Ariz. 2008) ("The general rule, supported by the great weight of authority, is that 'infringement of [the distribution right] requires an actual dissemination of either copies or phonorecords.'") (quoting Nat'l Car Rental, 991 F.2d at 434); London-Sire Records, Inc. v. Doe 1, 542 F. Supp. 2d 153, 167 (D. Mass. 2008) (characterizing the holding of National Car Rental as "stating that infringement of the distribution right requires the actual dissemination of copies or phonorecords").

While the Eighth Circuit did provide multiple reasons for its holding that National did not distribute functionality, one of those grounds was that distribution required actual dissemination of a copy. Therefore, the statement

that "[i]nfringement of [the distribution right] requires an actual dissemination of either copies or phonorecords" is not dictum. Moreover, as the Court has already determined, the Eighth Circuit's holding is consistent with the only reasonable interpretation of § 106(3).

Amici argue that, even if the Court does follow National Car Rental, it should find that a defendant who makes copyrighted works available for file-sharing over a peer-to-peer network should be deemed to have satisfied any requirement of actual dissemination of copies or phonorecords. Amici argue that this rule is appropriate because peer-to-peer infringers use technology specifically configured not to retain direct evidence of wrongdoing, making proof of actual dissemination difficult. This argument is based on the Fourth Circuit decision of Hotaling v. Church of Jesus Christ of Latter-Day Saints, 118 F.3d 199 (4th Cir. 1997).

### H.      Hotaling v. Church of Jesus Christ of Latter-Day Saints

In Hotaling, the Fourth Circuit held that "a library distributes a published work, within the meaning of the Copyright Act, when it places an unauthorized copy of the work in its collection, includes the copy in its catalog or index system, and makes the copy available to the public." Id. at 201 (citation omitted).

The Fourth Circuit noted, "In order to establish 'distribution' of a copyrighted work, a party must show that an unlawful copy was disseminated 'to the public.'" Id. at 203 (citing, e.g., 17 U.S.C. § 106(3); Nat'l Car Rental, 991 F.2d at 434). In Hotaling, there was no evidence in the record "showing specific instances within the limitations period in which the libraries loaned the infringing copies to members of the public." Id. at 203. The court concluded,

> When a public library adds a work to its collection, lists the work in its index or catalog system, and makes the work available to the borrowing or browsing public, it has completed all the steps necessary for distribution to the public. At that point, members of the public can visit the library and use the work. Were this not to be considered distribution within the meaning of § 106(3), a copyright holder would be prejudiced by a library that does not keep records of public use, and the library would unjustly profit by its own omission.

Id. at 203. As demonstrated by the quotation above, the Fourth Circuit did not analyze any case law to support its conclusion that making the copyrighted materials available for distribution constituted distribution. Nor did it conduct any analysis of § 106(3). Instead, the court was guided by equitable concerns.

Some courts have applied the principle articulated in Hotaling to conclude that merely making a work available for others to download over a peer-to-peer network may constitute a distribution. See, e.g., Warner Bros. Records, Inc. v.

Payne, Civil Action No. W-06-CA-051, 2006 WL 2844415, at *3-4 (W.D. Tex. July 17, 2006) ("Listing unauthorized copies of sound recordings using an online file-sharing system constitutes an offer to distribute those works, thereby violating a copyright owner's exclusive right of distribution. ") (citing, e.g., Hotaling, 118 F.3d at 203).

Amici conclude that Hotaling's deemed distributed liability should apply to peer-to-peer file sharing because a contrary rule would reward infringers who use technology configured to not retain direct evidence of wrongdoing. See Warner Bros. Records, Inc., 2006 WL 2844415, at *3 ("[T]he same evidentiary concerns that were present in Hotaling are also present in a case involving peer-to-peer file sharing programs. As Plaintiffs note, '[p]iracy typically takes place behind closed doors and beyond the watchful eyes of a copyright holder.'") (citations omitted).

National Car Rental, not Hotaling, is binding upon this Court. Moreover, National Car Rental, not Hotaling, is consistent with the logical statutory interpretation of § 106(3), the body of Copyright Act case law, and the legislative history of the Copyright Act. Nonetheless, it is appropriate to note that this Court's rejection of Hotaling in favor of the plain meaning of § 106(3) does not

leave copyright holders without redress.  The specter of impossible-to-meet

evidentiary standards raised by amici is overstated.  A person who makes an

unauthorized copy or phonorecord of a copyrighted work for the purposes of

uploading it onto a peer-to-peer network, absent a defense such as fair use,

violates the reproduction right.  17 U.S.C. § 106(a).  That person might also be

liable for indirect infringement to the extent that her conduct caused others to

engage in unauthorized reproduction, adaptation, public distribution, public

performance, or public display of another's copyrighted work.

The end user who accesses or downloads the unauthorized copy or

phonorecord may be liable for direct infringement, depending on the facts of the

case and the applicability of defenses, such as the fair use defense.  Under certain

circumstances, a person who markets products or services that can enable others

to infringe or to circumvent technological measures that control or restrict access

to copyrighted works also may be liable for indirect infringement or for violation

of the Digital Millennium Copyright Act, 17 U.S.C. §§ 1201(a)(2), (b).

Finally, while the Court does not adopt the deemed-disseminated theory

based on Hotaling, it notes that **direct** proof of actual dissemination is not

required by the Copyright Act.  Plaintiffs are free to employ circumstantial

evidence to attempt to prove actual dissemination. Overall, it is apparent that implementation of Congress's intent through a plain meaning interpretation of § 106(3) will not leave copyright holders without recourse when infringement occurs over a peer-to-peer network.

## I. Implications of International Law

### 1. U.S. Treaty Obligations Regarding the Making-Available Right

The United States is party to the World Intellectual Property Organization ("WIPO") Copyright Treaty ("WCT") and the WIPO Performances and Phonograms Treaty ("WPPT"). S. Rep. No. 105-190, 5, 9 (1998). It is undisputed that the WCT and the WPPT recognize a making-available right that is not dependent on proof that copies were actually transferred to particular individuals. WCT art. 6(1), art. 8; WPPT art. 12(1), art. 14. Additionally, by ratifying and adopting the treaties, the legislative and executive branches indicated that U.S. law complied with the treaties by protecting that making-available right.

Amici also note that the United States has entered various Free Trade Agreements ("FTA") that require the United States to provide a making-available

right.  See, e.g., U.S.-Australia Free Trade Agreement, art. 17.5, May 18, 2004.

## 2. **Charming-Betsy** Doctrine

### a. **Introduction to the Doctrine**

Amici assert that under the Charming-Betsy rule, the Court must adopt

any reasonable interpretation of the Copyright Act that would grant Plaintiffs a

making-available right to ensure that the U.S. complies with its treaty obligations.

The Supreme Court has explained:

> [T]his Court ordinarily construes ambiguous statutes to avoid
> unreasonable interference with the sovereign authority of other
> nations.  This rule of construction reflects principles of customary
> international law – law that (we must assume) Congress ordinarily
> seeks to follow.

F. Hoffmann-La Roche Ltd. v. Empagran S.A., 542 U.S. 155, 164 (2004).  See

Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 118, 2 L. Ed. 208 (1804)

("[A]n act of Congress ought never to be construed to violate the law of nations if

any other possible construction remains. . . .").

### b. **Application of the Doctrine to Non-Self-Executing Treaties**

The WIPO treaties are not self-executing and lack any binding legal

authority separate from their implementation through the Copyright Act.  17

U.S.C. § 104(c), (d); <u>Medellin v. Texas</u>, 128 S Ct. 1346, 1365 (2008) (holding that

non-self-executing treaties do not have binding domestic effect). Therefore, the

fact that the WIPO treaties protect a making-available right does not create an

enforceable making-available right for Plaintiffs in this Court. <u>See, e.g.</u>,

<u>Guaylupo-Moya v. Gonzales</u>, 423 F.3d 121, 137 (2d Cir. 2005) ("This declaration

[that the ICCPR is not self-executing] means that the provisions of the ICCPR do

not create a private right of action or separate form of relief enforceable in United

States courts.") (citations omitted). Rather, the contents of the WIPO treaties are

only relevant insofar as § 106(3) is ambiguous and there is a reasonable

interpretation of § 106(3) that aligns with the United States' treaty obligations.

### c.      Application of the Doctrine in This Case

The Court acknowledges that past Presidents, Congresses, and the Register

of Copyrights have indicated their belief that the Copyright Act implements

WIPO's make-available right. The Court also acknowledges that, given multiple

reasonable constructions of U.S. law, the <u>Charming-Betsy</u> doctrine directs the

Court to adopt the reasonable construction that is consistent with the United

States' international obligations. However, after reviewing the Copyright Act

itself, legislative history, binding Supreme Court and Eighth Circuit precedent,

and an extensive body of case law examining the Copyright Act, the Court

concludes that Plaintiffs' interpretation of the distribution right is simply not

reasonable.  The <u>Charming-Betsy</u> doctrine is a helpful tool for statutory

construction, but it is not a substantive law.  It is always the case that "clear

congressional action trumps customary international law and previously enacted

treaties."  <u>Guaylupo-Moya</u>, 423 F.3d at 136 (holding that it is improper to apply

the <u>Charming-Betsy</u> canon when "the relevant provisions [of domestic law] are

unambiguous").  Here, concern for U.S. compliance with the WIPO treaties and

the FTAs cannot override the clear congressional intent in § 106(3).

**J.      Grant of a New Trial**

Liability for violation of the exclusive distribution right found in § 106(3)

requires actual dissemination.  Jury Instruction No. 15 was erroneous and that

error substantially prejudiced Thomas's rights.  Based on the Court's error in

instructing the jury, it grants Thomas a new trial.  Because the Court grants a new

trial on the basis of jury instruction error, it does not reach Thomas's claim

regarding excessive damages set forth in her motion for a new trial.  Plaintiffs'

request to amend the judgment is denied because the judgment is vacated.

**K.      Need for Congressional Action**

The Court would be remiss if it did not take this opportunity to implore

Congress to amend the Copyright Act to address liability and damages in peer-

to-peer network cases such as the one currently before this Court.  The Court

begins its analysis by recognizing the unique nature of this case.  The defendant

is an individual, a consumer.  She is not a business.  She sought no profit from

her acts.  The myriad of copyright cases cited by Plaintiffs and the Government,

in which courts upheld large statutory damages awards far above the minimum,

have limited relevance in this case.  All of the cited cases involve corporate or

business defendants and seek to deter future illegal commercial conduct.  The

parties point to no case in which large statutory damages were applied to a party

who did not infringe in search of commercial gain.

The statutory damages awarded against Thomas are not a deterrent

against those who pirate music in order to profit.  Thomas's conduct was

motivated by her desire to obtain the copyrighted music for her own use.  The

Court does not condone Thomas's actions, but it would be a farce to say that a

single mother's acts of using Kazaa are the equivalent, for example, to the acts of

global financial firms illegally infringing on copyrights in order to profit in the

securities market.  Cf. Lowry's Reports, Inc. v. Legg Mason, Inc., 271 F. Supp. 2d

737, 741-42 (D. Md. 2003) (describing defendants as a "global financial-services firm" and a corporation that brokers securities).

While the Court does not discount Plaintiffs' claim that, cumulatively, illegal downloading has far-reaching effects on their businesses, the damages awarded in this case are wholly disproportionate to the damages suffered by Plaintiffs. Thomas allegedly infringed on the copyrights of 24 songs - the equivalent of approximately three CDs, costing less than $54, and yet the total damages awarded is $222,000 – more than *five hundred* times the cost of buying 24 separate CDs and more than *four thousand* times the cost of three CDs. While the Copyright Act was intended to permit statutory damages that are larger than the simple cost of the infringed works in order to make infringing a far less attractive alternative than legitimately purchasing the songs, surely damages that are more than one hundred times the cost of the works would serve as a sufficient deterrent.

Thomas not only gained no profits from her alleged illegal activities, she sought no profits. Part of the justification for large statutory damages awards in copyright cases is to deter actors by ensuring that the possible penalty for infringing substantially outweighs the potential gain from infringing. In the case

of commercial actors, the potential gain in revenues is enormous and enticing to potential infringers. In the case of individuals who infringe by using peer-to-peer networks, the potential gain from infringement is access to free music, not the possibility of hundreds of thousands – or even millions – of dollars in profits. This fact means that statutory damages awards of hundreds of thousands of dollars is certainly far greater than necessary to accomplish Congress's goal of deterrence.

Unfortunately, by using Kazaa, Thomas acted like countless other Internet users. Her alleged acts were illegal, but common. Her status as a consumer who was not seeking to harm her competitors or make a profit does not excuse her behavior. But it does make the award of hundreds of thousands of dollars in damages unprecedented and oppressive.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

1. The Court hereby **VACATES** the verdict rendered in this case by the jury and grants Defendant a new trial to commence on a date to be set by the Court after consultation with the parties.

2. The Judgment entered on October 5, 2007 [Docket No. 106] is **VACATED**.

3.    Defendant's Motion for New Trial, or in the Alternative, for Remittitur [Docket No. 109] is **GRANTED** on the grounds set forth in this Memorandum of Law & Order.

4.    Plaintiffs' unopposed Motion to Amend Judgment [Docket No. 116] is **DENIED**.


Dated:   September 24, 2008                    s/Michael J. Davis
                                               Michael J. Davis
                                               Chief Judge
                                               United States District Court